**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE NIELSEN COMPANY (US), LLC, ) <br> ) <br> Plaintiff, ) <br> ) C.A. No. _____ <br> v. ) <br> ) **JURY TRIAL DEMANDED** <br> HYPHAMETRICS, INC., ) <br> ) <br> Defendant. ) | |

**COMPLAINT FOR PATENT INFRINGEMENT**

The Nielsen Company (US), LLC ("Nielsen" or "Plaintiff"), for its Complaint against HyphaMetrics, Inc. ("HyphaMetrics" or "Defendant"), alleges as follows:

**NATURE OF THE ACTION**

1. This is an action for patent infringement brought against Defendant for infringement of United States Patent No. 11,652,901 (the "'901 Patent").

**PARTIES**

2. Nielsen is a limited liability company organized and existing under the laws of the state of Delaware.

3. HyphaMetrics is a corporation organized and existing under the laws of the state of Delaware.

**JURISDICTION AND VENUE**

4. This is an action for patent infringement arising under the Patent Act, 35 U.S.C. §§ 1 *et seq*. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338(a) (action arising under the Patent Act).

5. This Court has personal jurisdiction over Defendant because Defendant is a Delaware corporation.

6.      Venue is proper pursuant to 28 U.S.C. § 1400(b) because Defendant is a Delaware corporation.

## FACTUAL BACKGROUND

7.      Founded in 1923 by Arthur C. Nielsen, Nielsen is the media industry's leading data and analytics company. Nielsen fuels the industry with an accurate understanding of what people watch and listen to.

8.      Measuring across all channels and platforms – from traditional linear television to streaming TV to social media and on-line video/audio platforms – Nielsen helps its clients and partners optimize the value of their marketing investments and growth strategies. Nielsen offers measurement and analytics in nearly 60 countries.

9.      One of the unique features of Nielsen's product and service offerings is the leveraging of panel measurement technologies. More specifically, a cornerstone of Nielsen's media data and analytics business has been its investment in media panels and the related technology to measure those panels. Media panels consist of people allowing Nielsen into their homes to enable first-hand measurement, via audience measurement devices, of their media consumption activities on an ongoing basis. These media panels allow for a true understanding of, not just who is consuming media, but when, why, where, and how much – a truth set, which can be used to improve the accuracy of other messy, "dirty," or fragmented Big Data sets from other sources. Panel measurement can de-duplicate video and audio audiences so Nielsen's customers can know, for example, the difference between a single binge watcher and a family of devotees gathered in the living room watching their favorite programs.

10.     The importance of panel measurement to Nielsen's products and services explains why Nielsen has spent hundreds of millions of dollars on its panel measurement technologies and

capabilities over decades. Knowing exactly who and how many individuals are watching television or consuming media within a particular Nielsen panel-home at a given time is at the core of Nielsen's data and analytics business.

## THE ASSERTED PATENT

11. The '901 Patent, entitled "Systems, Methods, and Apparatus to Identify Media Devices," was duly and legally issued on May 16, 2023. A true and correct copy of the '901 Patent is attached hereto as Exhibit A.

12. Nielsen is the assignee and owner of all right, title, and interest in the '901 Patent.

13. The '901 Patent is valid and enforceable.

14. The '901 Patent relies on a series of continuation applications dating back to U.S. Patent Application Ser. No. 13/931,750, filed on Jun. 28, 2013, and entitled "Systems, Methods, And Apparatus To Identify Media Devices," which claims the benefit of U.S. Provisional Application No. 61/814,782, which is entitled "Systems, Methods, And Apparatus To Identify Media Devices" and was filed on Apr. 22, 2013.

15. The declaration of Paul Martin, Ph.D. ("Martin Decl."), attached as Exhibit B, is incorporated by reference into this Complaint.

16. The '901 Patent relates to, among other things, monitoring network activity, and, more particularly, to systems, methods, and apparatus to identify media devices. In particular, the '901 patent relates to collecting "the viewing, listening, and/or media behavior/interests of audience members and/or the public in general. To collect these behavior/interests, an audience measurement company may enlist panelists (*e.g.*, persons agreeing to be monitored) to cooperate in an audience measurement study for a period of time. The media usage habits of these panelists

as well as demographic data about the panelists is collected and used to statistically determine the size and demographics of an audience." ('901 Patent, 1:45-53.)

17. The invention of the '901 patent relates to collecting data in a household media environment where panelists consume data from a variety of sources over a variety of devices, not just traditional television. (Martin Decl., ¶ 16.) Even though panelist households in the prior art had devices in their homes to monitor some media usage, these devices were not able to monitor the growing variety of media consumption using the broader types of devices on which consumers are now consuming media. (*Id.*) These prior art devices were connected to a television or similar device and were limited to monitoring media consumption only in their immediate physical area and only on one particular device. As the '901 patent explains, "[i]n recent years, more consumer devices have been provided with Internet connectivity and the ability to retrieve media from the Internet. As such, media exposure has shifted away from conventional methods of presentation, such as broadcast television, towards presentation via consumer devices accessing the Internet to retrieve media for display." ('901 Patent, 1:54-60.)

18. The invention of the '901 Patent seeks to collect data about media viewing from Internet sources over the disparate devices in a modern home. The '901 patent therefore describes a "network communications monitor [that] monitors all network devices within the media exposure measurement location." (*Id.*, 5:29-31.) "The network communications monitor is installed at the media exposure measurement location and identifies network communications to and/or from media devices within the media exposure measurement location (*e.g.*, the communications of devices sharing a public IP address via, for example, a gateway). Thus, the network communications monitor monitors all network devices within the media exposure measurement location." (*Id.*, 5:23-31.)

19. In operation, the "network communications monitor creates a log and/or a record of the network communications, identifies a device associated with the network communications (*e.g.*, a device that originated and/or is to receive the network communication), and electronically transmits the log and/or the record to the network activity measurement system (*e.g.*, to an audience measurement [sic] such as The Nielsen Company (US), LLC)." (*Id.*, 5:31-38.) In the invention as claimed in the '901 patent, "the network communications monitor determines a device identifier of the identified device based on a MAC address of the device involved in the network communications." (*Id.*, 5:39-41.)

20. The invention of the '901 patent solved several problems inherent in the prior art, and the inventors had to overcome technical challenges to solve those problems. Before the '901 patent (*i.e.*, in the prior art), audience measurements in a network environment were generally done at the device level, not at the network level. (Martin Decl., ¶ 19.) But "not all media devices are amenable to being monitored by an on-device meter. For example some media devices do not allow installation of third-party software (e.g., an on-device meter). Further, because of the many types of media devices available, maintaining software packages for every type of media device is difficult. Because installation of a monitoring system on all types of network devices is difficult, if not impossible, some network devices may go unmonitored." ('901 Patent, 4:65-5:6.) These unmonitored devices reduced the accuracy of the collected data. (Martin Decl., ¶ 19.)

21. The broad array of devices on which modern users were consuming Internet-based media presented problems for monitoring panelists' media consumption. (Martin Decl., ¶ 20.) Prior art systems, apparatuses, and methods did not have the ability to monitor these diverse devices, nor did prior art systems, apparatuses, and methods enable doing so in a central manner. (*Id.*) Prior art monitoring of a presentation device like a television could not capture the

5

broader range of devices on which panelists now consume media, such as on tablets, computers, and phones. (*Id.*)

22. Prior art device-based monitoring could be extended to the new environment of media consumption on many devices with monitoring software installed on each device. (Martin Decl., ¶ 21.) But monitoring each device individually has several disadvantages, such as (1) having to install monitoring software on each device, with each device reporting individually back to the audience measurement entity, (2) having to write software for each type of device in the marketplace as well as needing to write new software as new devices are released, (3) needing to update/maintain this software generally and because existing devices get software updates, putting an audience measurement company on a continuous treadmill of writing and maintaining software to keep up, and (4) not being able to monitor viewing on some devices at all because some prior art devices did not allow the installation of third-party software, making monitoring them directly impossible. ('901 Patent, 4:65-5:6.) ("[N]ot all media devices are amenable to being monitored by an on-device meter. For example some media devices do not allow installation of third-party software (*e.g.*, an on-device meter). Further, because of the many types of media devices available, maintaining software packages for every type of media device is difficult. Because installation of a monitoring system on all types of network devices is difficult, if not impossible, some network devices may go unmonitored."; Martin Decl., ¶ 21.) In addition, some devices require privacy permission to access user data, which complicates, at least, deployment at the user device level. (Martin Decl., ¶ 20.)

23. The inventors realized that these problems could be solved with a technical solution by making an improvement at the central network gateway. (Martin Decl., ¶ 22.) These devices shared a common network interface through the Internet, allowing monitoring through

6

that common point. "Internet Service Providers (ISPs) typically provide a single public Internet protocol (IP) address for each media exposure measurement location (*e.g.,* a media presentation location, a panelist household, an internet café, an office, etc.) receiving Internet services." ('901 Patent, 3:11-15.) "The network communications monitor is installed at the media exposure measurement location and identifies network communications to and/or from media devices within the media exposure measurement location (e.g., the communications of devices sharing a public IP address via, for example, a gateway). Thus, the network communications monitor monitors all network devices within the media exposure measurement location." (*Id.*, 5:23-31.)

24. The inventors realized that the network gateway provided a central point to collect data about network media communications. (Martin Decl., ¶ 23.) Instead of installing monitoring software on individual devices and having to deal with any one or more of the aforementioned problems with doing so, they realized that installing a network communications monitor at the network gateway would capture all media impressions without having to interact with (by, *e.g.*, creating, maintaining, and installing software on) each device on the network. (Martin Decl., ¶ 23.) Monitoring centrally provided a technological improvement and solution to the problems of (1) having to interact with each disparate device to install software on it, (2) writing software for a large number of devices, (3) maintaining software for each device, and (4) the lack of monitoring on devices that did not allow the installation of third-party software. (Martin Decl., ¶ 23.) Using central monitoring or network-level monitoring for these purposes was not routine, conventional, or well-understood at the time of the invention. (Martin Decl., ¶ 23.)

25. Central or network-level monitoring, however, presented technical challenges. Collecting data centrally presented a problem with collecting accurate data because network addresses, such as IP addresses, can, and often do, change. (Martin Decl., ¶ 25.) Hence, the IP

address of a device on the network is not a reliable indicator over time of which device has requested content: "[T]he IP address is used to identify the media device. As disclosed above, the IP address may change over time and, therefore, may not accurately identify the media device." ('901 Patent, 4:27-30.) For example, collecting data linking an IP address to network-provided content could incorrectly indicate that content provided to different devices (and different members of the panelist household) was provided to the same device (if the devices used the same IP address at different times). (Martin Decl., ¶ 25.)

26. The inventors saw a novel solution to this problem by using an IP address to obtain a device's MAC address as content is received. MAC addresses identify devices. (Martin Decl., ¶ 26.) Devices receive MAC addresses on manufacture, so they do not generally change without user intervention, especially at the time of the invention. ('901 Patent, 3:66-4:2.) ("Unlike an IP address, the MAC address does not change over time. The MAC address of a media device is provided by the hardware manufacturer of the media device at the time of manufacture."); (Martin Decl., ¶ 26.) The MAC address of a device is therefore a reliable identifier of a device over time. (*Id.*)

27. But as the '901 patent explains, "[w]hen transmitting network communications (*e.g.*, transmission control protocol (TCP) communications, user datagram protocol (UDP) communications, etc.) the MAC address of the media device is not included. Rather, the IP address is used to identify the media device." ('901 Patent, 4:24-28.) Network communications equipment, however, maintains a table that links MAC address to current IP address: "To translate an IP address into a MAC address, media devices include an address resolution protocol (ARP) table." (*Id.*, 4:30-32; Fig. 4A.) This process allows the linking of a MAC address to a

network communication by looking up an IP address in an ARP table and obtaining the MAC address of the source or destination of the network communication. (Martin Decl., ¶ 27.)

28. "[A] device identifier is used to identify the media device. For example, a media device may be associated with a panelist and/or a household, and may receive a unique device identifier (*e.g*., "Suzie's iPAD", "Smith Family iPad 01", etc.) to facilitate such association." ('901 Patent, 5:7-11.) In other words, the device identifier connects a device to a user in the household. (Martin Decl., ¶ 28.) This connection is important because it allows audience measurement companies to report personalized, individual-level data.

29. The relationship between the device identifier and the MAC address is set when the monitoring system is installed or a new device is added to the network. (Martin Decl., ¶ 29.) "[D]evice information receiver 430 stores a device identifier that is provided by an installer (*e.g*., a representative of a media monitoring entity (*e.g*., an audience measurement entity such as The Nielsen Company (US), LLC) and/or by a user of the media device. For each media device on the network, the installer and/or user enters a MAC address of the device and a respective device identifier of the corresponding media device into the interface of the device information receiver 430." ('901 Patent, 12:3-11.) Thus, in the disclosed system, "the MAC address is associated with the device identifier." (*Id.*, 5:12-13.)

30. The invention accordingly uses the MAC address to determine the device identifier. ('901 patent, Fig. 4B, 12:52-13:30; Martin Decl., ¶ 30.) The network communications monitor stores the device identifier along with a content identifier and timestamp. (*See e.g.*, '901 patent, Fig. 5A, 14:23-51.) This record constitutes a log or record of the network communications that is sent to the audience measurement company: "The network communications monitor creates a log and/or a record of the network communications, identifies

a device associated with the network communications (*e.g.*, a device that originated and/or is to receive the network communication), and electronically transmits the log and/or the record to the network activity measurement system (*e.g.*, to an audience measurement [sic] such as The Nielsen Company (US), LLC)." ('901 Patent, 5:31-38; Martin Decl., ¶ 30.)

31. The inventor's solution of using a MAC address to link network communications to device identifiers provided a technical solution to the technical problem of accurately collecting and recording data, including person-level data, about media usage. (Martin Decl., ¶ 31.) The inventor's idea of converting IP addresses to MAC addresses and then using the MAC address rather than the changeable IP address to obtain the device identifier solved the technical problem of how to collect accurate data about devices identified by changeable IP addresses. (Martin Decl., ¶ 31.) The solution of using MAC addresses to connect IP addresses to device identifiers of panelists devices was not routine, conventional, or well-understood at the time of the invention. (Martin Decl., ¶ 31.)

32. The claims of the '901 patent capture this invention.

33. All the claims of the '901 patent recite centrally monitoring network communications. All the independent system claims (claims 1 and 18) require that the "network communications monitor" have "a non-transitory computer-readable medium" that contains the executable instructions of "detecting, "accessing," "determining," and "causing." In addition, claims 1 and 18 recite that "the network communications monitor is implemented by the network gateway." Claim 20 recites "[a]t least one non-transitory computer readable storage medium comprising instructions that, when executed, cause at least one processor of a network communications monitor to at least" perform instructions similar to those in claims 1 and 18. And method claim 13 recites that the "detecting" and "determining" steps are performed "via a

network interface of a network communications monitor located within the household" and "via a processor of the network communications monitor," respectively. Centrally monitoring network communications, as recited in claims 1, 13, 18, and 20, was not well-understood, routine, or conventional in the prior art. (Martin Decl., ¶ 35.) The dependent claims include these elements and therefore also contain elements that were not well-understood, routine, or conventional in the prior art. (*Id.*)

34. In addition, all the claims of the '901 patent recite using the MAC addresses to associate the panelist device with the network communications. (Martin Decl., ¶ 36.) Independent claims 1, 13, and 18 recite "determining that a media access control (MAC) address associated with the network communication matches a MAC address of the panelist device." And independent claim 20 recites instructions that "determine based on the panelist data, that a network communication of the multiple network communications is associated with the panelist device based on a determination that a media access control (MAC) address associated with the network communication matches a MAC address of the panelist device. Matching a MAC address to a panelist device, as recited in claims 1, 13, 18, and 20, was not well-understood, routine, or conventional in the prior art. (Martin Decl., ¶ 36.) The dependent claims include these elements and therefore also contain elements that were not well-understood, routine, or conventional in the prior art. (*Id.*)

35. The claims do not preempt all ways of monitoring user media consumption over a network. (Martin Decl., ¶ 37.) Other ways of monitoring were known at the time, including installing monitoring software on each network-attached device. (*Id.*) Moreover, the claims do not even preempt all ways of centrally monitoring user media viewing. Instead, the claims recite a specific way of solving certain prior art problems relating to monitoring of various devices by

using central monitoring and by using device MAC addresses to reliably link IP addresses and network communications to device identifiers. (*Id.*)

36. Claims 1, 13, 18, and 20 (and their dependent claims) of the '901 Patent are not directed to an abstract idea. Rather, they are directed to specific technical solutions to prior art problems relating to monitoring in network environments. (Martin Decl., ¶ 38.) These problems include the technical difficulty and sometimes impossibility of providing monitoring software for network-attached devices and the technical difficulty in network-level monitoring that arises because of the variability of IP addresses over time. (*Id.*) In other words, instead of a general result, Claims 1, 13, 18, and 20 of the '901 Patent are directed to a specific technological approach– *i.e.*, a real-world application. (*Id.*)

## THE INFRINGING APPARATUS AND METHOD

37. HyphaMetrics is an audience measurement company. (*See* https://www.hyphametrics.com (last accessed April 11, 2023) ("We serve as the objective technology standard globally for the precise measurement of media at the individual level.") attached hereto as Exhibit C.)

38. HyphaMetrics' audience measurement solution includes a coreMeter that monitors every aspect of digital entertainment in the home (the "Infringing Product" and as the coreMeter is used, the "Infringing Method"). The coreMeter "acts as a router for network traffic measurement." (*See* Cohen, Rafi, "Hyphametrics comes out swinging with hyper-surveillance attribution," Rethink Technology Research, March 25, 2021, available at https://rethinkresearch.biz/articles/hyphametrics-comes-swinging-hyper-surveillance-attribution/ ("Cohen Article") attached as Exhibit D.)

39. HyphaMetrics is the listed assignee of U.S. Patent No. 10,932,002 (the "'002 Patent"), attached as Exhibit E. The '002 patent was filed on July 9, 2020 and claims priority to a provisional patent application filed on July 9, 2019. The '002 Patent describes elements of HyphaMetrics' audience measurement methodology "including the tracking of IP traffic." (*See* Ex. D, Cohen Article.) HyphaMetrics' CEO and co-founder Joanna Drews has been reported saying that the '002 Patent describes the Infringing Product and Infringing Method. (Jon Lafayette, HyphaMetrics Issued Patent for Cross-Platform Measurement, March 10, 2021, https://www.nexttv.com/news/hyphametrics-issued-patent-for-cross-platform-measurement ("Lafayette Article"), attached as Exhibit F ("Patent No. 10,932,002 covers [HyphaMetrics'] unique coreMeter hardware, its methodology for collecting data from all media sources in a household, and how the company determines individuals' media consumption within a household.")); Ex. D, Cohen Article ("HyphaMetrics has just been issued its first patent, which [HyphaMetrics co-founder and CEO Joanna] Drews said covers 15 unique elements of its methodology, including the tracking of IP traffic, the use of certain ML algorithms, as well as the proprietary hardware, software and cloud technologies that are used.").)

40. Figure 2D of '002 Patent shows a "gateway 110" that is configured to detect consumption of and identify media content presented on various wireless devices within a household. (*See* Ex. E, U.S. Patent No. 10,932,002, col. 7, lines 27-38.)



FIG. 2D

41. According to the '002 patent, the gateway 110 includes wireless software "that allows the gateway to detect each panelist's Internet activity on their associated mobile device and/or computer." (*See* Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 38-54.) More specifically:

> When operating in the router mode, the Wi-Fi chipset 125 allows the gateway 110 to operate as wireless access point or wireless signal repeater for the household 202. When operating in this mode, mobile/desktop clients connect directly to the gateway 110 in order to obtain an Internet connection. Thus, all the wireless traffic for the household 202 goes through the gateway 110. The gateway 110 is configured to capture the network packets, identify media content presented on specific devices, and generally log all the Internet traffic passing through the gateway. (*Id.*, col. 42, lines 58-67.)

42. The gateway 110 described in U.S. Patent No. 10,932,002 (*see* Fig. 2D) is visually similar to the coreMeter pictured in HyphaMetrics' Federal Communications Commission application:

Photo 5



(https://fcc.report/FCC-ID/2AYHD-A20DC6/5091730, January 22, 2021, attached as Exhibit H.)

43. The wireless networking software in the coreMeter is executable to cause the coreMeter to operate in a router mode. The wireless networking software of the coreMeter interacts with the networking hardware components to provide routing services. (*See* Ex. E, U.S. Patent No. 10,932,002, col. 11, lines 28-49; col. 42, lines 38-67.) In router mode, the coreMeter operates as a wireless access point, such that all wireless traffic for the household goes through the coreMeter. Further, in router mode, the coreMeter logs the wireless traffic for the household. (*See Id.*, col. 42, lines 54-67.)

44. The coreMeter includes a Wi-Fi module. (*See* coreMeter User Manual, Section 2.2, January 22, 2021, available at https://fcc.report/FCC-ID/2AYHD-A20DC6/5091681, attached as Exhibit G; *see also* Ex. E, U.S. Patent No. 10,932,002, col. 11, lines 28-41

(communications module 120 of the gateway 110 includes a wireless transceiver 124 and Wi-Fi chipset 125).)

45. The coreMeter includes a central processing unit. (*See* Ex. G, coreMeter User Manual, Section 2.2, January 22, 2021, available at https://fcc.report/FCC-ID/2AYHD-A20DC6/5091681; *see also* Ex. E, U.S. Patent No. 10,932,002, col. 8, lines 7-25 (gateway 110 includes processing circuitry/logic 114 in the form of a commercially available microprocessor).)

46. The coreMeter includes a memory storing instructions for execution by the central processor. (*See* Ex. E, U.S. Patent No. 10,032,002, col. 8, lines 32-45.) The instructions stored by the memory of the coreMeter include operational software for wireless networking features ("wireless networking software").

47. The wireless networking software is executable to cause the coreMeter to detect each panelist's Internet activity on their associated mobile device and/or computer. (*See id.*, col. 42, lines 38-54.) The coreMeter determines that identified web traffic is associated with the panelist device by determining that the MAC address associated with the web traffic matches the MAC address of the panelist device. (*See id.*, col. 43, lines 14-36.) If web traffic is associated with a panelist's device, the coreMeter associates the identified web traffic with the panelist of the household that is associated with the panelist device. (*See id.*, col. 43, lines 35-39.) The coreMeter stores data indicative of this association in memory. (*See id.*, col. 42, line 64 – col. 43, line 12.)

48. HyphaMetrics' chief revenue officer Mike Bologna has been quoted as saying that HyphaMetrics performs, makes, uses, sells, and offers for sale the Infringing Product and Method. (Ex. F, Lafayette Article ("'We are about to launch a field trial,' [HyphaMetrics' chief revenue officer Mike Bologna] said, putting [HyphaMetrics'] coreMeter boxes into about 100

16

homes while working with a few select partners.").) More recently HyphaMedtrics announced that it was "working to scale to 5,000 homes and roughly 15,000 devices." (Allison Schiff, Alt Panel Provider HyphaMetrics Is On A Mission To Democratize TV Measurement, November 4, 2021, https://www.adexchanger.com/tv-and-video/alt-panel-provider-hyphametrics-is-on-a-mission-to-democratize-tv-measurement/ ("Schiff Article"), attached as Exhibit J.) Upon information and belief, HyphaMetrics tests and demonstrates the Infringing Product and Method. (*See id.*)

49. The press has reported that HyphaMetrics has concluded a deal with audience measurement company VideoAmp (the "VideoAmp Deal"). (Ex. F, Lafayette Article.) Pursuant to this deal, VideoAmp will incorporate data derived from HyphaMetrics' Infringing Product and Method into its measurement products. (*Id.*) Upon information and belief, VideoAmp chose to pursue the VideoAmp Deal at least in part due to HyphaMetrics' activities and the data collected from those activities that constitute infringement of the '901 Patent. (*See id.* ("'[VideoAmp has] been especially impressed with HyphaMetrics' innovative, patented measurement tech stack . . . .'").)

50. By performing, making, using, offering to sell, and selling the Infringing Product and Infringing Method, HyphaMetrics infringes at least independent claims 1, 13, 18, and 20 and dependent claims 2, 3, 4, 5, 8, 9, 10, 11, 12, 14, 15, 16, 17, 19, and 21 of the '901 Patent. HyphaMetrics' infringement has harmed, and will continue to harm, Nielsen. (*See* Ex. F, Lafayette Article ("ViacomCBS said it would use a currency based on VideoAmp measurement as a currency to plan, transact and measure national media campaigns . . . .").)

51. By this lawsuit, Nielsen seeks to enjoin HyphaMetrics from any further unauthorized performance, making, use, sale, or offering for sale of Nielsen's patented

technology, and it seeks to recover damages, including lost profits, treble damages, reasonable attorneys' fees, and other such and further relief as the Court deems just and proper against HyphaMetrics' violation of federal law.

## COUNT I
## INFRINGEMENT OF THE '901 Patent

52. Nielsen repeats and re-alleges paragraphs 1-51 as if fully set forth herein.

53. HyphaMetrics has infringed and continues to infringe, literally or under the doctrine of equivalents, independent claims 1, 13, 18, and 20 and dependent claims 2, 3, 4, 5, 8, 9, 10, 11, 12, 14, 15, 16, 17, 19, and 21 of the '901 Patent ("Asserted '901 Claims") under 35 U.S.C. § 271(a) by, making, using, selling and/or offering to sell within the United States, and/or importing into the United States the Infringing Product and by performing the Infringing Method in the United States.

54. Defendant's activities are without license or permission from Nielsen.

55. The Infringing Product and the Infringing Method include all elements of the Asserted '901 Claims, either literally or equivalently, as shown in the claim charts incorporated by reference in this Complaint and attached as Exhibit I.

56. As of the filing date of this Complaint, HyphaMetrics is aware of the '901 Patent and the manner in which the Infringing Product and Infringing Method practice the Asserted '901 Claims. Accordingly, since that date, HyphaMetrics has willfully infringed those claims.

57. Through the conduct alleged above, HyphaMetrics has caused and will in the absence of an injunction continue to cause Nielsen to suffer damages, which in no event are less than a reasonably royalty, and which include, but are not limited to, lost sales and sales opportunities.

58. HyphaMetrics has also irreparably harmed Nielsen. Unless and until HyphaMetrics is enjoined by this Court from further infringement, Nielsen will continue to suffer damages and irreparable injury for which it has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Nielsen prays for judgment against Defendant as follows:

1. A judgment declaring that Defendant has infringed the '901 Patent and that such infringement has been willful;

2. An order and judgment permanently enjoining Defendant and its officers, directors, agents, servants, employees, affiliates, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors and assigns, from further acts of infringement of the '588 Patent;

3. A judgment awarding Nielsen all damages adequate to compensate for the Defendant's infringement of the '901 Patent, but in no event less than a reasonable royalty, for Defendant's acts of infringement, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

4. A judgment awarding Nielsen all damages, including treble damages, based on any infringement found to be willful and egregious, pursuant to 35 U.S.C. § 284, together with pre-judgment interest;

5. A finding that this case is "exceptional" within the meaning of 35 U.S.C. § 285;

6. A judgment ordering that Defendant pay Nielsen its reasonable attorneys' fees and expenses pursuant to 35 U.S.C. § 285; and

7. Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial on all issues so triable.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | POTTER ANDERSON & CORROON LLP |
| OF COUNSEL: | |
|  | By: */s/ David E. Moore* |
| Steven Yovits | David E. Moore (#3983) |
| Constantine Koutsoubas | Bindu A. Palapura (#5370) |
| Douglas Lewis | Andrew L. Brown (#6766) |
| Melvin Gaddy | Hercules Plaza, 6th Floor |
| KELLEY DRYE & WARREN LLP | 1313 N. Market Street |
| 333 West Wacker Drive | Wilmington, DE  19801 |
| Chicago, IL 60606 | Tel:  (302) 984-6000 |
| Tel: (312) 857-7070 | dmoore@potteranderson.com |
|  | bpalapura@potteranderson.com |
| Clifford Katz | abrown@potteranderson.com |
| Jolie Schenerman |  |
| KELLEY DRYE & WARREN LLP | *Attorneys for Plaintiff The Nielsen Company* |
| 3 World Trade Center | *(US), LLC* |
| 175 Greenwich Street |  |
| New York, NY 10007 |  |
| Tel: (212) 808-7800 |  |

Dated: May 17, 2023
10816517 / 14944.00007