# EXHIBIT A

To Promote the Progress

of Science and Useful Arts

# The Director

of the United States Patent and Trademark Office has received an application for a patent for a new and useful invention. The title and description of the invention are enclosed. The requirements of law have been complied with, and it has been determined that a patent on the invention shall be granted under the law.

Therefore, this United States

# Patent

grants to the person(s) having title to this patent the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States of America or importing the invention into the United States of America, and if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States of America, products made by that process, for the term set forth in 35 U.S.C. 154(a)(2) or (c)(1), subject to the payment of maintenance fees as provided by 35 U.S.C. 41(b). See the Maintenance Fee Notice on the inside of the cover.

*Katherine Kelly Vidal*

DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

## Maintenance Fee Notice

If the application for this patent was filed on or after December 12, 1980, maintenance fees are due three years and six months, seven years and six months, and eleven years and six months after the date of this grant, or within a grace period of six months thereafter upon payment of a surcharge as provided by law. The amount, number and timing of the maintenance fees required may be changed by law or regulation. Unless payment of the applicable maintenance fee is received in the United States Patent and Trademark Office on or before the date the fee is due or within a grace period of six months thereafter, the patent will expire as of the end of such grace period.

## Patent Term Notice

If the application for this patent was filed on or after June 8, 1995, the term of this patent begins on the date on which this patent issues and ends twenty years from the filing date of the application or, if the application contains a specific reference to an earlier filed application or applications under 35 U.S.C. 120, 121, 365(c), or 386(c), twenty years from the filing date of the earliest such application ("the twenty-year term"), subject to the payment of maintenance fees as provided by 35 U.S.C. 41(b), and any extension as provided by 35 U.S.C. 154(b) or 156 or any disclaimer under 35 U.S.C. 253.

If this application was filed prior to June 8, 1995, the term of this patent begins on the date on which this patent issues and ends on the later of seventeen years from the date of the grant of this patent or the twenty-year term set forth above for patents resulting from applications filed on or after June 8, 1995, subject to the payment of maintenance fees as provided by 35 U.S.C. 41(b) and any extension as provided by 35 U.S.C. 156 or any disclaimer under 35 U.S.C. 253.

Form **PTO-377C** (Rev 09/17)

US011652901B2

(12) **United States Patent**

Besehanic

(10) Patent No.: **US 11,652,901 B2**

(45) Date of Patent: ***May 16, 2023**

(54) **SYSTEMS, METHODS, AND APPARATUS TO IDENTIFY MEDIA DEVICES**

(71) Applicant: **The Nielsen Company (US), LLC**, New York, NY (US)

(72) Inventor: **Jan Besehanic**, Tampa, FL (US)

(73) Assignee: **The Nielsen Company (US), LLC**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/956,450**

(22) Filed: **Sep. 29, 2022**

(65) **Prior Publication Data**

US 2023/0029204 A1 Jan. 26, 2023

**Related U.S. Application Data**

(63) Continuation of application No. 17/328,860, filed on May 24, 2021, which is a continuation of application (Continued)

(51) **Int. Cl.**
**H04L 67/50** (2022.01)
**H04L 61/103** (2022.01)
(Continued)

(52) **U.S. Cl.**
CPC ........... **H04L 67/535** (2022.05); **H04H 60/32** (2013.01); **H04L 61/103** (2013.01); **H04L 61/2514** (2013.01); **H04L 61/5014** (2022.05)

(58) **Field of Classification Search**
CPC . H04L 67/535; H04L 61/103; H04L 61/2514; H04L 61/5014; H04H 60/32
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,958,010 A | 9/1999 | Agarwal et al. |
| 7,180,115 B1 | 2/2007 | Hofmann et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2009294972 | 12/2009 |
| WO | 2014176171 | 10/2014 |

OTHER PUBLICATIONS

International Searching Authority, "International Search Report and Written Opinion," issued in connection with International Application No. PCT/US2014/034820, dated Aug. 14, 2014, 9 pages.

(Continued)

*Primary Examiner* — Michael A Keller

(74) *Attorney, Agent, or Firm* — Hanley, Flight & Zimmerman, LLC

(57) **ABSTRACT**

Systems, methods, and apparatus to identify media devices are disclosed. An example network communications monitor includes network interface circuitry, computer readable instructions, and processor circuitry. The processor circuitry is to execute the computer readable instructions to detect, via the network interface circuitry, multiple network communications transmitted on a home network within the household, access panelist data that associates a panelist of the household with a panelist device of the panelist, determine, based on the panelist data, that one or more of the multiple network communications are associated with the panelist device, and cause storage of data identifying the one or more network communications in association with the panelist.

**21 Claims, 13 Drawing Sheets**



**US 11,652,901 B2**

Page 2

## Related U.S. Application Data

No. 16/834,842, filed on Mar. 30, 2020, now Pat. No. 11,019,164, which is a continuation of application No. 16/404,366, filed on May 6, 2019, now Pat. No. 10,609,166, which is a continuation of application No. 15/588,245, filed on May 5, 2017, now Pat. No. 10,284,665, which is a continuation of application No. 13/931,750, filed on Jun. 28, 2013, now Pat. No. 9,647,779.

(60) Provisional application No. 61/814,792, filed on Apr. 22, 2013.

(51) **Int. Cl.**
| | |
|---|---|
| *H04L 61/2514* | (2022.01) |
| *H04L 61/5014* | (2022.01) |
| *H04H 60/32* | (2008.01) |

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,801,150 | B1 | 9/2010 | Rupavatharam |
| 8,700,657 | B2 | 4/2014 | Frett et al. |
| 8,843,953 | B1 * | 9/2014 | Dang ................. H04N 21/4542 |
| | | | 725/28 |
| 9,647,779 | B2 | 5/2017 | Besehanic |
| 10,284,665 | B2 | 5/2019 | Besehanic |
| 10,609,166 | B2 | 3/2020 | Besehanic |
| 11,019,164 | B2 | 5/2021 | Besehanic |
| 2001/0034232 | A1 | 10/2001 | Kuwahara |
| 2002/0136268 | A1 | 9/2002 | Gan et al. |
| 2002/0198762 | A1 | 12/2002 | Donato |
| 2006/0268744 | A1 | 11/2006 | Sakai et al. |
| 2008/0155613 | A1 | 6/2008 | Benya et al. |
| 2008/0263579 | A1 | 10/2008 | Mears et al. |
| 2009/0210892 | A1 | 8/2009 | Ramaswamy |
| 2009/0323634 | A1 | 12/2009 | Kim et al. |
| 2010/0103824 | A1 | 4/2010 | Gilmour |
| 2010/0106769 | A1 | 4/2010 | Blanchard et al. |
| 2010/0115543 | A1 | 5/2010 | Falcon |
| 2010/0228625 | A1 | 9/2010 | Priyadarshan et al. |
| 2010/0242095 | A1 * | 9/2010 | Mendenhall ........ H04L 63/0227 |
| | | | 726/4 |
| 2010/0309912 | A1 | 12/2010 | Mehta et al. |
| 2011/0019673 | A1 | 1/2011 | Gutierrez |
| 2011/0067119 | A1 | 3/2011 | Baum |
| 2011/0077043 | A1 | 3/2011 | Aoyagi et al. |
| 2011/0113455 | A1 | 5/2011 | Wu |
| 2011/0149960 | A1 | 6/2011 | Gutierrez |
| 2011/0191811 | A1 | 8/2011 | Rouse et al. |
| 2011/0213863 | A1 | 9/2011 | Shah et al. |
| 2012/0011559 | A1 | 1/2012 | Miettinen et al. |
| 2012/0026999 | A1 | 2/2012 | Choi et al. |
| 2012/0036220 | A1 | 2/2012 | Dare et al. |
| 2012/0036552 | A1 | 2/2012 | Dare et al. |
| 2012/0042005 | A1 | 2/2012 | Papakostas et al. |
| 2012/0093508 | A1 | 4/2012 | Baykal et al. |
| 2012/0131157 | A1 | 5/2012 | Gospodarek et al. |
| 2012/0173701 | A1 | 7/2012 | Tenbrock |
| 2012/0185910 | A1 | 7/2012 | Miettinen et al. |
| 2013/0006435 | A1 | 1/2013 | Berrios et al. |
| 2013/0007236 | A1 | 1/2013 | Besehanic |
| 2013/0046651 | A1 * | 2/2013 | Edson ................. G06Q 30/0631 |
| | | | 705/26.4 |
| 2013/0061243 | A1 * | 3/2013 | Pillers .................... G06F 11/302 |
| | | | 719/313 |
| 2013/0070639 | A1 * | 3/2013 | Demura ................ H04L 61/103 |
| | | | 370/254 |
| 2013/0111013 | A1 | 5/2013 | Besehanic |
| 2013/0128751 | A1 | 5/2013 | Keesara et al. |
| 2013/0132152 | A1 * | 5/2013 | Srivastava ......... G06Q 30/0201 |
| | | | 705/7.29 |
| 2013/0137451 | A1 | 5/2013 | Meredith et al. |
| 2013/0212200 | A1 | 8/2013 | Dennis et al. |
| 2013/0232251 | A1 | 9/2013 | Pauley |
| 2013/0244579 | A1 | 9/2013 | Hohteri et al. |
| 2014/0003286 | A1 | 1/2014 | Estevez et al. |
| 2014/0287682 | A1 | 9/2014 | Minemura et al. |
| 2014/0317270 | A1 | 10/2014 | Besehanic |
| 2015/0063233 | A1 | 3/2015 | Choi et al. |
| 2015/0085775 | A1 | 3/2015 | Choi et al. |
| 2015/0334523 | A1 | 11/2015 | Lappetelainen et al. |
| 2017/0244797 | A1 | 8/2017 | Besehanic |
| 2019/0260842 | A1 | 8/2019 | Besehanic |
| 2020/0228615 | A1 | 7/2020 | Besehanic |
| 2021/0281652 | A1 | 9/2021 | Besehanic |

### OTHER PUBLICATIONS

United States Patent and Trademark Office, "Final Office Action," issued in connection with U.S. Appl. No. 13/931,750, dated Jan. 26, 2016, 11 pages.

United States Patent and Trademark Office, "Final Office Action," issued in connection with U.S. Appl. No. 13/931,750, dated Sep. 15, 2016, 14 pages.

United States Patent and Trademark Office, "Non-Final Office Action," issued in connection with U.S. Appl. No. 13/931,750, dated Jul. 1, 2015, 10 pages.

United States Patent and Trademark Office, "Non-Final Office Action," issued in connection with U.S. Appl. No. 13/931,750, dated Mar. 24, 2016, 18 pages.

United States Patent and Trademark Office, "Notice of Allowance," issued in connection with U.S. Appl. No. 13/931,750, dated Jan. 5, 2017, 7 pages.

United States Patent and Trademark Office, "Non-Final Office Action," issued in connection with U.S. Appl. No. 15/588,245, dated Aug. 29, 2018, 16 pages.

United States Patent and Trademark Office, "Notice of Allowance," issued in connection with U.S. Appl. No. 15/588,245, dated Dec. 28, 2018, 6 pages.

United States Patent and Trademark Office, "Non-Final Office Action," issued in connection with U.S. Appl. No. 16/404,366, dated Aug. 23, 2019, 4 pages.

United States Patent and Trademark Office, "Notice of Allowance," issued in connection with U.S. Appl. No. 16/404,366, dated Nov. 20, 2019, 6 pages.

United States Patent and Trademark Office, "Non-Final Office Action," issued in connection with U.S. Appl. No. 16/834,842, dated Oct. 8, 2020, 6 pages.

United States Patent and Trademark Office, "Notice of Allowance," issued in connection with U.S. Appl. No. 16/834,842, dated Jan. 26, 2021, 7 pages.

United States Patent and Trademark Office, "Non-Final Office Action," issued in connection with U.S. Appl. No. 17/328,860, dated Oct. 6, 2022, 5 pages.

United States Patent and Trademark Office, "Notice of Allowance," issued in connection with U.S. Appl. No. 17/328,860, dated Jan. 30, 2023, 7 pages.

* cited by examiner



**FIG. 1**



**FIG. 2**



**FIG. 3**

**U.S. Patent**      May 16, 2023      Sheet 4 of 13      US 11,652,901 B2



**FIG. 4**

401

460          465

| IP ADDRESS | MAC ADDRESS |
|---|---|
| 192.168.1.20 | 00:22:34:CD:56:EF |
| 192.168.1.32 | 00:19:AB:34:CD:12 |
| 192.168.1.31 | 4C:B1:99:12:EF:1A |
| 192.168.1.51 | 4C:B1:99:34:CD:86 |
| 192.168.1.50 | A0:D2:B1:BD:DC:66 |

471
472
473
474
475

**FIG. 4A**

402

480    485

| MAC ADDRESS | DEVICE IDENTIFIER |
|---|---|
| 00:22:34:CD:56:EF | PANELIST0001_XBOX01 |
| 00:19:AB:34:CD:12 | PANELIST0001_PLAYSTATION01 |
| 4C:B1:99:12:EF:1A | PANELIST0001_IPAD01 |
| 4C:B1:99:34:CD:86 | PANELIST0001_IPAD02 |
| A0:D2:B1:BD:DC:66 | PANELIST0001_SMARTTV01 |

490 →
491 →
492 →
493 →
494 →

**FIG. 4B**



**FIG. 5**

501


| DEVICE IDENTIFIER | TIMESTAMP | NETWORK DATA |
|---|---|---|
| PANELIST0001_XBOX01 | 1:42:01 PM 3/22/2013 | GET /tv HTTP/1.1 Host: www.hulu.com User-Agent: Mozilla |
| PANELIST0001_IPAD02 | 2:23:56 PM 3/22/2013 | GET / HTTP/1.1 Host: www.engadget.com User-Agent: Mozilla |
| PANELIST0001_XBOX01 | 2:42:13 PM 3/22/2013 | GET / HTTP/1.1 Host: www.netflix.com User-Agent: Mozilla |
| PANELIST0001_XBOX01 | 3:01:41 PM 3/22/2013 | GET / HTTP/1.1 Host: www.netflix.com User-Agent: Mozilla |
| PANELIST0001_IPAD02 | 3:14:01 PM 3/22/2013 | GET /index.html HTTP/1.1 Host: www.cnet.com User-Agent: Mozilla |

560    563    566

570    571    572    573    574

**FIG. 5A**

U.S. Patent          May 16, 2023          Sheet 9 of 13          US 11,652,901 B2



**FIG. 6**



**FIG. 7**



**FIG. 8**



**FIG. 9**



**FIG. 10**

US 11,652,901 B2

1

# SYSTEMS, METHODS, AND APPARATUS TO IDENTIFY MEDIA DEVICES

## RELATED APPLICATION

This patent arises from a continuation of U.S. patent application Ser. No. 17/328,860, filed on May 24, 2021, and entitled "SYSTEMS, METHODS, AND APPARATUS TO IDENTIFY MEDIA DEVICES," which is a continuation of U.S. patent application Ser. No. 16/834,842, filed on Mar. 30, 2020, and entitled "SYSTEMS, METHODS, AND APPARATUS TO IDENTIFY MEDIA DEVICES," which is a continuation of U.S. patent application Ser. No. 16/404, 366, filed on May 6, 2019, and entitled "SYSTEMS, METHODS, AND APPARATUS TO IDENTIFY MEDIA DEVICES," which is a continuation of U.S. patent application Ser. No. 15/588,245, filed on May 5, 2017, and entitled "SYSTEMS, METHODS, AND APPARATUS TO IDENTIFY MEDIA DEVICES," which is a continuation of U.S. patent application Ser. No. 13/931,750, filed on Jun. 28, 2013, and entitled "SYSTEMS, METHODS, AND APPARATUS TO IDENTIFY MEDIA DEVICES," which claims the benefit of U.S. Provisional Application No. 61/814,782, which is entitled "SYSTEMS, METHODS, AND APPARATUS TO IDENTIFY MEDIA DEVICES" and was filed on Apr. 22, 2013. Priority to U.S. patent application Ser. Nos. 17/328,860, 16/834,842, 16/404,366, 15/588,245, 13/931, 750, and U.S. Provisional Application No. 61/814,782 is hereby claimed. U.S. patent application Ser. Nos. 17/328, 860, 16/834,842, 16/404,366, 15/588,245, 13/931,750, and U.S. Provisional Application No. 61/814,782 are hereby incorporated by reference in their entireties.

## FIELD OF THE DISCLOSURE

This disclosure relates generally to monitoring network activity, and, more particularly, to systems, methods, and apparatus to identify media devices.

## BACKGROUND

Media providers and/or metering entities such as, for example, advertising companies, broadcast networks, etc. are often interested in the viewing, listening, and/or media behavior/interests of audience members and/or the public in general. To collect these behavior/interests, an audience measurement company may enlist panelists (e.g., persons agreeing to be monitored) to cooperate in an audience measurement study for a period of time. The media usage habits of these panelists as well as demographic data about the panelists is collected and used to statistically determine the size and demographics of an audience.

In recent years, more consumer devices have been provided with Internet connectivity and the ability to retrieve media from the Internet. As such, media exposure has shifted away from conventional methods of presentation, such as broadcast television, towards presentation via consumer devices accessing the Internet to retrieve media for display.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of an example system to identify media presentation devices.

FIG. 2 is a block diagram of an example configuration of the media devices shown in FIG. 1.

2

FIG. 3 is a block diagram of another example configuration of the media devices shown in FIG. 1.

FIG. 4 is a block diagram of an example network communications monitor to implement the network communications monitor of FIG. 1.

FIG. 4A is an example address resolution protocol (ARP) table that may be stored by the example network communications data store of the example network communications monitor of FIGS. 1 and/or 4 to associate an Internet protocol (IP) address with a media access control (MAC) address.

FIG. 4B is an example MAC address to device identifier table that may be stored by the example network communications data store of the example network communications monitor of FIGS. 1 and/or 4 to associate a media access control (MAC) address with a device identifier.

FIG. 5 is a block diagram of an example network activity measurement system to implement the example network activity measurement system of FIG. 1.

FIG. 5A is an example communication log that may be stored by the example network communications data store of the example network activity measurement system of FIGS. 1 and/or 5.

FIG. 6 is a flowchart representative of example machine-readable instructions which may be executed to implement the example network communications monitor of FIGS. 1 and/or 4 to identify network communications.

FIG. 7 is a flowchart representative of example machine-readable instructions which may be executed to implement the example network communications monitor of FIGS. 1 and/or 4 to identify network communications.

FIG. 8 is a flowchart representative of example machine-readable instructions which may be executed to implement the example network communications monitor of FIGS. 1 and/or 4 to transmit network communications.

FIG. 9 is a flowchart representative of example machine-readable instructions which may be executed to implement the example network activity measurement system of FIGS. 1 and/or 5 to identify media devices.

FIG. 10 is a block diagram of an example processor platform capable of executing the example machine-readable instructions of FIGS. 6, 7, 8, and/or 9 to implement the example network activity measurement system of FIGS. 1 and/or 5, and/or the example network communications monitor of FIGS. 1 and/or 4.

## DETAILED DESCRIPTION

As used herein, the term "media" includes any type of content and/or advertisements, such as television programming, radio programming, news, movies, web sites, etc. Example methods, apparatus, and articles of manufacture disclosed herein identify media devices and/or types of media devices for media measurement. Such media devices may include, for example, Internet-enabled televisions, personal computers, Internet-enabled mobile handsets (e.g., a smartphone), video game consoles (e.g., Xbox®, Playstation® 3), tablet computers (e.g., an iPad®), digital media players (e.g., a Roku® media player, a Slingbox®, etc.), etc. In some examples, identifications of media devices used in consumer locations (e.g., homes, offices, etc.) are aggregated to determine ownership and/or usage statistics of available media devices, relative rankings of usage and/or ownership of media devices, types of uses of media devices (e.g., whether a device is used for browsing the Internet, streaming media from the Internet, etc.), and/or other types of media device information.

US 11,652,901 B2

3

4

In some disclosed examples, a media device includes a network interface to transmit a request for media to be presented by the media device. In such examples, the media device requests media from a media provider via a network (e.g., the Internet). In some examples, the request for media is a HyperText Transfer Protocol (HTTP) request, a Session Initiation Protocol (SIP) message, a domain name service (DNS) query, a file transfer protocol (FTP) request, and/or any other type of request for media (e.g., content and/or advertisements).

Internet Service Providers (ISPs) typically provide a single public Internet protocol (IP) address for each media exposure measurement location (e.g., a media presentation location, a panelist household, an internet café, an office, etc.) receiving Internet services. In some examples, multiple devices (e.g., media devices) are communicatively coupled by a local area network (LAN) at a media exposure measurement location. In some examples, the LAN includes a router and/or gateway that accesses another network (e.g., the Internet) using a public IP address associated with the media exposure measurement location.

Within the LAN, individual media devices are given private IP addresses by, for example, a dynamic host control protocol (DHCP.) When a media device within the LAN transmits a request to a resource outside of the LAN (e.g., on the Internet,) the router and/or gateway translates the originating (private) IP address of the device making the query before relaying the request outside of the LAN (e.g., to the Internet). Thus, when the resource outside of the LAN receives the request, the resource is able to transmit a return message (e.g., a response) to the LAN. On the return path, the router and/or gateway translates the destination IP address of the response to the private IP address of the requesting device so that the return message may be delivered to the media device that made the original request.

Some networks utilize Internet Protocol (IP) for communication. The IP address scheme utilizes IP addresses assigned to media devices. For example, a media device might be assigned an IP version 4 (IPv4) address of 192.168.0.2. Any other past, present, and or future addressing scheme may additionally or alternatively be used such as, for example, IP version 6 (IPv6). In some examples, IP addresses are dynamically assigned using DHCP. Both public and private IP addresses may be assigned using DHCP. In some examples, the IP address assignment is referred to as a lease. IP address leases are generally time-dependent in that they are only valid for a particular period of time (e.g., one day, one week, one month, etc.) After the expiration of the lease, the media device requests a new IP address from a DHCP server (e.g., a router, a server, etc.). Accordingly, more than one IP address might be associated with a media device over an extended period of time. For example, at a first time, the media device might be identified by an IP address of 192.168.0.2, while at a second time, the media device might be identified by an IP address of 192.168.0.3. Further, a second media device may be assigned the first IP address at the second time. Accordingly, identifying which device is associated with network requests occurring on a network based on the IP address alone is difficult.

Network interfaces of media devices are provided with a media access control (MAC) address. The MAC address is a serial number of the network interface of the media device. MAC addresses are used when issuing IP addresses to identify the media device to which the IP address is assigned. Unlike an IP address, the MAC address does not change over time. The MAC address of a media device is provided by the hardware manufacturer of the media device at the time of manufacture. In some examples, the MAC address may be changed at a later time (e.g., after manufacturing the device). In examples disclosed herein, the MAC address is a forty-eight bit identifier, and is typically represented as a twelve character hexadecimal identifier. However, any other representation may additionally or alternatively be used. For example, the MAC address convention may change over time to use different numbers and/or types of characters.

In some examples, the MAC address includes a twenty-four bit organizationally unique identifier (OUI). An OUI is used to identify the manufacturer and/or model of the media device. In some examples, the first twelve bits of the OUI identify a manufacturer, while the second twelve bits of the OUI identify a model of the device. Accordingly, a manufacturer and/or model of a device may be identified based on the OUI. The OUI, however, does not distinguish between multiple media devices of the same manufacturer and model. For example, a first iPad may have the same OUI as a second iPad. However, the devices will be uniquely identified by the remainder of the MAC address (e.g., the portion of the MAC address following the OUI).

When transmitting network communications (e.g., transmission control protocol (TCP) communications, user datagram protocol (UDP) communications, etc.) the MAC address of the media device is not included. Rather, the IP address is used to identify the media device. As disclosed above, the IP address may change over time and, therefore, may not accurately identify the media device. To translate an IP address into a MAC address, media devices include an address resolution protocol (ARP) table. However, any other type of table may additionally or alternatively be used such as, for example a neighbor discovery protocol (NDP) (e.g., for use with IP version 6 (IPv6)). The ARP table enables translation from an IP address to a MAC address. The ARP table is maintained by media devices (e.g., a router and/or a gateway). Accordingly, a media device can be associated with network communications even though the IP address associated with the media device may change.

In some examples, network resources (e.g., servers providing media to the media devices) are identified by domain names. Domain names are human readable identifiers that identify a network resource. While an IP address of a network resource might change over time, the domain name typically remains the same. Domain names typically remain the same because they are purchased by the media provider as a way for users to easily identify the service provided by the service provider. As the IP address of the media provider changes (e.g., because the media provider is now hosting their service via a different server, etc.), the domain name is updated to be associated with the most recent IP address.

In some examples, media devices that are capable of individually being monitored via an on-device meter are used within the media exposure measurement location. The monitored media device may be, for example, a personal computer, a smart phone, a tablet, etc. In some examples, the on-device meter collects monitoring information regarding the network communications and/or activities of the media device. In some examples, the on-device meter collects information in addition to the network communications of the monitored media device such as, for example, indicia of user input, indicia of information presented by the monitored network device, etc.

However, not all media devices are amenable to being monitored by an on-device meter. For example some media devices do not allow installation of third-party software

US 11,652,901 B2

5

(e.g., an on-device meter). Further, because of the many types of media devices available, maintaining software packages for every type of media device is difficult. Because installation of a monitoring system on all types of network devices is difficult, if not impossible, some network devices may go unmonitored.

In examples disclosed herein, a device identifier is used to identify the media device. For example, a media device may be associated with a panelist and/or a household, and may receive a unique device identifier (e.g., "Suzie's iPAD", "Smith Family iPad **01**", etc.) to facilitate such association. In some examples, the MAC address is associated with the device identifier. In examples disclosed herein, the assignment of the unique device identifier and the association with a MAC address of the device is made by an installer (e.g., a representative of a media monitoring entity) and/or by a user of the media device. However, any other party may assign and/or associate the device identifier with the media device and/or the MAC address of the media device.

In examples disclosed herein, a network communications monitor is used to capture network communications of media devices on the network (e.g., a home network). The network communications monitor is installed at the media exposure measurement location and identifies network communications to and/or from media devices within the media exposure measurement location (e.g., the communications of devices sharing a public IP address via, for example, a gateway). Thus, the network communications monitor monitors all network devices within the media exposure measurement location. The network communications monitor creates a log and/or a record of the network communications, identifies a device associated with the network communications (e.g., a device that originated and/or is to receive the network communication), and electronically transmits the log and/or the record to the network activity measurement system (e.g., to an audience measurement such as The Nielsen Company (US), LLC). In examples disclosed herein, the network communications monitor determines a device identifier of the identified device based on a MAC address of the device involved in the network communications. While the MAC address is not contained in the network communications itself, it can be derived by using, for example, an address resolution protocol (ARP) lookup. In some examples, the log of network communications created by the network communications monitor may be transmitted by physically mailing the log (e.g., a log stored on a memory device such as, for example, a flash memory, a compact disc, a DVD, etc.)

Some example methods, apparatus, and articles of manufacture disclosed herein are located at a media exposure measurement location having one or more media devices. Some of these example methods, apparatus, and articles of manufacture are interposed between the media devices and a wide area network (WAN), such as the Internet, that includes one or more media providers that provide media in response to request(s) from the media devices. Some example methods, apparatus, and articles of manufacture disclosed herein intercept messages to and/or from the WAN (e.g., media requests (e.g., HTTP requests) from media devices on the same LAN as the intercepting method, apparatus, or article of manufacture.) When intercepting messages to and/or from the WAN, in some examples, the network communications monitor identifies an internal (e.g., private) IP address associated with the intercepted message (e.g., a destination IP address or a source IP address). In some examples, the internal IP address is used when deter-

6

mining the MAC address of the media device associated with the intercepted message.

Some example methods, apparatus, and articles of manufacture disclosed herein inspect the network communications to determine if the network communications should be recorded. Not all network requests are of interest to the monitoring entity. For example, when the network communications monitor identifies hypertext transfer protocol (HTTP) requests, the network communications are transmitted to a network activity measurement system and/or stored for transmission to the network activity measurement system at a later time. In contrast, when the network communications monitor identifies a message not associated with media presentation (e.g., a border gateway protocol (BGP) message), the network communications monitor may ignore such a message. In some other examples, the message may be ignored when a device identifier and/or a MAC address cannot be determined. Some such example methods, apparatus, and articles of manufacture additionally or alternatively determine ownership and/or usage statistics based on messages from the WAN to the media devices on the LAN. Some example methods, apparatus, and articles of manufacture disclosed herein determine the type(s) of media device based on the network communications (e.g., via HTTP queries contained in the communications, via a MAC address associated with the media device, via a device identifier associated with the media device, etc.) but, unlike media providers that track usage statistics, do not return media to the media device(s) in response to the network communications.

FIG. **1** is a block diagram illustrating an example system **100** to identify media devices shown in an example environment of use. The example system of FIG. **1** includes a network activity measurement system **110**, and a network communications monitor **180**. The network communications monitor **180** monitors communications across a network **125**. The example environment of FIG. **1** includes the network **125**, an example media exposure measurement location **140**, and an example media provider **130**. The example media exposure measurement location **140** of FIG. **1** includes an example network gateway **145**, an example modem **143**, and example network devices **150**. The network gateway **145** is able to communicate with, for example, the example media provider **130** via the network **125**. In the illustrated example, network devices **150** include a first media device **151**, a second media device **152**, a third media device **153**, a fourth media device **154**, and a fifth media device **155**.

The network activity measurement system **110** of the illustrated example comprises a server **111** that collects and processes network communications from the media devices **150** to generate media device information. The server **111** of the network activity measurement system **110** of FIG. **1** analyzes the network communications across multiple measurement locations such as the example measurement location **140** to identify, for example, which media devices are the most owned, the most-frequently used, the least-frequently owned, the least-frequently used, the most/least-frequently used for particular type(s) and/or genre(s) of media, and/or any other media statistics or aggregate information that may be determined from the data. The media device information may also be correlated or processed with factors such as geodemographic data (e.g., a geographic location of the media exposure measurement location, age(s) of the panelist(s) associated with the media exposure measurement location, an income level of a panelist, etc.) Media device information may be useful to manufacturers and/or

US 11,652,901 B2

7

advertisers to determine which features should be improved, determine which features are popular among users, identify geodemographic trends, occurrence(s) related to and/or behaviors of (e.g., demographic group(s) in physical geographic area(s) (e.g., North America, the South Eastern US, etc.)) with respect to media devices, identify market opportunities, and/or otherwise evaluate their own and/or their competitors' products. In some examples, the network activity measurement system is a central measurement system that receives and/or aggregates monitoring information collected at multiple different measurement sites.

The network 125 of the illustrated example of FIG. 1 is a wide area network (WAN) such as the Internet. However, in some examples, local networks may additionally or alternatively be used. For example, multiple networks may be utilized to couple the components of the example system 100 to identify media devices.

In the illustrated example, the media devices 150 of FIG. 1 are devices that retrieve media from the media provider 130 (e.g., via gateway 145) for presentation at the media exposure measurement location 140. In some examples, the media devices 150 are capable of directly presenting media (e.g., via a display) while, in some other examples, the media devices 150 present the media on separate media presentation equipment (e.g., speakers, a display, etc.). The first media device 151 of the illustrated example is an Internet enabled television, and thus, is capable of directly presenting media (e.g., via an integrated display and speakers). The second media device 152 of the illustrated example is a first gaming console (e.g., Xbox®, Playstation® 3, etc.) and requires additional media presentation equipment (e.g., a television) to present media. The third media device 153 and the fourth media device 154 are tablet devices. In the illustrated example, the third media device 153 and the fourth media device 154 are the same type of device from the same manufacturer (e.g., both the third media device 153 and the fourth media device 154 are Apple iPads). Accordingly, the OUI (e.g., a manufacturer and/or device specific portion of the MAC address) of the third media device 153 and the fourth media device 154 are the same. The fifth media device 155 of the illustrated example is a second gaming console (e.g., Xbox®, Playstation® 3, etc.) and requires additional media presentation equipment (e.g., a television) to present media. Although the fifth media device 155 and the second media device 152 are both gaming consoles, they are not made by the same manufacturer and, accordingly, do not share the same OUI. While, in the illustrated example, an Internet enabled television, gaming consoles, and tablet devices are shown, any other type(s) and/or number(s) of media device(s) may additionally or alternatively be used. For example, Internet-enabled mobile handsets (e.g., a smartphone), tablet computers (e.g., an iPad®, a Google Nexus, etc.) digital media players (e.g., a Roku® media player, a Slingbox®, etc.) etc. may additionally or alternatively be used. Further, while in the illustrated example five media devices are shown, any number of media devices may be used. In the illustrated example, media devices 150 may be wired devices (e.g., connected to the network communications monitor 180 via wired connection such as, for example, an Ethernet connection) the media devices 150 may additionally or alternatively be wireless devices (e.g., connected to the network communications monitor 180 via a wireless connection such as, for example, a WiFi connection, a Bluetooth connection, etc.)

The media provider 130 of the illustrated example of FIG. 1 includes a server 131 providing media (e.g., web pages, videos, images, advertisements, etc.). The media provider

8

130 may be implemented by any provider(s) of media such as a digital broadcast provider (e.g., a cable television service, a fiber-optic television service, etc.) and/or an on-demand digital media provider (e.g., Internet streaming video and/or audio services such as Netflix®, YouTube®, Hulu®, Pandora®, Last.fm®,) and/or any other provider of media services (e.g., streaming media services). In some other examples, the media provider 130 is a host for a web site(s). Additionally or alternatively, the media provider 130 may not be on the Internet. For example, the media provider may be on a private and/or semi-private network (e.g., a LAN.)

The media exposure measurement location 140 of the illustrated example of FIG. 1 is a panelist household. However, the media exposure measurement location 140 may be any other location, such as, for example an internet café, an office, an airport, a library, a non-panelist household, etc. While in the illustrated example a single media exposure measurement location 140 is shown, any number and/or type(s) of media exposure measurement locations may be used.

The modem 143 of the illustrated example of FIG. 1 is a modem that enables network communications of the media exposure measurement location 140 to reach the network 125. In some examples, the modem 143 is a digital subscriber line (DSL) modem, while in some other examples the modem 143 is a cable modem. In some examples, the modem 143 is a media converter that converts one communications medium (e.g., electrical communications, optical communications, wireless communications, etc.) into another type of communications medium. In the illustrated example, the modem 143 is separate from the network gateway 145. However, in some examples, the modem 143 may be a part of (e.g., integral to) the network gateway 145.

The example network gateway 145 of the illustrated example of FIG. 1 is a router that enables the media devices 150 to communicate with the network 125 (e.g., the Internet). In some examples, the example network gateway 145 includes gateway functionality such as modem capabilities. In some other examples, the example network gateway 145 is implemented in two or more devices (e.g., a router, a modem, a switch, a firewall, etc.).

In some examples, the example network gateway 145 hosts a LAN for the media exposure measurement location 140. In the illustrated example, the LAN is a wireless local area network (WLAN) that communicates wirelessly with the media devices 150, and allows the media devices 150 to transmit and receive data via the Internet. Alternatively, the network gateway 145 may be coupled to such a LAN.

The network communications monitor 180 of the illustrated example of FIG. 1 is a network device interposed between the LAN hosted by the example network gateway 145 and the network 125. Additionally or alternatively, the network communications monitor 180 may be a device on the LAN and/or integrated into the gateway 145. The network communications monitor 180 of the illustrated example identifies network communications from the media devices 150 within the media exposure measurement location 140. The network communications monitor 180 creates a record (e.g., a log) identifying which of the media device(s) 150 were involved in which of the network communications and transmits the record to the network activity measurement system 190. In some examples, the network communications monitor 180 determines which device was involved in the network communications by inspecting the network communications passing through the network communications monitor 180 for indicia that may identify the

US 11,652,901 B2

9

media device and/or may facilitate identification of the media device (e.g., an IP address that may be used to lookup a MAC address via an ARP table).

In some examples, the example network gateway **145** permits custom firmware and/or software to be loaded and/or executed. In some such examples, the network gateway **145** may be provided with firmware and/or software to implement the network communications monitor **180** (in whole or in part). In such an example, in addition to standard routing and/or modem behavior, the firmware and/or software monitors messages and/or data packets directed from the media devices **150** to the network **125** or directed from the network **125** to the media devices **150**. As noted above, such monitoring functionality may be part of and/or shared with a separate device such as, for example, the network communications monitor **180**.

FIG. **2** is a block diagram of an example configuration **200** of the local area network shown in FIG. **1**. In the example configuration **200** of the illustrated example, the network communications monitor **180** is placed between the network **125** and the modem **143**. The modem **143** communicates with the network gateway **145**, which in turn communicates with the media devices **150**.

In the illustrated example, the network communications monitor **180** monitors communications between the modem **143** and the network **125**. For example, when the modem **143** is a DSL modem the network communications monitor **180** monitors the DSL communications. In the illustrated example, the network communications monitor **180** includes one or more ports (e.g., a DSL port, a cable port, etc.) for receiving and/or transmitting network communications.

FIG. **3** is a block diagram of another example configuration **300** of the LAN shown in FIG. **1**. In the example configuration **300** of FIG. **3**, the network communications monitor **180** is placed between the network gateway **145** and the media devices **150**. Thus, the modem **143** communicates with the network gateway **145**. The network gateway **145** communicates with the media devices **150**, and those communications pass through the network communications monitor **180**.

In the illustrated example of FIG. **3**, the network communications monitor **180** monitors communications between the network gateway **145** and the media devices **150**. In some examples, the network communications monitor **180** is a network routing device (e.g., a router, a switch, a hub, etc.) that monitors network communications. In the illustrated example, because the modem **143** and the network gateway **145** are adjacent, they may be combined into a single device. For example, a combined gateway and modem device may additionally or alternatively be used. In some examples, the network communications monitor **180** is additionally or alternatively integrated in the network gateway and/or in the modem **143**.

FIG. **4** is a block diagram of an example network communications monitor **180** to implement the network communications monitor **180** of FIG. **1**. The example network communications monitor **180** of FIG. **4** includes a network communicator **405**, a communications processor **410**, a communications data storer **415**, a communications data store **420**, a communications transmitter **425**, and a device information receiver **430**.

The network communicator **405** of the illustrated example of FIG. **4** is an Ethernet interface. In the illustrated example, the network communicator **410** receives network communications (e.g., HTTP requests, etc.) from the network gateway **145**, the media devices **150**, and/or the modem **143**. The network communicator **405** transmits the network com-

10

munications to the network **125**, and receives and/or transmits network communications in the reverse path (e.g., towards the LAN). While in the illustrated example, the network communicator **405** is an Ethernet interface, any other type of interface may additionally or alternatively be used. For example, the network communicator **405** might include one or more of a Bluetooth interface, a WiFi interface, a digital subscriber line (DSL) interface, a T1 interface, etc. While in the illustrated example a single network communicator **405** is shown, any number and/or type(s) of network communicators may additionally or alternatively be used. For example, two network communicators (e.g., Ethernet interfaces) may be used. In such an example, a first network communicator may receive and/or transmit network communications to and/or from the network gateway **145** while a second network communicator may receive and/or transmit network communications to and/or from the network **125**.

The communications processor **410** of the illustrated example of FIG. **4** inspects network communications received by the network communicator **405**. The example communications processor **410** of FIG. **4** is implemented by a processor executing instructions, but it could alternatively be implemented by an Application Specific Integrated Circuit (ASIC), Digital Signal Processor (DSP), Field Programmable Gate Array (FPGA), or other circuitry. In the illustrated example, the communications processor **410** filters network communications received by the network communicator **405** to identify network communications of the media devices **150**. Further, the communications processor **410** identifies the media device **150** involved in the network communications. In examples disclosed herein, the communications processor **410** identifies the media device **150** by determining a device identifier of the media device **150** and/or a MAC address of the media device **150**.

The communications data storer **415** of the illustrated example of FIG. **4** stores network communications identified by the communications processor **410** in the network communications data store **420**. The example data storer **415** of the illustrated example is implemented by a processor executing instructions, but it could alternatively be implemented by an ASIC, DSP, FPGA, or other circuitry. The communications processor **410** and the data storer **415** may be implemented by the same physical processor. In the illustrated example, network communications identified by the communications processor **410** are stored in association with the media device(s) **150** identified as receiving and/or transmitting network communications.

The network communications data store **420** of the illustrated example of FIG. **4** may be any device for storing data such as, for example, flash memory, magnetic memory, optical media, etc. Furthermore, the data stored in the network communications data store **420** may be in any data format such as, for example, binary data, comma delimited data, tab delimited data, structured query language (SQL) structures, etc. While, in the illustrated example, the network communications data store **420** is illustrated as a single database, the network communications data store **420** may be implemented by any number and/or type(s) of databases. In the illustrated example, the network communications data store **420** stores an ARP table **401**, and a MAC address to device identifier table **402**. An example implementation of the ARP table **401** is further described in connection with FIG. **4A**. An example implementation of the MAC address to device identifier table **402** is further described in connection with FIG. **4B**.

US 11,652,901 B2

11

The communications transmitter **425** of the illustrated example of FIG. **4** transmits network communications data stored in the network communications data store **420**. In the illustrated example, the communications transmitter **425** is implemented by a processor executing instructions, but it could alternatively be implemented by an ASIC, DSP, FPGA, or other circuitry. The communications transmitter **425** may be implemented on the same physical processor as the communications processor **410** and/or the communications data storer **415**. The communications transmitter **425** of the illustrated example periodically and/or a-periodically transmits network communications data from the network communications data store **420** to the network activity measurement system **110**.

The example communications transmitter **425** may transmit the network communications data upon determining that the amount of network communications data stored in the network communication data store **420** has reached a threshold, and/or in response to a clock (e.g., a time limit specifying that network communications are transmitted once every day). Transmitting network communications every day ensures that there is little lag time between the occurrence of the network communications and the ability to analyze the network communications. However, the transmission may occur at any desired interval(s) such as, for example, transmitting once every hour, once every week, etc. In examples in which the transmission is triggered based on an amount of network communications data stored in the network communications data store **420**, the transmission threshold might indicate that network communications should be transmitted if there is more than a threshold amount (e.g., one megabyte) of network communications data stored in the network communications data store **420**. Any data storage amount may be used for such a trigger such as, for example, ten megabytes, one hundred megabytes, etc. Additionally or alternatively, multiple transmission thresholds may be present. For example, a threshold indicating that network communications data should be transmitted at least once a day and a threshold indicating that network communications data should be transmitted if more than one megabyte of network communications data is stored in the network communications data store **420** might be used.

In the illustrated example, the communications transmitter **425** transmits the network communications data via the network **125**. However, the communications transmitter **425** may transmit network communications data via any other communication medium. For example, the network communications monitor **180** may be physically mailed to the network activity measurement system **110** and the communications transmitter **425** might transmit network communications data via, for example, a USB connection, a Bluetooth connection, a serial connection, a local area network (LAN), etc.

The example device information receiver **430** of the illustrated example of FIG. **4** receives and stores device identifiers in association with MAC addresses in the MAC address to device identifier table **402** of the network communications data store **420**. In the illustrated example, the device information receiver **430** is implemented by a processor executing instructions, but it could alternatively be implemented by an ASIC, DSP, FPGA, or other circuitry. The device information receiver **430** may be implemented on the same physical processor as the communications processor **410**, the communications data storer **415**, and/or the communications transmitter **425**. In the illustrated example, the device information receiver **430** provides a network accessible interface (e.g., a webpage) that is

12

accessed via a separate device (e.g., a personal computer, a tablet computer, etc.). In examples disclosed herein, the device information receiver **430** stores a device identifier that is provided by an installer (e.g., a representative of a media monitoring entity (e.g., an audience measurement entity such as The Nielsen Company (US), LLC) and/or by a user of the media device. For each media device on the network, the installer and/or user enters a MAC address of the device and a respective device identifier of the corresponding media device into the interface of the device information receiver **430**. The device information receiver **430** then stores the association of the MAC address and the device identifier in the MAC address to device identifier table **402**, which may be used to identify the corresponding media device at a later time.

FIG. **4A** is an example address resolution protocol (ARP) table **401** that may be stored by the example network communications data store of the example network communications monitor of FIGS. **1** and/or **4** to associate an Internet protocol (IP) address with a media access control (MAC) address. The example ARP table **401** is maintained by the network communicator **405**. The ARP table **401** is updated by the network communicator **405** as IP addresses of media devices change (e.g., new IP addresses are issued via DHCP).

The example ARP table **401** of FIG. **4A** includes an IP address column **460** and a MAC address column **465**. In the illustrated example, the IP address column **460** represents a IP version 4 (IPv4) addresses of media devices on the LAN. However, any other type of address may additionally or alternatively be used such as, for example, an IPv6 address. In the illustrated example, the MAC address column **465** represents MAC addresses of media devices on the LAN. However, any other type of address may additionally or alternatively be used. Each row of the ARP table **401** of FIG. **4A** represents a specific media device (i.e., the IP address and MAC address of a single media device).

The example ARP table **401** of the illustrated example of FIG. **4A** includes five rows respectively associated with five different media devices on the LAN. A first row **471** corresponds to the first media device **151**. A second row **472** corresponds to the second media device **152**. A third row **473** corresponds to the third media device **153**. A fourth row **474** corresponds to the fourth media device **154**. A fifth row **475** corresponds to the fifth media device **155**. In the illustrated example, the first six characters of the MAC address (described above as the OUI) of the third row **473** and the fourth row **474** are the same (e.g., "4C:B1:99"). In the illustrated example, the matching OUI indicates that the third media device **153** and the fourth media device **154** are of the same manufacturer and/or model.

FIG. **4B** is an example MAC address to device identifier table **402** that may be stored by the example network communications data store of the example network communications monitor of FIGS. **1** and/or **4** to associate a media access control (MAC) address with a device identifier. The example MAC address to device identifier table **402** is updated by the device information receiver **430**. The example MAC address to device identifier table **402** includes a MAC address column **480** and a device identifier column **485**. Because MAC addresses are persistent, the association of the MAC address column **480** and the device identifier column **485** is also persistent. That is, device identifiers are permanently and/or semi-permanently associated with media devices at the media exposure measurement location **140**. The example MAC address to device identifier table **402** includes five rows respectively associ-

US 11,652,901 B2

13

ated with five different media devices at the media exposure measurement location **140**. For example, a first iPad in the media exposure measurement location **140** is assigned a device identifier of "PANELIST0001_IPAD01" (row **492**), while a second iPad in the media exposure measurement location is assigned a device identifier of "PANELIST0001_IPAD02" (row **493**). The identifier of row **493** indicates that the second iPad is associated with the same panelist (e.g., the same person in the same household). However, the second iPad may be assigned and/or associated with any other device identifier to, for example, identify a particular panelist within a household (e.g., "PANELIST0002_IPAD02", "Suzie's iPad", etc.).

In the illustrated example of FIG. 4B, the device identifiers associated with each of the MAC addresses includes a panelist identifier (e.g., "PANELIST0001"), a media device type (e.g., "XBOX", "PLAYSTATION", "IPAD", "SMARTTV", etc.), and a serial identifier (e.g., "01"). However, the device identifier may be formatted and/or constructed in any other fashion. In the illustrated example, the device identifier is a unique identifier that is not shared across media devices and/or media exposure measurement location **140**. However, in some examples, the device identifier is not unique across multiple media exposure measurement location (but is preferably unique within a single media exposure measurement location). In such examples, the device identifier may be combined with a network communications monitor identifier and/or media exposure measurement location identifier (e.g., a unique identifier assigned to the panelist and/or panelist household).

FIG. 5 is a block diagram of an example implementation of the example network activity measurement system **110** of FIG. 1. The example network activity measurement system **110** of FIG. 5 includes a communications receiver **520**, a communications analyzer **540**, and a network communications data store **510**.

The communications receiver **520** of the illustrated example of FIG. 5 receives network communications data from the example network communications monitor **180** shown in FIGS. 1 and 4. In the illustrated example, the communications data receiver **520** is implemented by a processor executing instructions, but it could alternatively be implemented by an ASIC, DSP, FPGA, or other circuitry. In the illustrated example, the communications receiver **520** is implemented by a server which receives the network communications from the network communications monitor **180** via a network interface (e.g., an Ethernet connection). However, the communications receiver **520** may receive the network communications from the network communications monitor **180** via any other type of interface such as, for example, a universal serial bus (USB) connection, a Bluetooth connection, etc. The communications receiver **520** of the illustrated example stores the received network communications in the network communications data store **510**.

The network communications data store **510** of the illustrated example of FIG. 5 may be implemented by any type(s) and/or number of device(s) and/or storage disks for storing data such as, for example, flash memory, magnetic media, optical media, etc. Furthermore, the data stored in the network communications data store **510** may be in any data format(s) such as, for example, binary data, comma delimited data, tab delimited data, structured query language (SQL) structures, etc. While, in the illustrated example, the network communications data store **510** is illustrated as a single database, the network communications data store **510** may be implemented by any number and/or type(s) of databases. In the illustrated example, the example network

14

communications data store **510** stores the MAC address to device identifier table **402**, and a communication log **501**. The communication log **501** is described in further detail in connection with FIG. 5A.

The communications analyzer **540** of the illustrated example of FIG. 5 analyzes communications from the network devices **150** (received via the network communications monitor **180** and the communications receiver **520**). In the illustrated example, the communications analyzer **540** is implemented by a processor executing instructions, but it could alternatively be implemented by an ASIC, DSP, FPGA, or other circuitry. The communications analyzer **540** may be implemented on the same physical processor as the communications receiver **520**. The example communications analyzer **540** of FIG. 5 is implemented by a server which analyzes the communications from the media devices **150** to determine, for example, ownership and/or usage statistics of the media devices **150**, relative rankings of usage and/or ownership of media devices **150**, type(s) of uses of media devices **150** (e.g., whether a device is used for browsing the Internet, streaming media from the Internet, etc.), and/or other type(s) of network device information.

FIG. 5A is an example communication log **501** that may be stored by the example network communications data store **510** of the example network activity measurement system **110** of FIGS. 1 and/or 5. The example communication log **501** is transmitted to the network activity measurement system **110** by the network communications monitor **180**. In the illustrated example, for simplicity, the communication log **501** represents communications received from a single network communications monitor **180** (e.g., network communications monitored at a single media exposure measurement location **140**). However, in practice, the communication log **501** may represent communications received from multiple network communications monitors **180**, associated with many different media exposure measurement locations **140**. In the illustrated example, the communication log **501** includes a device identifier column **560**, a timestamp column **563**, and a network data column **566**. The device identifier column **560** represents device identifiers as received from the network communications monitor **180** (and/or as translated by the communications analyzer **540** based on the MAC address). The timestamp column **563** represents a timestamp (e.g., a time of occurrence) associated with the network data of the network data column **566**. The example network data column **566** includes HTTP headers of network communications monitored by the network communications monitor **180**. However, any other information related to the communications may additionally or alternatively be stored such as, for example, an HTTP payload, FTP data, HTTPS data, etc.

The example data of the communications log **501** indicates that at a first time, the first media device **151** transmitted a request to "www.hulu.com" (row **570**). Such a request indicates that the first media device **151** was used to present media retrieved from hulu. At a second time, the fourth media device **154** transmitted a request to "www.engadget.com" (row **571**). The first media device then transmitted a request to "www.netflix.com" at a third time (row **572**), and then another request to the same destination at a fourth time (row **573**). The fourth media device **154** then transmitted a request to "www.cnet.com" at a fifth time (row **574**). Based on the network data, the communications analyzer **540** may, for example, determine ownership and/or usage statistics of the media devices **150**, determine relative rankings of usage and/or ownership of media devices **150**, determine demographics that may more frequently use a

US 11,652,901 B2

15

particular type of media device, determine demographics that may more frequently use a particular media device for a certain function (e.g., streaming television, internet browsing, etc.), types of uses of media devices **150** (e.g., whether a device is used for browsing the Internet, streaming media from the Internet, etc.), and/or other types of network device information and/or media usage information (e.g., exposure statistics for various demographic groups).

While an example manner of implementing the network activity measurement system **110** of FIG. 1 has been illustrated in FIG. **5** and an example manner of implementing the network communications monitor **180** of FIG. 1 has been illustrated in FIG. **4**, one or more of the elements, processes and/or devices illustrated in FIGS. **4** and/or **5** may be combined, divided, re-arranged, omitted, eliminated and/or implemented in any other way. Further, the example network communicator **405**, the example communications process **410**, the example communications data storer **415**, the example network communications data store **420**, the example communications transmitter **425**, the example device information receiver **430**, and/or, more generally, the example network communications monitor **180** of FIGS. 1 and **4** and/or the example network communications data store **510**, the example communications receiver **520**, the example communications analyzer **540**, and/or, more generally, the example network activity measurement system **110** of FIGS. 1 and **5** may be implemented by hardware, software, firmware and/or any combination of hardware, software and/or firmware. Thus, for example, any of the example network communicator **405**, the example communications process **410**, the example communications data storer **415**, the example network communications data store **420**, the example communications transmitter **425**, the example device information receiver **430**, and/or, more generally, the example network communications monitor **180** of FIGS. 1 and **4** and/or the example network communications data store **510**, the example communications receiver **520**, the example communications analyzer **540**, and/or, more generally, the example network activity measurement system **110** of FIGS. 1 and **5** could be implemented by one or more analog or digital circuit(s), logic circuits, programmable processor(s), application specific integrated circuit(s) (ASIC(s)), programmable logic device(s) (PLD(s)) and/or field programmable logic device(s) (FPLD(s)). When reading any of the apparatus or system claims of this patent to cover a purely software and/or firmware implementation, at least one of the example network communicator **405**, the example communications process **410**, the example communications data storer **415**, the example network communications data store **420**, the example communications transmitter **425**, the example device information receiver **430**, and/or, more generally, the example network communications monitor **180** of FIGS. 1 and **4** and/or the example network communications data store **510**, the example communications receiver **520**, the example communications analyzer **540**, and/or, more generally, the example network activity measurement system **110** of FIGS. 1 and **5** is/are hereby expressly defined to include a tangible computer readable storage device or storage disk such as a memory, a digital versatile disk (DVD), a compact disk (CD), a Blu-ray disk, etc. storing the software and/or firmware. Further still, the example network activity measurement system **110** of FIGS. 1 and/or **5**, and/or the example network communications monitor **180** of FIGS. 1 and/or **4** may include one or more elements, processes and/or devices in addition to, or instead of, those illustrated in FIGS. 1, **4**, and/or **5**, and/or

16

may include more than one of any or all of the illustrated elements, processes and devices.

Flowcharts representative of example machine readable instructions for implementing the example network communications monitor **180** of FIGS. 1 and/or **4** are shown in FIGS. **6**, **7**, and/or **8**. Flowcharts representative of example machine readable instructions for implementing the example network activity measurement system **110** of FIGS. 1 and/or **5** is shown in FIG. 9. In these examples, the machine readable instructions comprise a program for execution by a processor such as the processor **1012** shown in the example processor platform **1000** discussed below in connection with FIG. **10**. The program may be embodied in software stored on a tangible computer readable storage medium such as a CD-ROM, a floppy disk, a hard drive, a digital versatile disk (DVD), a Blu-ray disk, or a memory associated with the processor **1012**, but the entire program and/or parts thereof could alternatively be executed by a device other than the processor **1012** and/or embodied in firmware or dedicated hardware. Further, although the example program is described with reference to the flowcharts illustrated in FIGS. **6**, **7**, **8**, and/or **9**, many other methods of implementing the example network activity measurement system **110** of FIGS. 1 and/or **5**, and/or the example network communications monitor **180** of FIGS. 1 and/or **4** may alternatively be used. For example, the order of execution of the blocks may be changed, and/or some of the blocks described may be changed, eliminated, or combined.

As mentioned above, the example processes of FIGS. **6**, **7**, **8**, and/or **9** may be implemented using coded instructions (e.g., computer and/or machine readable instructions) stored on a tangible computer readable storage medium such as a hard disk drive, a flash memory, a read-only memory (ROM), a compact disk (CD), a digital versatile disk (DVD), a cache, a random-access memory (RAM) and/or any other storage device or storage disk in which information is stored for any duration (e.g., for extended time periods, permanently, for brief instances, for temporarily buffering, and/or for caching of the information). As used herein, the term tangible computer readable storage medium is expressly defined to include any type of computer readable storage device and/or storage disk and to exclude propagating signals. As used herein, "tangible computer readable storage medium" and "tangible machine readable storage medium" are used interchangeably. Additionally or alternatively, the example processes of FIGS. **6**, **7**, **8**, and/or **9** may be implemented using coded instructions (e.g., computer and/or machine readable instructions) stored on a non-transitory computer and/or machine readable medium such as a hard disk drive, a flash memory, a read-only memory, a compact disk, a digital versatile disk, a cache, a random-access memory and/or any other storage device or storage disk in which information is stored for any duration (e.g., for extended time periods, permanently, for brief instances, for temporarily buffering, and/or for caching of the information). As used herein, the term non-transitory computer readable medium is expressly defined to include any type of computer readable device or disk and to exclude propagating signals. As used herein, when the phrase "at least" is used as the transition term in a preamble of a claim, it is open-ended in the same manner as the term "comprising" is open-ended.

FIG. 6 is a flowchart representative of example machine-readable instructions **600** which may be executed to implement the example network communications monitor **180** of FIGS. 1 and **4** to monitor network communications. The machine-readable instructions **600** of FIG. 6 begin execution when the network communicator **405** receives network

US 11,652,901 B2

17                                                 18

communications (block **610**). In the illustrated example, the network communicator **405** receives network communications sent from the network gateway **145** to the network **125** and/or a device on the network **125**. However, in some examples, the network communicator **405** also receives network communications sent from the network **125** and/or a device on the network **125** to the network gateway **145**.

The communications processor **410** then determines the internal IP address of the media device involved in the network communication (block **620**). In some examples, the media device may be the source (e.g., the originator) of the network communication, while in some other examples the media device may be the destination of the network communication. In the illustrated example, the communications processor **410** identifies the IP address by selecting an internal IP address involved in the communications. In some examples, the network communication may involve both a source and a destination that are internal to the LAN (e.g., a first media device on the LAN communicates with a second media device on the LAN). In such examples, the communications processor **410** may ignore the network communication. However, in some examples, the communications processor **410** may select the IP address of the source of the network communication as the IP address.

The communications processor **410** then performs a lookup of the MAC address based on the IP address (block **630**). In the illustrated example, the communications processor **410** performs the lookup via the ARP table **401**. The ARP table is maintained by the example network communicator **405** of the network communications monitor **180**. However any other way of determining the MAC address of the IP address associated with the network communications may be used. The communications processor **410** then determines the device identifier based on the MAC address (block **640**). In the illustrated example, the communications processor **410** determines the device identifier based on the MAC address identified by the lookup of block **630**. However, in some examples, the communications processor **410** may determine the device identifier based on the IP address. In such an example, the network communicator **405** may maintain a table storing relationships between IP addresses of media devices on the network and their respective device identifiers. The communications processor **410** determines whether the device identifier can be resolved based on the MAC address (block **650**).

If the device identifier can be resolved, the communications data storer **415** stores data identifying the network communication in association with the device identifier in the network communications data store **420** (block **670**). If the device identifier cannot be resolved, the reason for not being resolved is likely that a new device has been added to the network. To account for such a situation, if the device identifier cannot be resolved, the communications processor **410** sends an alert to the network activity measurement system **110** of a new device added to the network (block **660**). Such an alert enables the monitoring entity associated with the network activity measurement system **110** to contact the panelist (e.g., the homeowner) to inquire about the new device. If, for example, the panelist confirms to that a new device has been added, a device identifier may be issued for the new device. In some examples, an installer may be sent to the media exposure measurement location **140** to identify the media device **150** and/or the MAC address of the media device **150**. The installer may interact with the device information receiver **430** to enter the identifier and the MAC address of the media device so that the association can be recorded in the MAC address to device identifier

table **402**. In some examples, the installer may direct and/or otherwise instruct a user of the media device to interact with the device information receiver **430**. For example, the installer may conduct a telephone call with the user to convey such instructions. While in the illustrated example, the installer is described as an active party (e.g., a party that actively inputs information into an interface of the device information receiver **430**, a party that instructs a user of the media device to do the same, etc.), in some examples the installer may be a set of instructions (e.g., an instruction booklet, an email message, a SMS message, etc.) that instructs the user to enter an device identifier of a media device via an interface of the device information receiver. If a new device has not been added (e.g., the media device was temporarily used at the media exposure measurement location **140**, for instance, by a house guest), a device identifier may not be issued. If the device identifier cannot be resolved, the communications data storer **415** stores data identifying the network communication in association with the MAC address in the network communications data store **420** (block **665**).

In the illustrated example, the communications processor **410** timestamps the network communications stored in the network communications data store **410** (block **680**). Timestamping (e.g., recording a time that an event occurred) enables accurate identification and/or correlation of media that was presented.

In some examples, the communications processor **410** inspects the network communications to identify HTTP communications. That is, the communications processor **410** and/or the communications data storer **415** may store network communications only when the communications are HTTP communications. In such an example, the HTTP communications are stored in the network communications data store **420** by the communications data storer **415**. In some examples, the communications processor **410** inspects the network communications to identify a type and/or protocol of network communication (e.g., HTTP communications, DNS communications, SIP communications, FTP communications, etc.) by for example, inspecting a header of network communication (e.g., a transmission control packet (TCP) header, a user datagram protocol (UDP) header). In some examples, the communications processor **410** inspects the network communications to identify a source and/or a destination of the network communications by for example, inspecting a header of network communication (e.g., a transmission control packet (TCP) header, a user datagram protocol (UDP) header). In such an example, communications might only be stored when they are requests transmitted to particular providers of Internet services (e.g., Netflix®, YouTube®, Hulu®, Pandora®, Last.fm®, etc.) and/or when the communications originated from a particular type of network device (e.g., an Internet enabled television, a video game console, etc.), depending on the nature of the study.

In some examples, the communications processor **410** processes the received network communications to identify particular portion(s) of the network communications. For example, to reduce the amount of storage space required to store the network communications, the communications processor **410** may remove and/or compress one or more portion(s) of the network communications.

FIG. **7** is a flowchart representative of example machine-readable instructions **700** which may be executed to implement the example network communications monitor **180** of FIGS. **1** and **4** to monitor network communications. In some examples, the MAC address to device identifier table **402** is

US 11,652,901 B2

19                                                  20

stored at the network activity measurement system **110** rather than at that the network communications monitor **180**. In such an example, the network communications monitor **180** may not be able to determine a device identifier and may instead store the network communication in association with the MAC address. As described above, FIG. **6** illustrates example instructions **600** which, when executed, attempt to identify the media device using a device identifier. In contrast, FIG. **7** illustrates example instructions **700** which, when executed, attempt to identify the media device based on a MAC address, leaving for a translation from MAC address to device identifier to be performed at the network activity measurement system **110**.

The machine-readable instructions **700** of FIG. **7** begin execution when the network communicator **405** receives network communications (block **710**). In the illustrated example, the network communicator **405** receives network communications sent from the network gateway **145** to the network **125** and/or a device on the network **125**. However, in some examples, the network communicator **405** also receives network communications sent from the network **125** and/or a device on the network **125** to the network gateway **145**.

The communications processor **410** then determines the internal IP address of the media device involved in the network communication (block **720**). In some examples, the media device may be the source (e.g., the originator) of the network communication, while in some other examples the media device may be the destination of the network communication. In the illustrated example, the communications processor **410** identifies the IP address by selecting an internal IP address involved in the communications. In some examples, the network communication may involve both a source and a destination that are internal to the LAN (e.g., a first media device on the LAN communicates with a second media device on the LAN). In such examples, the communications processor **410** may ignore the network communication. However, in some examples, the communications processor **410** may select the IP address of the source of the network communication as the IP address.

The communications processor **410** then performs a lookup of the MAC address based on the IP address (block **730**). In the illustrated example, the communications processor **410** performs the lookup via the ARP table **401**. In the illustrated example, the ARP table is maintained by the example network communicator **405** of the network communications monitor **180**. However any other way of determining the MAC address of the IP address associated with the network communications may be used.

The communications data storer **415** stores data identifying the network communication in association with the MAC address in the network communications data store **420** (block **750**). The network communication and the associated MAC address may be transmitted to the network activity measurement system **110** at a later time. In the illustrated example, the communications processor **410** timestamps the network communications stored in the network communications data store **410** (block **760**). Timestamping (e.g., recording a time that an event occurred) enables accurate identification and/or correlation of media that was presented and also enables alignment of the media identification data with audience composition data collected by, for example, a people meter to thereby enable correlation of an audience demographic to media exposure.

FIG. **8** is a flowchart representative of example machine-readable instructions **800** which may be executed to implement the example network communications monitor **180** of FIGS. **1** and **4** to transmit stored network communications. The machine-readable instructions **800** of FIG. **8** begin execution at block **805** when the communications transmitter **425** determines whether a network communications threshold has been exceeded (block **810**). In the illustrated example, the threshold is a time limit specifying that network communications are transmitted once every day. Additionally or alternatively, any other periodic and/or aperiodic approach to transmitting network communications from the network communications monitor **180** may be used. For example, the network communications threshold might be based on an amount of network communications data stored in the network communications data store **420**.

If the network communications threshold has not been exceeded (block **810**), the communications transmitter **425** continues to determine whether the data identifying the network communications have exceeded the network communications threshold. When the network communications threshold has been exceeded (block **810**), the communications transmitter **425** transmits the data identifying the network communications to the network communications data receiver **340** of the network activity measurement system **110** as a log of network activity (block **820**). In the illustrated example, the data identifying the network communications is transmitted in association with an identifier of the network communications monitor **180**. The identifier of the network communications monitor **180**, in some examples, enables identification of the source of network communications analyzed by the communications analyzer **540** of the network activity measurement system **110**.

In the illustrated example, the communications transmitter **425** transmits the stored network communications via the network communicator **405**. However, in some examples, the communications transmitter **425** transmits the stored network communications via a local connection such as, for example, a serial connection, a universal serial bus (USB) connection, a Bluetooth connection, etc. In some examples, the network communications monitor **180** may be physically moved to a location of the network activity measurement system **110** by, for example, physically mailing the network communications monitor **180**, etc.

FIG. **9** is a flowchart representative of example machine-readable instructions **900** which may be executed to implement the example network activity measurement system **110** of FIGS. **1** and **5** to identify media devices. In particular, the example flowchart of FIG. **9** illustrates an example process wherein the network activity measurement system **110** receives network communications from the network communications monitor **180** and analyzes the same. The example machine-readable instructions **900** of FIG. **9** begin execution when the communications receiver **520** receives network communications from the network communications monitor **180** (block **910**). In the illustrated example, the network communications are received from the network communications monitor **180** via a network connection, such as, for example, the Internet. However, the network communications data may be received in any other fashion. For example, the network communications data may be received via a universal serial bus (USB) connection. In such an example, the network communications monitor **180** may be mailed to a location of the network activity measurement system **110**. Additionally or alternatively, a storage device (e.g., a memory stick, a compact disk, a hard disk drive, etc.) may be mailed and/or otherwise sent to the network activity measurement system. Upon receiving the network commu-

US 11,652,901 B2

21                                                        22

nications data, the communications receiver **520** stores the network communications in the network communications data store **510**.

In some examples, the MAC address to device identifier table **402** is stored at the network communications data store **510** of the network activity measurement system **110**. In such an example, the communications analyzer **540** determines if the received network communications are received in association with a device identifier (block **920**). If the network communications are not received in association with a device identifier (block **920**) (e.g., the network communications are received in association with a MAC address), the communications analyzer **540** determines if a device identifier can be resolved based on the MAC address (block **930**). Such a determination is made by the communications analyzer **540** by performing a lookup in the MAC address to device identifier table **402**. If the device identifier can be resolved based on the MAC address, the communications analyzer **950** translates the MAC address identifier into the device identifier (block **950**).

If the device identifier cannot be resolved based on the MAC address, an alert is thrown by the communications analyzer **540**. Such an alert enables the monitoring entity associated with the network activity measurement system **110** to contact the panelist (e.g., the homeowner) to inquire about the new device. In the illustrated example, the alert identifies the identifier of the network communications monitor **180**, so that the monitoring entity associated with the network activity measurement system **110** can contact the correct panelist and/or household regarding the newly added device. If, for example, the panelist confirms that a new device has been added, a device identifier may be issued for the new device and/or may be stored in the MAC address to device identifier table. In some examples, an installer may be sent to the media exposure measurement location **140** to identify the new media device **150** and/or the MAC address of the new media device **150**. If a new device has not been added (e.g., the media device was temporarily used at the media exposure measurement location **140**), a device identifier may not be issued.

If the device identifier cannot be resolved, the communications analyzer **540** identifies the media device **150** associated with the network communications based on the MAC address (block **960**). For example, the communications analyzer may parse the MAC address to identify an OUI of the MAC address. Because the OUI is manufacturer and/or model specific, the communications analyzer **540** can identify a make and/or model of the media device associated with the network communication. In a similar regard, the identification of the make and/or model of the media device may be useful when contacting the panelist for inquiring about the newly added device. For example, the make and/or model may facilitate questioning the panelist to confirm whether a particular new device has been added to the network (e.g., "Have you recently added an Apple iPad to your network? If so, is that device associated with a particular user in the household?"). If the panelist answers in the affirmative, a device identifier indicating that the device is associated with the panelist (e.g., "PANELIST0005_IPAD") may be stored in association with the MAC address of the device in the MAC address to device identifier table **402**.

If the network communications are associated with a device identifier (block **920**), after the MAC address is translated to the device identifier (block **950**), and/or after a manufacturer and/or model of the media device is identified based on the MAC address (block **960**), the communications

analyzer **540** analyzes the communications from the media devices **150** to identify media devices (block **970**). In the illustrated example, the example communications analyzer **540** analyzes the communications to determine ownership and/or usage statistics of the media devices **150**. However, in some examples, the example communications analyzer **540** may additionally or alternatively analyze the communications to determine relative rankings of usage and/or ownership of media devices **150**, types of uses of media devices **150** (e.g., whether a device is used for browsing the Internet, streaming media from the Internet, etc.), and/or other types of media device information.

FIG. **10** is a block diagram of an example processor platform **1000** capable of executing the instructions of FIGS. **6**, **7**, **8**, and/or **9** to implement the example network activity measurement system **110** of FIGS. **1** and/or **5**, and/or the example network communications monitor **180** of FIGS. **1** and/or **4**. The processor platform **1000** can be, for example, a server, a personal computer, a mobile device (e.g., a cell phone, a smart phone, a tablet such as an iPad™), a personal digital assistant (PDA), an Internet appliance, a set top box, or any other type of computing device.

The processor platform **1000** of the illustrated example includes a processor **1012**. The processor **1012** of the illustrated example is hardware. For example, the processor **1012** can be implemented by one or more integrated circuits, logic circuits, microprocessors or controllers from any desired family or manufacturer.

The processor **1012** of the illustrated example includes a local memory **1013** (e.g., a cache). The processor **1012** of the illustrated example is in communication with a main memory including a volatile memory **1014** and a non-volatile memory **1016** via a bus **1018**. The volatile memory **1014** may be implemented by Synchronous Dynamic Random Access Memory (SDRAM), Dynamic Random Access Memory (DRAM), RAIVIBUS Dynamic Random Access Memory (RDRAM) and/or any other type of random access memory device. The non-volatile memory **1016** may be implemented by flash memory and/or any other desired type of memory device. Access to the main memory **1014**, **1016** is controlled by a memory controller.

The processor platform **1000** of the illustrated example also includes an interface circuit **1020**. The interface circuit **1020** may be implemented by any type of interface standard, such as an Ethernet interface, a universal serial bus (USB), and/or a PCI express interface.

In the illustrated example, one or more input devices **1022** are connected to the interface circuit **1020**. The input device(s) **1022** permit(s) a user to enter data and commands into the processor **1012**. The input device(s) can be implemented by, for example, a keyboard, a button, a mouse, a touchscreen, a track-pad, a trackball, isopoint and/or a voice recognition system.

One or more output devices **1024** are also connected to the interface circuit **1020** of the illustrated example. The output devices **1024** can be implemented, for example, by display devices (e.g., a light emitting diode (LED), an organic light emitting diode (OLED), a liquid crystal display, a cathode ray tube display (CRT), a touchscreen, a tactile output device, a light emitting diode (LED), a printer and/or speakers). The interface circuit **1020** of the illustrated example, thus, typically includes a graphics driver card, a graphics driver chip or a graphics driver processor.

The interface circuit **1020** of the illustrated example also includes a communication device such as a transmitter, a receiver, a transceiver, a modem and/or network interface card to facilitate exchange of data with external machines

23

(e.g., computing devices of any kind) via a network **1026** (e.g., an Ethernet connection, a digital subscriber line (DSL), a telephone line, coaxial cable, a cellular telephone system, etc.).

The processor platform **1000** of the illustrated example also includes one or more mass storage devices **1028** for storing software and/or data. Examples of such mass storage devices **1028** include floppy disk drives, hard drive disks, compact disk drives, Blu-ray disk drives, RAID systems, and digital versatile disk (DVD) drives.

The coded instructions **1032** of FIGS. **6**, **7**, **8**, and/or **9** may be stored in the mass storage device **1028**, in the volatile memory **1014**, in the non-volatile memory **1016**, and/or on a removable tangible computer readable storage medium such as a CD or DVD.

Although certain example methods, apparatus and articles of manufacture have been described herein, the scope of coverage of this patent is not limited thereto. On the contrary, this patent covers all methods, apparatus and articles of manufacture fairly falling within the scope of the claims of this patent.

What is claimed is:

**1**. A network communications monitor to log network traffic within a household that is monitored by an audience measurement entity, the network communications monitor comprising:

a network interface;

a processor; and

a non-transitory computer-readable medium having stored therein instructions that are executable to cause the network communications monitor to perform operations comprising:

detecting, via the network interface, multiple network communications transmitted on a wireless network within the household via a network gateway of the wireless network, wherein the network gateway is configured to route the multiple network communications within the wireless network;

accessing panelist data that associates a panelist of the household with a panelist device of the panelist;

determining, based on the panelist data, that a network communication of the multiple network communications is associated with the panelist device by determining that a media access control (MAC) address associated with the network communication matches a MAC address of the panelist device, and

causing storage of data identifying the network communication in association with the panelist,

wherein:

the network communications monitor is located within the household; and

the network communications monitor is implemented by the network gateway.

**2**. The network communications monitor of claim **1**, wherein:

the panelist data associates the MAC address of the panelist device with the panelist, and

the panelist device is a source of the network communication or a destination of the network communication.

**3**. The network communications monitor of claim **1**, wherein the panelist device is a mobile device that is wirelessly connected to the wireless network.

**4**. The network communications monitor of claim **3**, wherein detecting the multiple network communications includes inspecting traffic passing through the network gateway.

24

**5**. The network communications monitor of claim **4**, wherein the data identifying the network communication includes a timestamp and network data extracted from a header of the network communication.

**6**. The network communications monitor of claim **5**, wherein the network data includes a uniform resource locator.

**7**. The network communications monitor of claim **2**, wherein operations further comprise identifying the MAC address of the panelist device using an address resolution protocol table.

**8**. The network communications monitor of claim **2**, wherein the operations further comprise:

obtaining identification data that identifies the MAC address of the panelist device and indicates that the panelist device is associated with the panelist; and

generating the panelist data that associates the MAC address with the panelist.

**9**. The network communications monitor of claim **1**, wherein causing storage of the data identifying the network communication in association with the panelist includes causing the data identifying the network communication in association with the panelist to be added to a log of network traffic.

**10**. The network communications monitor of claim **9**, wherein the operations further include causing transmission of the log of network traffic to a server that collects and processes logs of network traffic from a plurality of households.

**11**. The network communications monitor of claim **9**, wherein the operations further include:

detecting an additional network communication transmitted on the wireless network within the household,

determining, using the panelist data, that the additional network communication is not associated with any known panelist devices of panelists of the household, and

causing storage of data identifying the additional network communication in the log of network traffic in a manner that distinguishes the additional network communication from the network communication.

**12**. The network communications monitor of claim **1**, wherein the storage of the data identifying the network communication in association with the panelist is performed in response to the determination that the one or more of the network communication is associated with the panelist device.

**13**. A method for logging network traffic within a household that is monitored by an audience measurement entity, the method comprising:

detecting, via a network interface of a network communications monitor located within the household, multiple network communications transmitted on a wireless network within the household via a network gateway of a wireless network, wherein the network gateway routes the network communications within the wireless network;

accessing panelist data that associates a panelist of the household with a panelist device of the panelist;

determining, via a processor of the network communications monitor, based on the panelist data, that a network communication of the multiple network communications is associated with the panelist device by determining that a media access control (MAC) address associated with the network communication matches a MAC address of the panelist device; and

US 11,652,901 B2

25      26

based on determining that the network communication is associated with the panelist device, storing data identifying the network communication in association with the panelist.

**14**. The method of claim **13**, wherein:

the panelist data associates the media access control MAC address of the panelist device with the panelist, and

the panelist device is a source of the network communication or a destination of the network communication.

**15**. The method of claim **13**, wherein the panelist device is a mobile device that is wirelessly connected to the wireless network.

**16**. The method of claim **15**, wherein detecting the multiple network communications includes inspecting traffic passing through the network gateway.

**17**. The method of claim **16**, wherein the data identifying the network communication includes a timestamp and network data extracted from a header of the network communication.

**18**. An audience measurement system comprising:

a server; and

a network communications monitor to log network traffic within a household, the network communications monitor located within the household, the network communications monitor including a network interface, a processor, and a non-transitory computer-readable medium having stored therein instructions that are executable to cause the network communications monitor to perform operations comprising:

    detecting, via the network interface, multiple network communications transmitted on a wireless network within the household via a network gateway, wherein the network gateway is configured to route the multiple network communications within the wireless network;

    accessing panelist data that associates a panelist of the household with a panelist device of the panelist;

    determining, based on the panelist data, that a network communication of the multiple network communications is associated with the panelist device by

determining that that a media access control (MAC) address associated with the network communication matches a MAC address of the panelist device,

causing storage of data identifying the network communication in association with the panelist in a log of network traffic; and

transmitting the log of network traffic to the server,

wherein the network communications monitor is implemented by the network gateway.

**19**. The audience measurement system of claim **18**, wherein the server is configured to determine media exposure data based on the log of network traffic and logs of network traffic from other households.

**20**. At least one non-transitory computer readable storage medium comprising instructions that, when executed, cause at least one processor of a network communications monitor to at least:

    detect multiple network communications transmitted on a wireless network within a household via a network gateway, wherein the network gateway is configured to route the multiple network communications within the wireless network;

    access panelist data that associates a panelist of the household with a panelist device of the panelist;

    determine based on the panelist data, that a network communication of the multiple network communications is associated with the panelist device based on a determination that a media access control (MAC) address associated with the network communication matches a MAC address of the panelist device; and

    store data identifying the network communication in association with the panelist.

**21**. The at least one non-transitory computer readable storage medium of claim **20**, wherein the panelist device is a mobile device that is wirelessly connected to the wireless network.

\* \* \* \* \*

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. _____ |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| HYPHAMETRICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF PAUL D. MARTIN, PH.D..

I, Paul Martin, declare as follows:

## INTRODUCTION AND ENGAGEMENT

1.      I have been retained on behalf of The Nielsen Company (US), LLC ("Nielsen") to offer technical opinions relating to U.S. Patent No. 11,652,901 ("the '901 patent").

2.      I have no financial interest in either party to, or in the outcome of, the above-styled proceeding. I am being compensated for my work as an expert on an hourly basis at my standard consulting rate. My compensation is not dependent on the outcome of these proceedings or the content of my opinions.

## PERSON OF ORDINARY SKILL IN THE ART

3.      In my opinion, a person of ordinary skill in the art ("POSA") in the field of the patent-in-suit would have a working knowledge of networking technologies, including those used to monitor network activity. The POSA would have gained this knowledge through an undergraduate degree in an applicable engineering field (for example, electrical or computer engineering or computer science) and at least five years of work experience in relevant fields.

## MY EXPERTISE

4.      My CV, attached to this declaration as Exhibit A, demonstrates my expertise in the field of the '901 Patent.

5.      I hold B.S., M.S.E., and Ph.D. degrees in computer science from Johns Hopkins University and have worked in the areas of software engineering, computer and network security, and applied cryptography for more than 10 years. In my professional work, I have led a wide variety of security and privacy projects, including developing vulnerability assessment applications, performance testing, and cryptographic protocol design and implementation.

6.      My expertise includes binary analysis, source code review, and security analysis in various programming languages such as ARM Assembly, X86 Assembly, MIPS Assembly, C, C++, C#, Objective C, Java, Python, Perl, JavaScript, Swift, Kotlin, Ruby, COBOL, and others. I have also reverse-engineered products to discover exploitable vulnerabilities and developed proof-of-concept exploits in some cases.

7.      I have published research on systems security and applied cryptography, including foci on low-overhead and super-scalable security solution as well as on cryptographically secure network authentication protocols. My work has led to the development of commercial products and services, such as a Hadoop-based application for large-scale statistical analysis of audit logs and a web-based network traffic visualization dashboard for smart grid networks. I am a named inventor on several patents in these areas.

8.      In my work at Applied Communication Sciences in 2013, I designed and implemented a web-based traffic visualization dashboard and analysis system for field area smart grid networks that could be used to quickly gain an understanding of the current state of a SmartGrid network as well as to detect unexpected anomalies in the network. Applied

Communication Sciences subsequently patented this work and continued to build on the project. To my knowledge, they actually sold and/or still sell this product as part of their SecureSmart Managed Security Service product offering.

9.      During my tenure as a Ph.D. student at Johns Hopkins, I was fully funded as a research assistant and/or teaching assistant throughout all of my semesters. I was a member of the Upsilon Pi Epsilon computer science honor society, as well as its treasurer for the 2014-2015 school year. I was also a member of the Johns Hopkins chapter of the Association for Computing Machinery. I earned an award for outstanding teaching assistant in the Computer Science department for the year 2014-2015. I co-instructed a short course called, "Introduction to Hardware Hacking." In this course, we offered lessons and hands-on workshops on a variety of topics including binary analysis and modification; network device modification; network attacks; network traffic analysis; and web-based vulnerability assessment and exploitation.

10.     At Harbor Labs, I manage client engagements and lead teams focused on systems and network security, cryptographic analysis, and source code analysis. I have reviewed software systems of varying sizes across numerous industries, including embedded systems security, cryptographical protocols for network security, television-based set-top boxes, network appliances, web-based enterprise systems, email management systems, telephony products, embedded system bootloaders, and social network platforms.

11.     I also serve as the technical and development lead for a firmware security analysis product called Firmware IQ. This product is designed to analyze the firmware of embedded devices for security and cryptographic vulnerabilities in an automated fashion. In one configuration of the product, a developer uploads a firmware image to a web-based portal, which uses a broker to forward the firmware to an engine for analysis. The engine unpacks the

firmware, breaks it into its constituent components, and performs more than a hundred automated security and cryptography checks to find vulnerabilities in the firmware image. This analysis allows for the discovery and cataloging of vulnerabilities, including of high-severity remotely exploitable vulnerabilities that can be performed over the network.

## INFORMATION CONSIDERED

12.    I have reviewed the '901 patent as well as other materials referenced in Appendix A to this declaration. Counsel has informed me that I should consider these materials through the lens of one skilled in the art of the field of the patents-in-suit at the time of the priority date of the '901 patent, and I have done so.

13.    I have assumed the priority date of the '901 patent is Jun. 28, 2013, the filing date of the ultimate parent of the '901 patent, even though the '901 patent also claims priority from a provisional application filed on April 22, 2013. In this declaration, I use the term "prior art" to refer to what was known and/or done before the priority date of the applicable patent. My opinion would not change if the priority date were considered to be April 22, 2013 or any other date reasonably close to June 28, 2013.

14.    My analyses are based on my education and work experience, in addition to my investigation and study of materials listed in Appendix A.

## THE '901 PATENT

15.    The '901 Patent relates to, among other things, monitoring network activity, and, more particularly, to systems, methods, and apparatus to identify media devices. In particular, the '901 patent relates to collecting "the viewing, listening, and/or media behavior/interests of audience members and/or the public in general. To collect these behavior/interests, an audience measurement company may enlist panelists (*e.g.*, persons agreeing to be monitored) to cooperate

in an audience measurement study for a period of time. The media usage habits of these panelists as well as demographic data about the panelists is collected and used to statistically determine the size and demographics of an audience." ('901 Patent, 1:45-53.)

16.     The '901 patent relates to collecting data in a household media environment where panelists consume data from a variety of sources over a variety of devices, not just traditional television. Even though panelist households in the prior art had devices in their homes to monitor some media usage, these devices could not monitor the growing variety of media consumption using the broader types of devices on which consumers are now consuming media. These prior art devices were connected to a television or similar device and were limited to monitoring media consumption only in their immediate physical area and only on one particular device. As the '901 patent explains, "[i]n recent years, more consumer devices have been provided with Internet connectivity and the ability to retrieve media from the Internet. As such, media exposure has shifted away from conventional methods of presentation, such as broadcast television, towards presentation via consumer devices accessing the Internet to retrieve media for display." ('901 Patent, 1:54-60.)

17.     The '901 Patent describes collecting data about media viewing from Internet sources over the disparate devices in a modern home. The '901 patent therefore describes a "network communications monitor [that] monitors all network devices within the media exposure measurement location." (*Id.*, 5:29-31.) "The network communications monitor is installed at the media exposure measurement location and identifies network communications to and/or from media devices within the media exposure measurement location (*e.g.*, the communications of devices sharing a public IP address via, for example, a gateway). Thus, the

network communications monitor monitors all network devices within the media exposure measurement location." (*Id.*, 5:23-31.)

18.     In operation, the "network communications monitor creates a log and/or a record of the network communications, identifies a device associated with the network communications (*e.g.*, a device that originated and/or is to receive the network communication), and electronically transmits the log and/or the record to the network activity measurement system (*e.g.*, to an audience measurement [sic] such as The Nielsen Company (US), LLC)." (*Id.*, 5:31-38.) In the invention as claimed in the '901 patent, "the network communications monitor determines a device identifier of the identified device based on a MAC address of the device involved in network communications." (*Id.*, 5:39-41.)

19.     The '901 patent solved several problems inherent in the prior art, and the inventors had to overcome technical challenges to solve those problems. Before the '901 patent (*i.e.*, in the prior art), audience measurements in a network environment were generally done at the device level, not at the network level. But "not all media devices are amenable to being monitored by an on-device meter. For example some media devices do not allow installation of third-party software (e.g., an on-device meter). Further, because of the many types of media devices available, maintaining software packages for every type of media device is difficult. Because installation of a monitoring system on all types of network devices is difficult, if not impossible, some network devices may go unmonitored." (*Id.*, 4:65-5:6.) These unmonitored devices reduced the accuracy of the collected data.

20.     The broad array of devices on which modern users were consuming Internet-based media presented problems for monitoring panelists' media consumption. Prior art systems, apparatuses, and methods did not have the ability to monitor these diverse devices, nor did prior

art systems, apparatuses, and methods enable doing so in a central manner. Prior art monitoring of a presentation device like a television could not capture the broader range of devices on which panelists now consume media, such as on tablets, computers, and phones.

21.     Prior art device-based monitoring could be extended to the new environment of media consumption on many devices with monitoring software installed on each device. But monitoring each device individually has several disadvantages. The disadvantages of monitoring at each device include: (1) having to install monitoring software on each device, with each device reporting individually back to the audience measurement entity, (2) having to write software for each type of device in the marketplace as well as needing to write new software as new devices are released, (3) needing to update/maintain this software generally and because existing devices get software updates, putting an audience measurement company on a continuous treadmill of writing and maintaining software to keep up, and (4) not being able to monitor viewing on some devices at all because some prior art devices did not allow the installation of third-party software, making monitoring them directly impossible: "[N]ot all media devices are amenable to being monitored by an on-device meter. For example some media devices do not allow installation of third-party software (*e.g.*, an on-device meter). Further, because of the many types of media devices available, maintaining software packages for every type of media device is difficult. Because installation of a monitoring system on all types of network devices is difficult, if not impossible, some network devices may go unmonitored." ('901 Patent, 4:65-5:6.) In addition, some devices require privacy permission to access user data, which complicates, at least, deployment at the user device level.

22.     The inventors realized that these problems could be solved with a technical solution by making an improvement at the central network gateway. These devices shared a

common network interface to the Internet, allowing monitoring through that common point. "Internet Service Providers (ISPs) typically provide a single public Internet protocol (IP) address for each media exposure measurement location (*e.g.,* a media presentation location, a panelist household, an internet café, an office, etc.) receiving Internet services." ('901 Patent, 3:11-15.) "The network communications monitor is installed at the media exposure measurement location and identifies network communications to and/or from media devices within the media exposure measurement location (e.g., the communications of devices sharing a public IP address via, for example, a gateway). Thus, the network communications monitor monitors all network devices within the media exposure measurement location." (*Id.*, 5:23-31.)

23.     The inventors realized that the network gateway provided a central point to collect data about network media communications. Instead of installing monitoring software on individual devices, with the problems associated with doing so, they realized that installing a network communications monitor at the network gateway would capture all media impressions without having to interact with (by, *e.g.*, creating, maintaining, and installing software on) each device on the network. Monitoring centrally provided a technological improvement and solution to the problem of: (1) having to interact with each disparate device to install software on it, (2) writing software for a large number of devices, (3) maintaining software for each device, and (4) the lack of monitoring on devices that did not allow the installation of third-party software. Central monitoring provided a technical improvement to these problems. Using central monitoring or network-level monitoring for these purposes was not routine, conventional, or well-understood at the time of the invention.

24.     The specification explains how central monitoring works: "a network communications monitor is used to capture network communications of media devices on the

network (e.g., a home network). The network communications monitor is installed at the media exposure measurement location and identifies network communications to and/or from media devices within the media exposure measurement location (e.g., the communications of devices sharing a public IP address via, for example, a gateway). Thus, the network communications monitor monitors all network devices within the media exposure measurement location. The network communications monitor creates a log and/or a record of the network communications, identifies a device associated with the network communications (e.g., a device that originated and/or is to receive the network communication), and electronically transmits the log and/or the record to the network activity measurement system (e.g., to an audience measurement such as The Nielsen Company (US), LLC)." ('901 Patent, 5:21-38.) Moreover, "the network communications monitor 180 may be a device on the LAN and/or integrated into the gateway 145. The network communications monitor 180 of the illustrated example identifies network communications from the media devices 150 within the media exposure measurement location 140. The network communications monitor 180 creates a record (e.g., a log) identifying which of the media device(s) 150 were involved in which of the network communications and transmits the record to the network activity measurement system 110. In some examples, the network communications monitor 180 determines which device was involved in the network communications by inspecting the network communications passing through the network communications monitor 180 for indicia that may identify the media device and/or may facilitate identification of the media device (e.g., an IP address that may be used to lookup a MAC address via an ARP table)." ('901 Patent, 8:53-9:3.)

25.    Central or network-level monitoring, however, presented technical challenges. Collecting data centrally presented a problem with collecting accurate data because network

addresses, such as IP addresses, can, and often do, change. Hence, the IP address of a device on the network is not a reliable indicator over time of which device has requested content: "[T]he IP address is used to identify the media device. As disclosed above, the IP address may change over time and, therefore, may not accurately identify the media device." ('901 Patent, 4:27-30.) For example, collecting data linking an IP address to network-provided content could incorrectly indicate that content provided to different devices (and different members of the panelist household) was provided to the same device (if the devices used the same IP address at different times).

26.    The '901 patent describes a novel solution to this problem by using an IP address to obtain a device's MAC address as content is received. MAC addresses identify devices. Devices receive MAC addresses on manufacture, so they do not generally change without user intervention, especially at the time of the invention. ('901 Patent, 3:66-4:2.)  ("Unlike an IP address, the MAC address does not change over time. The MAC address of a media device is provided by the hardware manufacturer of the media device at the time of manufacture."). The MAC address of a device is therefore a reliable identifier of a device over time.

27.    But as the '901 patent explains, "[w]hen transmitting network communications (*e.g.*, transmission control protocol (TCP) communications, user datagram protocol (UDP) communications, etc.) the MAC address of the media device is not included. Rather, the IP address is used to identify the media device." (*Id.*, 4:24-28.) Network communications equipment, however, maintains a table that links MAC address to current IP address: "To translate an IP address into a MAC address, media devices include an address resolution protocol (ARP) table." (*Id.*, 4:30-32; Fig. 4A.) This process allows the linking of a MAC address to a

network communication by looking up an IP address in an ARP table and obtaining the MAC address of the source or destination of the network communication.

28.    "[A] device identifier is used to identify the media device. For example, a media device may be associated with a panelist and/or a household, and may receive a unique device identifier (*e.g.*, "Suzie's iPAD", "Smith Family iPad 01", etc.) to facilitate such association." (*Id.*, 5:7-11.) In other words, the device identifier connects a device to a user and/or to a particular device in the household.

29.    The relationship between the device identifier and the MAC address is set when the monitoring system is installed or a new device is added to the network: "[D]evice information receiver 430 stores a device identifier that is provided by an installer (*e.g.*, a representative of a media monitoring entity (*e.g.*, an audience measurement entity) such as The Nielsen Company (US), LLC) and/or by a user of the media device. For each media device on the network, the installer and/or user enters a MAC address of the device and a respective device identifier of the corresponding media device into the interface of the device information receiver 430." (*Id.*, 12:3-11.) Thus, in the disclosed system, "the MAC address is associated with the device identifier." (*Id.*, 5:12-13.)

30.    The '901 patent accordingly uses the MAC address to determine the device identifier. ('901 patent, Fig. 4B, 12:52-13:30..) The network communications monitor stores the device identifier along with a content identifier and timestamp. (*See e.g.*, '901 patent, Fig. 5A, 14:23-51.) This record constitutes a log or record of the network communications that is sent to the audience measurement company: "The network communications monitor creates a log and/or a record of the network communications, identifies a device associated with the network communications (*e.g.*, a device that originated and/or is to receive the network communication),

and electronically transmits the log and/or the record to the network activity measurement system (*e.g.*, to an audience measurement [sic] such as The Nielsen Company (US), LLC)." ('901 Patent, 5:31-38.)

31.    The '901 patent's solution of using a MAC address to link network communications to device identifiers provided a technical solution to the technical problem of accurately collecting and recording data, including person-level data, about media usage. Converting IP addresses to MAC addresses and then using the MAC address rather than the changeable IP address to obtain the device identifier solved the technical problem of how to collect accurate data about devices identified by changeable IP addresses. This solution of using MAC addresses to connect IP addresses to device identifiers of panelist devices was not routine, conventional, or well-understood at the time of the invention.

32.    The specification describes this process of linking an IP address, MAC address, and device identifier: "FIG. 4A is an example address resolution protocol (ARP) table 401 that may be stored by the example network communications data store of the example network communications monitor of FIGS. 1 and/or 4 to associate an Internet protocol (IP) address with a media access control (MAC) address. The example ARP table 401 is maintained by the network communicator 405. The ARP table 401 is updated by the network communicator 405 as IP addresses of media devices change (e.g., new IP addresses are issued via DHCP)." ('901 Patent, 12:16-25.) Further, "[t]he example ARP table 401 of FIG. 4A includes an IP address column 460 and a MAC address column 465. In the illustrated example, the IP address column 460 represents a IP version 4 (IPv4) addresses of media devices on the LAN. … In the illustrated example, the MAC address column 465 represents MAC addresses of media devices on the

LAN. … Each row of the ARP table 401 of FIG. 4A represents a specific media device (i.e., the IP address and MAC address of a single media device)." (*Id.*, 12:26-37.)

33.    The MAC address is then associated with the device identifier: "FIG. 4B is an example MAC address to device identifier table 402 that may be stored by the example network communications data store of the example network communications monitor of FIGS. 1 and/or 4 to associate a media access control (MAC) address with a device identifier. … The example MAC address to device identifier table 402 includes a MAC address column 480 and a device identifier column 485. Because MAC addresses are persistent, the association of the MAC address column 480 and the device identifier column 485 is also persistent. That is, device identifiers are permanently and/or semi-permanently associated with media devices at the media exposure measurement location 140." (*Id.*, 12:51-66.) And "[i]f the device identifier cannot be resolved, the reason for not being resolved is likely that a new device has been added to the network. To account for such a situation, if the device identifier cannot be resolved, the communications processor 410 sends an alert to the network activity measurement system 110 of a new device added to the network (block 660). Such an alert enables the monitoring entity associated with the network activity measurement system 110 to contact the panelist (e.g., the homeowner) to inquire about the new device. If, for example, the panelist confirms to that a new device has been added, a device identifier may be issued for the new device. In some examples, an installer may be sent to the media exposure measurement location 140 to identify the media device 150 and/or the MAC address of the media device 150. The installer may interact with the device information receiver 430 to enter the device identifier and the MAC address of the media device so that the association can be recorded in the MAC address to device identifier table 402." ('901 Patent, 17:46-18:1; also Fig. 6.)

34.     The claims of the '901 patent include these innovations in collecting usage data. All the claims of the '901 patent recite centrally monitoring network communications. All the independent system claims (claims 1 and 18) require that the "network communications monitor" have "a non-transitory computer-readable medium" that contains the executable instructions of "detecting, "accessing," determining," and causing." In addition, claims 1 and 18 recite that "the network communications monitor is implemented by the network gateway." Claim 20 recites "[a]t least one non-transitory computer readable storage medium comprising instructions that, when executed, cause at least one processor of a network communications monitor to at least" perform instructions similar to those in claims 1 and 18. And method claim 13 recites that the "detecting" and "determining" steps are performed "via a network interface of a network communications monitor located within the household" and "via a processor of the network communications monitor," respectively.

35.     Centrally monitoring network communications as recited in claims 1, 13, 18, and 20 was not well-understood, routine, or conventional in the prior art. The dependent claims include these elements and therefore also contain elements that were not well-understood, routine, or conventional in the prior art.

36.     All the claims of the '901 patent also recite using MAC addresses to associate the panelist device with the network communications. Independent claims 1, 13, and 18 recite "determining that that a media access control (MAC) address associated with the network communication matches a MAC address of the panelist device." And independent claim 20 recites instructions that "determine based on the panelist data, that a network communication of the multiple network communications is associated with the panelist device based on a determination that a media access control (MAC) address associated with the network

14

communication matches a MAC address of the panelist device." Matching a MAC address to a panelist device, as recited in claims 1, 13, 18, and 20 was not well-understood, routine, or conventional in the prior art. The dependent claims include these elements and therefore also contain elements that were not well-understood, routine, or conventional in the prior art.

37.    The claims do not preempt all ways of monitoring user media consumption over a network. Other ways of monitoring were known at the time, including installing monitoring software on each network-attached device. Moreover, the claims do not even preempt all ways of centrally monitoring user media viewing. Instead, the claims recite a specific way of solving certain prior art problems relating to monitoring of various devices by using central monitoring and by using device MAC addresses to reliably link IP addresses and network communications to device identifiers.

38.    Claims 1, 13, 18, and 20 (and their dependent claims) of the '901 Patent are not directed to an abstract idea. Rather, they are directed to specific technical solutions to prior art problems relating to monitoring in network environments. These problems include the technical difficulty and sometimes impossibility of providing monitoring software for network-attached devices and the technical difficulty in network-level monitoring that arises because of the variability of IP addresses over time. In other words, instead of a general result, claims 1, 13, 18, and 20 of the '901 Patent are directed to a specific technological approach– *i.e.*, a real-world application.

* * *

39.     I declare under penalty of perjury that the foregoing statements are true and accurate to the best of my knowledge.


Dated: May 17, 2023                                    _____
                                                       Paul D. Martin, Ph.D.

# Exhibit A



# Paul D. Martin, Ph.D.

443.449.9006

paul@harborlabs.com

1777 Reisterstown Road, East Bldg, Suite 230; Pikesville, MD 21208

## Profile

Dr. Martin is the Director of Firmware Security and a Senior Research Scientist at Harbor Labs. His research interests include embedded system security, operating system security, vulnerability analysis, reverse engineering, network protocol analysis, applied cryptography, cryptanalysis and privacy-preserving protocols.

## Education

| | |
|---|---|
| **2011-2016** | *Ph.D. Computer Science, Johns Hopkins University, Baltimore, MD Securing Medical Devices and Protecting Patient Privacy in the Technological Age of Healthcare* |
| **2011-2013** | *M.S.E. Computer Science, Johns Hopkins University, Baltimore, MD* |
| **2007-2011** | *B.S. Computer Science, Johns Hopkins University, Baltimore, MD* |

## Industry Experience

| | | |
|---|---|---|
| **2018-Present** | *Harbor Labs* | **Director of Firmware Security, Senior Research Scientist** |
| **2013-2018** | *Harbor Labs* | **Research Scientist** |
| **2011-2016** | *Johns Hopkins University Health and Medical Security Lab* | **PhD Candidate, Research Assistant** |
| **2013** | *Applied Communication Sciences* | **Graduate Intern** |
| **2011** | *(ICPSR) University of Michigan Inter-university Consortium for Political and Social Research* | **Penetration Tester** |
| **2009-2011** | *Independent Security Evaluators* | **Security Intern** |
| **2008-2010** | *(DRCC) Johns Hopkins University Digital Research and Curation Center* | **Student Programmer** |
| **2008** | *Brandeis University Hardware Repair Shop* | **Freelance Programmer** |

## Teaching Experience

| | | |
|---|---|---|
| **2015** | *Introduction to Hardware Hacking* | **Instructor** |
| **2012-2014** | *Security and Privacy* | **Teaching Assistant** |
| **2011** | *Practical Cryptographic Systems* | **Course Assistant** |

## Publications

P. Martin, D. Russel, M. Ben Salem, S. Checkoway, A. Rubin, Sentinel: Secure Mode Profiling and Enforcement for Embedded Systems, Proc. ACM/IEEE International Conference on Internet-of-Things Design and Implementation, (IoTDI '18).

P. Martin, M. Rushanan, T. Tantillo, C. Lehmann and A. Rubin, Applications of Secure Location Sensing in Healthcare. In the proceedings of ACM Conference of Bioinformatics, Computational Biology, and Health Informatics (BCB '16).



J. Carrigan, P. Martin, M. Rushanan, KBID: Kerberos Bracelet Identification. In the Proceedings of Financial Cryptography and Data Security (FC '16).

P. Martin, M. Rushanan, S. Checkoway, M. Green, A. Rubin. Classifying Network Protocol Implementation Versions: An OpenSSL Case Study. Technical Report 13-01, Johns Hopkins University (December 2013).

P. Martin, A. Rubin, and R. Bhatti, *Enforcing Minimum Necessary Access in Healthcare Through Integrated Audit and Access Control.* In ACM Conference on Bioinformatics, Computational Biology, and Biomedical Informatics Health Informatics Symposium (BCB-HIS), (September 2013)

## Patents

| | |
|---|---|
| System and Method for automatically extracting information from binary files for use in Database Queries | **US 10,762,214 B1** |
| System and method for network traffic profiling and visualization | **US 9,667,521 B2** |
| System and method for network traffic profiling and visualization (Pending) | **US 15/606,717** |
| System and method for network traffic profiling and visualization (Pending) | **WO 2015113036A1** |
| Healthcare privacy breach prevention through integrated audit and access control | **US 8,984,583 B2** |
| Healthcare privacy breach prevention through integrated audit and access control | **US 9,438,632 B2** |

## Current Research

Automated binary version extraction for NVD cross-reference based on fuzzy matching.
Automated analysis of vulnerabilities in containers and virtual appliances.
Large-scale comparison of nature and kind of firmware vulnerabilities across and within product classes.

## Expert Witness Engagements

Class v. **Intuitive Surgical, Inc.**

| | |
|---|---|
| Case: | Case # 3:21-cv-03496-VC |
| Description: | Litigation related to cryptographic security protections. |
| Services: | Technical analysis and expert reports on security and technical aspects of surgical devices. |
| Expert Testimony at Deposition: | Monrovia, MD (March 16, 2023) |

Healthcare Advanced Risk Technologies, Inc. and Inspirien Holdings Corp. v. **Terrence Mills, AI.io. Corp., Jane Nemcova and VEUU, Inc.**

| | |
|---|---|
| Case: | Case # 2:22-cv-04192-JS-AYS |
| Description: | Litigation related to timeline of software development and misappropriation of trade secrets. |
| Services: | Source code and documentation review, source code copying analysis, expert report drafting. |

**Communication Technologies, Inc.** v. Samsung Electronics America, Inc., and Samsung Electronics Co. Ltd.

| | |
|---|---|
| Case: | Case # 2:21-cv-444-JRG |
| Description: | Litigation related to patents on secure erase processes. |
| Services: | Source code review of algorithms related to secure erase processes, declaration on aspects of source code review process and representativeness of source code |

Planck, LLC D/B/A Patch Media v. **Particle Media, Inc. D/B/A News Break, Et. Al.**

**harborlabs**
CYBER.SCIENCE

| | |
|---|---|
| Case: | Case # 20-cv-10959 (LGS) |
| Description: | Litigation related to copyright. |
| Services: | Review of web scraping facts, contracts and agreements and syndicated web feed technology, declaration on web scraping and syndicated web feed technology |

**WSOU Investments, LLC D/B/A Brazos Licensing and Development** v. Cisco, Inc.

| | |
|---|---|
| Case: | Case # 6:21-cv-00128-ADA |
| Description: | Litigation related to patents to patents on wireless network handoff, network management and authentication technologies. |
| Services: | Source code review of accused products, declaration on aspects of source code review process. |

United States **v. Laffon Ellis**

| | |
|---|---|
| Case: | Case # 2:19-cr-00369-DWA |
| Description: | Analysis related to reliability of specific types of computerized DNA analysis in criminal proceedings. |
| Services: | Source code review, expert report drafting. |
| Expert Testimony at Hearing: | Monrovia, MD (December 20, 2021) |

Sysmex Corporation and Sysmex America, Inc. v. **Beckman Coulter, Inc.**

| | |
|---|---|
| Case: | CA # 19-1642-RGA-CJB |
| Description: | Litigation related to hematology analysis machine patents. |
| Services: | Source code review.  Expert report drafting. |
| Expert Testimony at Deposition: | Monrovia, MD (November 22, 2021) |

**CERTAIN ROUTERS, ACCESS POINTS, CONTOLLERS, NETWORKS MANAGEMENT DEVICES, OTHER NETWORKING PRODUCTS, AND HARWARE AND SOFTWARE COMPONENTS THEREOF**

| | |
|---|---|
| Case: | ITC Investigation No. 337-TA-1227 |
| Description: | ITC Investigation related to patents on wireless network handoff, network management and QoS technologies. |
| Services: | Source code review, validity and prior art analysis, expert report drafting. |
| Expert Testimony at Trial: | Washington, DC (July 28, 2021) |
| Expert Testimony at Deposition: | Monrovia, MD (June 9-10, 2021) |

**Micro Focus, Inc.** v. Insurance Services Organization

| | |
|---|---|
| Case: | DE Civil Action # 15-252-RGA |
| Description: | Litigation related to unlicensed use of runtime environments, libraries and software compilers. |
| Services: | Source code review.  Binary reverse engineering and analysis, affidavit drafting, expert report drafting. |
| Expert Testimony at Deposition: | Wilmington, DE (Feb 2, 2021) |

**loanDepot.com, LLC** v. Sigma Infosolutions, Inc.

| | |
|---|---|
| Case: | AAA Case # 01-18-0001-5821 |
| Description: | Litigation related to software development practices. |
| Services: | Source code analysis, experimentation, report drafting. |
| Expert Testimony at Deposition: | Baltimore, MD (December 17, 2019) |

**Cypress Lake Software, Inc.** v. Samsung Electronics America and Dell, Inc.

| | |
|---|---|
| Case: | Case # 6:18-cv-00030-RWS |
| Description: | Litigation related to infringement of UX patents. |
| Services: | Source code analysis, report drafting. |
| Expert Testimony at Deposition: | Baltimore, MD (July 9, 2019) |

**Apple, Inc. Device Performance Litigation**

| | |
|---|---|
| Case: | CA Civil Action # 18-md-02827-EJD |

3

# harborlabs
CYBER.SCIENCE

| | |
|---|---|
| Description: | Litigation related to business practices. |
| Services: | Technical analysis and expert reports on security and technical aspects of mobile phone forensics. |

Italian Antitrust Authority v. **Apple, Inc.**

| | |
|---|---|
| Case: | PS/11309 |
| Description: | Litigation related to business practices. |
| Services: | Technical analysis and expert reports on security and technical aspects of software update processes. |

**Carl Zeiss AG and ASML Netherlands B.V.** v. Nikon

| | |
|---|---|
| Case: | Case # 2:17-cv-07083-RGK (MRWx) |
| Description: | Litigation related to patents on image detection algorithms. |
| Services: | Source code review of algorithms related to image processing and detection algorithms, declaration on aspects of source code review process. |

Decision Resources, LLC v. **Brigham Hyde, Precision Health Intelligence, LLC and Orr Inbar**

| | |
|---|---|
| Case: | MA Civil Action # 17-2834J |
| Description: | Litigation related to timeline of software development and misappropriation of trade secrets. |
| Services: | Source code and documentation review, development timeline analysis, affidavit drafting. |

## Litigation Support

**Proxense, LLC.** v. Samsung Electronics America, Inc., and Samsung Electronics

| | |
|---|---|
| Case: | Case # 6:21-cv-00210-ADA |
| Description: | Litigation related to patents on biometrics and payment processing. |
| Services: | Source code review, documentation review, product testing, validity analysis, infringement analysis, report drafting. |

Global Eticket Exchange Ltd. vs. **TicketMaster LLC**

| | |
|---|---|
| Case: | Case # 6:21-cv-00399-ADA |
| Description: | Litigation related to patents on electronic ticketing. |
| Services: | Source code review, documentation review, product testing, invalidity analysis, non-fringement analysis, report drafting. |

**US Dominion, Inc.** vs. Fox News Network

| | |
|---|---|
| Case: | Case # N21C-03-257-EMD |
| Description: | Litigation related to defamation and voting machine security. |
| Services: | Source code review, documentation review, product testing, report drafting. |

Centripetal Networks, Inc. vs. **Keysight Technologies, Inc.**

| | |
|---|---|
| Case: | Case # 2:22-cv-0002-AWA-DEM |
| Description: | Litigation related to patents on network monitoring devices and security gateways. |
| Services: | Source code review, documentation review, product testing, noninfringement analysis, infringement analysis. |

**Milliman, Inc and Vigilytics LLC,** vs. Gradient A.I. Corp.

| | |
|---|---|
| Case: | Case # 1:21-cv-10865-NMG |
| Description: | Litigation related to breach of contract and source code copying. |
| Services: | Source code review, documentation review. |

4

**harborlabs**
CYBER.SCIENCE

**WSOU Investments, LLC D/B/A Brazos Licensing and Development** v. Microsoft Corporation

| | |
|---|---|
| Case: | Case # 1:18- 6:20-cv-00464-ADA, 6:20-cv-00460-ADA, 6:20-cv-00457-ADA, |
| Description: | Litigation related to patents on telephony management systems and skill-based matchmaking. |
| Services: | Source code review, documentation review, validity analysis, infringement analysis, report drafting. |

**10Tales Inc.** v. TikTok PTE. Ltd.

| | |
|---|---|
| Case: | Case # 1:18-cv-826-WCB |
| Description: | Litigation related to patents on user-adapted video streams. |
| Services: | Claim construction analysis. |

Carriere v. **Symantec Corporation**

| | |
|---|---|
| Case: | Case # 500-06-000894-176 |
| Description: | Class action litigation related to product security. |
| Services: | Source code review, documentation review, report drafting. |

**IOENGINE, LLC** v. Ingenico, Inc.

| | |
|---|---|
| Case: | Case # 1:18-cv-826-WCB |
| Description: | Litigation related to patents on payment processing systems. |
| Services: | Source code review, documentation review, validity analysis, infringement analysis, report drafting. |

**IOENGINE, LLC** v. PayPal Holdings, Inc.

| | |
|---|---|
| Case: | Case # 1:18-cv-452-WCB |
| Description: | Litigation related to patents on payment processing systems. |
| Services: | Source code review, documentation review, validity analysis, infringement analysis, report drafting. |

AGIS Software Development LLC v. **Uber Technologies**

| | |
|---|---|
| Case: | Case # 2:21-cv-00026-JRG-RSP |
| Description: | Litigation related to patents on map overlays and messaging systems. |
| Services: | Source code review. |

Finjan v. **Palo Alto Networks**

| | |
|---|---|
| Case: | Case # 4:14-CV-04908-PJH |
| Description: | Litigation related to patents on malware scanning gateways. |
| Services: | Invalidity analysis, Claim construction analysis, source code review. |

Huawei Technologies Co. v. **Verizon Communications Inc.**

| | |
|---|---|
| Case: | Case # 6:20-CV-00090 |
| Description: | Litigation related to patents on malware scanning gateways with cloud components. |
| Services: | Source code review, non-infringement analysis. |

Epic Games, Inc. vs. **Apple, Inc.**

| | |
|---|---|
| Case: | Case # 4:20-cv-05640-YGR-TSH |
| Description: | Litigation related to business practices. |
| Services: | Document review, interviews, report drafting. |

Philips North America LLC ; Koninklujke Philips N.V. vs. **Summit Imaging Inc.**

| | |
|---|---|
| Case: | Case # 2:19-cv-01745-JLR |
| Description: | Litigation related to third-party repair services. |
| Services: | Source code review, document review, report drafting. |

**California Physicians Service, Inc D/B/A Blue Shield of California** vs. Healthplan Services Inc,

## harborlabs
### CYBER.SCIENCE

| | |
|---|---|
| Case: | Case # 3:18-cv-3730 |
| Description: | Litigation related to software development practices and breech of contract. |
| Services: | Document review, source code review, report drafting. |

**Finjan v. Qualys**

| | |
|---|---|
| Case: | Case # 4:18-cv-07229-YGR |
| Description: | Litigation related to patents on vulnerability assessment products. |
| Services: | Invalidity analysis, Non-infringement analysis, source code review, report drafting. |

**Finjan v. Sonicwall**

| | |
|---|---|
| Case: | Case # 5:17-cv-04467-BLF-HRL |
| Description: | Litigation related to patents on malware scanning gateways. |
| Services: | Invalidity analysis, Non-infringement analysis, source code review, report drafting. |

**TecSec Inc.** v. Cisco and Oracle

| | |
|---|---|
| Case: | Case # 1:10-cv-115 LO-TCB |
| Description: | Litigation related to patents on hardware accelerated cryptographic processors. |
| Services: | Infringement analysis, validity analysis, source code review, report drafting. |

**Blackberry Limited** v. Facebook, Inc.

| | |
|---|---|
| Case: | Case # 2:18-cv-01844-KSx |
| Description: | Litigation related to patents on agent-based network monitoring, configuration and security systems. |
| Services: | Infringement analysis, validity analysis, source code review, report drafting. |

Uniloc, Inc. v. **Big Fish Games, Inc.**

| | |
|---|---|
| Case: | Case # 2:16-cv-00741-JRG |
| Description: | Litigation related to patents on hardware cryptographic chips. |
| Services: | Non-infringement analysis, report drafting, source code review. |

SPEX Technologies, Inc. v. **Toshiba America Electronic Components, Inc., et al.**

| | |
|---|---|
| Case: | Case # 8:16-cv-01800-JVS |
| Description: | Litigation related to patents on hardware cryptographic chips. |
| Services: | Non-infringement analysis, report drafting. |

**Symantec Corporation** v. Zscaler, Inc.

| | |
|---|---|
| Case: | Case # 3:17-cv-04414-JST, |
| Description: | Litigation related to patents on security gateways, URL filtering and categorization |
| Services: | Infringement analysis, assignor estoppel, document review. |

Koninklijke Philips v. **Microsoft Inc.**

| | |
|---|---|
| Case: | Case # 4:18-cv-01885-HSG, |
| Description: | Litigation related to patents on secure cryptographic protocols |
| Services: | Non-infringement analysis, validity analysis, claim construction analysis, document review, source code review. |

**Netfuel, Inc.** v. Cisco Systems, Inc.

| | |
|---|---|
| Case: | Case # 5:18-cv-2352-EJD |
| Description: | Litigation related to patents on agent-based network monitoring, configuration and security systems. |
| Services: | Infringement analysis, claim construction analysis, |

6

## harbor**labs**

CYBER . SCIENCE

source code review, report drafting.

**Byrd et al.** v. Aaron's, Inc., et al.
Case:                PA Civil Action # 1:11-cv-00101-SJM-SPB
Description:         Class action litigation related to privacy.
Services:            Attend depositions, source code review, report drafting.

Finjan v. **Juniper Networks**
Case:                Case # 3:17-cv-05659-WHA
Description:         Litigation related to patents on malware scanning gateways.
Services:            Invalidity analysis, non-infringement analysis, source code review.

Grace et al. v. **Apple Inc.**
Case:                Case # 5:17-cv-00551-LHK (NC)
Description:         Litigation related to device performance and service outages.
Services:            Mobile forensics and device analysis, report drafting, source code review, document review, technical analysis and argument construction.

**Rimini Street, Inc.** v. Oracle International Corporation, et al.
Case:                Case # 2:14-cv-01699 LRH-CWH
Description:         Litigation related to false claims on security.
Services:            Large-scale testing of IPS techniques for including custom test infrastructure and implementation of techniques to block exploitation of vulnerabilities, technical analysis of vulnerabilities.

Finjan v. **Symantec Corporation**
Case:                Case # 14-cv-02998-HSG
Description:         Litigation related to patents on malware scanning gateways, endpoint protection and firewalls.
Services:            Build and/or test software for Windows, invalidity argument strategy, non-infringement argument strategy, report preparation, source code reviews.

Strikeforce, Inc. v. **Entrust et al.**
Case:                Case # 1:17-cv-00309
Description:         Litigation related to patents on authentication technologies.
Services:            Invalidity argument development, non-infringement argument development, report drafting.

**Sony Corporation, Inc.** v. Arris
Case:                Inv. # 337-TA-1049
Description:         Litigation related to patents on television streaming devices and/or services.
Services:            Validity argument development, source code review of entire platform codebase including numerous embedded platforms, infringement argument development.

**Kudelski SA, Nagra USA, Inc., Nagravision SA, and OpenTV, Inc.** v. Comcast Corporation
Case:                Case # 2:16-cv-1362-JRG, Inv. # 337-TA-1049
Description:         Litigation related to patents on television streaming devices and/or services.
Services:            Validity argument development, source code review of entire platform codebase including numerous embedded platforms, infringement argument development.

**Amazon.com Inc., Hulu, LLC, and Netflix, Inc.** v. Uniloc Luxembourg S.A.

7

**harborlabs**

*CYBER . SCIENCE*

Case:                    IPR 2017-00948
Description:             Litigation related to patents on DRM protection for content
                         distribution
Services:                Prior art search, PGR Preparation, IPR preparation.


PhishMe v. **Wombat Technologies, Inc.**
Case:                    Case # 16-403-LPS-CJB
Description:             Litigation related to patents on anti-phishing training
                         technologies.
Services:                Prior art search, PGR Preparation, IPR preparation.


Nader Asghari-Kamrani and Kamran Asghari-Kamrani v. **United States Automobile Association**
Case:                    Case # 2:15-cv-478
Description:             Litigation related to patents on authentication technologies.
Services:                Prior art search, invalidity argument strategy, non-infringement
                         argument strategy, source code reviews


Vir2us v. **Invincea Inc. and Invincea Labs, LLC**
Case:                    Case # Case 2:15-cv-00162-HCM-LRL
Description:             Litigation related to patents on virtualization and automated
                         corruption repair.
Services:                Prior art search, invalidity argument strategy, non-infringement
                         argument strategy, source code reviews


**Palo Alto Networks** v. Finjan
Case:                    IPR 2016-00159, IPR 2016-00151, IPR 2015-01974,
                         IPR 2015-02001, IPR 2015-01979
Description:             Litigation related to patents on malware scanning gateways and
                         firewalls,
Services:                Prior art search, patent interpretation, IPR preparation support,
                         claim chart review


TVIIM v. **McAfee**
Case:                    Case # 3:13-cv-04545-VC
Description:             Litigation related to patents on vulnerability scanning
Services:                Build and test software for SPARC/Linux/Windows, patch out
                         license checks/crack software (with permission), obtain
                         hard-to-find legacy software, prior art and non-
                         infringement argument strategy support, source code
                         reviews, prior art search


**Al Cioffi et al.** v. Google
Case:                    Case # 2:13-cv-103-JRG-RSP
Description:             Litigation related to patents on browser sandboxing and
                         process isolation.
Services:                Code review/software testing to collect evidence of
                         infringement, Infringement argument preparation support,
                         claim chart review


**Rovi Solutions & Veracode** v. Appthority
Case:                    Case # 12-10487-DPW
Description:             Litigation related to patents on static debugging tools
Services:                Source code review refuting opposing expert testimony


## Analysis, Design and Development Clients

Arai                                ICU Medical

**harborlabs**
CYBER.SCIENCE

| | |
|---|---|
| Baxter | Inexto |
| Bigfoot Medical | Intuitive Surgical |
| BT Group | Merlin |
| Cardiac Sciences | Orpheus |
| Dyadic | Security First Corporation |
| Fresenius | Texas Instruments |
| HLFIP Holdings | Thesys |
| Hospira | Vaxxin |

## Pre-Harbor Labs Security Design and Software Development Experience

**2013**         At *Applied Communication Sciences*
         Role:                         Graduate Intern
         Technologies:            JavaScript, Python, Tcpdump, Wireshark

- Developed extensible real-time traffic visualization tool to chart and analyze high-volume tcpdump streams of lossy metropolitan-area mesh network traffic.

**2011**         At *University of Michigan ICPSR*
         Role:                         Penetration Tester
         Technologies:            Numerous Security Tools, Amazon EC2, VMware VSphere

- Conducted wide-scale penetration testing on virtualized cloud-based systems meant to be secure environments for researchers to store confidential results
- Created formal threat model document detailing potential security vulnerabilities from all possible attack vectors
- Wrote two reports detailing results from penetration test

**2009-2011**         At *Independent Security Evaluators*
         Role:                         Security Intern
         Technologies:            C++, C#, Dalvik Bytecode, Gcov, GDB, Javascript, Peach Fuzzer, Python, RegEx, XML, Wireshark

- Created log parsing framework to analyze 20+ log file formats
- Assisted with malware testing, research and analysis
- Reverse engineered DRM schemes in Android and IOS applications
- Researched and prototyped secure cryptographic mail delivery system
- Developed web crawler to collect file sets for use in fuzzing
- Wrote code-coverage analysis tool for constructing minimum file set for fuzz testing
- Wrote fuzzing plugins using Peach Fuzzer framework and reverse engineered binary file specifications
- Wrote Internet Explorer and Chrome extensions for cryptographic proxy system
- Created and debugged network protocols for use in network protocol testing
- Wrote and debugged unit tests in C++ and Python for proprietary disk-encryption system

**2008-2010**         At *Johns Hopkins University DRCC*
         Role:                         Student Programmer
         Technologies:            DOM, Java EE, JSP Perl, SAX, XSLT

- Drafted a report detailing security recommendations for an NSF funded data conservancy project
- Set up and deployed a Fedora digital repository with the Islandora frontend
- Ported IRStats statistics package to the DSpace information repository XMLUI
- Wrote batch importer that is now used to import more than 20 digitized books a week into DSPace repository

**harborlabs**
CYBER.SCIENCE

**2008**                   At *Brandeis University Information Technology Services Hardware Repair Shop*
          Role:                         Freelance Programming Consultant
          Technologies:                 Java, Visual C++, VBScript

- Sole programmer on project to interface Request Tracker ticketing system with Brother PT- 9500PC Label Printer

## Technical Skills

| | |
|---|---|
| **Languages** | BASH, C, C++, C#, HTML, Java, JavaScript, Objective-C, Python, Perl, PHP, Regular Expressions, SQL, XML |
| **Architectures** | 6502, 8051, 8080, ARM Cortex-M, ARMv7, ARMv8, AVR, m68k, MIPS, MSP430, PIC, SPARC, PowerPC, x86, x86-64, Z80 |
| **Operating Systems** | Android, ChromeOS, FreeBSD, iOS, OpenBSD, Linux, macOS, Windows |
| **DevOps and Development Tools** | Ansible, Ant, BitBucket, Confluence, Docker, gdb, git, GitHub, GitLab, Gradle, Hadoop, jad, jd-gui, Jira, Maven, make, MySQL, PostgreSQL, subversion, Trello, Vagrant, valgrind |
| **Security Tools** | Aircrack-ng, apktool, binwalk, bulk-extractor, Burp suite, Charles Proxy, curl, dex2jar, ftk, hashcat, IDA Pro, Metasploit, mitmproxy, Nessus, nmap, OpenSSL, ophcrack, p0f, Scalpel, skipfish, snort, sslstrip, sslyze, Volatility, Web Scarab, wget, Wireshark |
| **Cloud and Virtualization** | AWS, Azure, Bhyve, KVM, LXD, QEMU, virt-manager, VMware, Xhyve |

## Honors, Societies and Awards

- Member Upsilon Pi Epsilon International Computer Science Honor Society
- Member Institute for Electrical and Electronics Engineers (#97507890)
- Member Association for Computing Machinery (#9700346)

### At Johns Hopkins University

- Computer Science Department Outstanding Teaching Assistant Award (2014)
- Treasurer, Upsilon Pi Epsilon International Computer Science Honor Society (JHU Chapter)
- Computer Science Department Faculty Liaison Czar
- Student Representative to the Computer Science Undergraduate Curriculum Planning Curriculum Committee

## Certifications

- Certified Six Sigma Green Belt
- Certified Six Sigma Black Belt

# EXHIBIT C



# What the World is Watching

HyphaMetrics provides a unified understanding of media behavior that evolves at the speed of culture. We serve as the objective technology standard globally for the precise measurement of media at the individual level. Using Artificial Intelligence and Machine learning to analyze and optimize advertising and video content for media executives overseeing content, ads, brand sponsorships, and product placements, we cost-efficiently support interoperability across the entire media ecosystem serving measurement companies, brands, agencies, and media publishers.

Who we are →

Learn more about our solutions                Go →

HyphaMetrics - What the World is Watching

CONTACT

Contact

LinkedIn

Twitter

SOLUTIONS

Learn More

COMPANY

About Us

DISPATCHES

# EXHIBIT D

Hyphametrics comes out swinging with hyper-surveillance attribution - Rethink

25 March 2021

# Hyphametrics comes out swinging with hyper-surveillance attribution

Hyphametrics comes out swinging with hyper-surveillance attribution - Rethink



By **Rafi Cohen**

Hyphametrics is an audience measurement start-up that does not take the buzzwords 'cross-platform' and 'holistic' lightly. While still in its infancy, Hyphametrics could assemble a highly accurate dataset that will be hard to match in terms of transparency, if all goes to plan.

This prediction is based on how Hyphametrics performs hyper-surveillance on every aspect of digital entertainment in the home by scrupulously tracking everything from the feed displayed on the TV, to the IP traffic on the router, and even the locations of people in the house. It sounds spooky, but this Big Brother-esque measurement is reserved for a select set of opt-in panel audiences.

Talking to Faultline this week, Hyphametrics CEO, Joanna Drews, and CTO, Gerardo Lopez, talked us through the ins and outs of its proprietary system. At the hub of the house is the coreMeter box, which hosts multiple HDMI inputs for outgoing feeds from all TVs, gaming consoles, and set tops. Frame by frame analysis is conducted on those feeds, with different techniques applied depending on the source of the media.

A set top feed will be examined for broadcaster logos, as well as the channel information overlays that appear when a channel is changed, whereas a games console feed will be analyzed for browsing of the console interface to identify which game is selected, as well as developer logos at the start of gameplay.

Case 1:23-cv-00532-GBW-CJB   Document 1-1   Filed 05/17/23   Page 66 of 223 PageID
#: 86

Similarly, user choices on OTT platforms are tracked
by following the user path towards content. Both
Drews and Lopez feel this makes Hyphametrics the
only measurement vendor that truly knows what
people are watching. "We know that it is Season 3,
Episode 6 of Seinfeld, not just a random sitcom,"
Lopez told us.

Keen to poke some holes, we asked whether
Hyphametrics would be able to detect a pirated
streaming website that is being displayed on the TV
by either casting or HDMI? Lopez told us that while
coreMeter would not be able detect this through its
HDMI inputs, the wider system would be able to do
so through IP traffic tracking.

The coreMeter is multi-tasking several capabilities
simultaneously. As well as being an interface for
HDMI feeds, the box acts as a router for network
traffic measurement, and a quasi-connected TV from
which OTT applications can be run (and measured.)

"We are replicating the CTV experience from our box.
Any app they can have in their smart TV they can
download here," Drews explained.

'Source of truth' is another buzzterm that often
makes us switch off when hearing from measurement
vendors, but Drews was keen to prove that
Hyphametrics was not just spouting marketing fluff.

"We are never making a guess or an inference. While
many competitors are reliant on libraries and
schedule data, so there is always an inference made
in the methodology, we are officially measuring who
is in the room," Drews assured us.

Take measurement rival Samba TV, which Drews felt

was a fitting example. "Samba TV works through TV manufacturers, which allows for scale, but it blocks measurement on all the top apps, and cannot tell you how many people are watching," she explained. "It makes ID matches with partners like Xperi, but those are loaded with inferences. It is not enough to provide granularity."

Hyphametrics can also tell who in the house is watching the TV at any moment by tracking the presence of users' mobile phones via Bluetooth and WiFi, which panelists agree to have turned on at all times. "We are officially measuring who is in the room and what they are exposed to," Lopez assured us.

Naturally, any company claiming such a competitive edge should be appropriately protected. Hyphametrics has just been issued its first patent, which Drews said covers 15 unique elements of its methodology, including the tracking of IP traffic, the use of certain ML algorithms, as well as the proprietary hardware, software and cloud technologies that are used.

Hyphametrics is in the process of recruiting its first preliminary panel of 100 households. "We know the market expectation in terms of neutrality, and we do not augment households. There will be some with every SVoD app, and other with just an antenna," explained Drews, meaning that a panel household is left as is, with no extra SVoD subscriptions, games consoles or set tops added.

Drews expects the panel to be reflective of the US within the first few hundred households, and once the panel hits 5,000 households, clients will be able to integrate its findings with census data to produce

Hyphametrics comes out swinging with hyper-surveillance attribution - Rethink

ratings.

So, who are these clients? Drews was unable to name any of the data platforms and media companies that were showing interest, but did say that its main focus is streaming platforms. "Networks are pumping ad dollars into those spaces, so those platforms need to better understand the user and their competitors," she explained. "What is a Pluto TV user doing when not on the platform?"

Interestingly, Drews did say that the likes of Nielsen and Comscore would find value in Hyphametrics' offering, suggesting it is not rival but rather a complementary service.

Being early days, Hyphametrics is not breaking out data on certain trends – like Nielsen and Comscore have done with D2C movies – but this is coming. "We have already entered into market conversations with interest in specific subsets. We have a proprietary system built from scratch, so it is a small lift," Drews told us.

Early interest is in IP traffic measurement, specifically seeing how effective ad placement matches internet browsing, as well as the more general interplay between all entertainment devices in the home.

# EXHIBIT E

US010932002B2

(12) **United States Patent**     (10) **Patent No.:**    **US 10,932,002 B2**
Zamudio et al.                 (45) **Date of Patent:**     **Feb. 23, 2021**

(54) **CROSS-MEDIA MEASUREMENT DEVICE AND METHOD**

(71) Applicant: **Hyphametrics, Inc.**, Albany, NY (US)

(72) Inventors: **Gerardo Lopez Zamudio**, Mexico City (MX); **Joanna Drews**, Derwood, MD (US)

(73) Assignee: **Hyphametrics, Inc.**, Albany, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/925,029**

(22) Filed: **Jul. 9, 2020**

(65) **Prior Publication Data**

US 2021/0014565 A1     Jan. 14, 2021

**Related U.S. Application Data**

(60) Provisional application No. 62/871,789, filed on Jul. 9, 2019.

(51) **Int. Cl.**

| | |
|---|---|
| *H04H 60/32* | (2008.01) |
| *H04N 21/442* | (2011.01) |
| *G06K 9/00* | (2006.01) |
| *H04N 21/258* | (2011.01) |
| *H04N 21/4402* | (2011.01) |
| *H04N 21/466* | (2011.01) |
| *G06N 20/00* | (2019.01) |
| *G06N 5/04* | (2006.01) |
| *H04N 21/81* | (2011.01) |
| *G06Q 30/02* | (2012.01) |

(52) **U.S. Cl.**
CPC ... *H04N 21/44222* (2013.01); *G06K 9/00744* (2013.01); *G06N 5/04* (2013.01); *G06N 20/00* (2019.01); *H04N 21/25883* (2013.01); *H04N*

*21/4402* (2013.01); *H04N 21/4662* (2013.01); *H04N 21/812* (2013.01); *G06K 2209/25* (2013.01); *G06Q 30/0242* (2013.01); *G06Q 30/0272* (2013.01)

(58) **Field of Classification Search**
CPC ....... H04N 21/44222; H04N 21/25883; H04N 21/4402; H04N 21/4662; H04N 21/812
USPC ........................................................ 725/14
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 9,055,309 | B2 * | 6/2015 | Neumeier | H04N 21/23614 |
| 9,705,544 | B2 * | 7/2017 | van de Beek | H04L 27/06 |
| 10,375,451 | B2 * | 8/2019 | Neumeier | H04N 21/25866 |
| 10,631,068 | B2 * | 4/2020 | Navin | G08C 17/02 |

(Continued)

*Primary Examiner* — Pankaj Kumar
*Assistant Examiner* — Sahar Aqil Riaz
(74) *Attorney, Agent, or Firm* — Maginot, Moore & Beck LLP

(57) **ABSTRACT**

A method of identifying media content presented on a display device includes determining a selected input source providing a video signal to the display device, and then selecting a first set of content identification rules when it is determined that the selected input source is a first input source, and selecting a second set of content identification rules when it is determined that the selected input source is a second input source. The method further comprises applying the selected first set or second set of content identification rules to the video signal in order to generate content identification data for the media content presented on the display device. Application of the content identification rules includes waiting for a trigger event and applying an algorithm to one or more frames of the video signal following the trigger event.

**20 Claims, 43 Drawing Sheets**



## US 10,932,002 B2

Page 2

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 10,779,058 B2 * | 9/2020 | Panchaksharaiah | ...................... | H04N 21/44222 |
| 2008/0184245 A1 * | 7/2008 | St-Jean | .............. | G06K 9/00771 718/103 |
| 2011/0078719 A1 * | 3/2011 | Kenyon | .............. | G06K 9/0055 725/19 |
| 2012/0158726 A1 * | 6/2012 | Musgrove | ............. | G06F 16/353 707/737 |
| 2014/0225924 A1 * | 8/2014 | Loxam | ................. | G06T 19/006 345/633 |
| 2014/0317155 A1 * | 10/2014 | Treibach-Heck | ....... | G06F 16/95 707/811 |
| 2018/0316939 A1 * | 11/2018 | Todd | .................. | H04N 21/6587 |
| 2018/0316947 A1 * | 11/2018 | Todd | ................ | H04N 21/25875 |
| 2019/0195652 A1 * | 6/2019 | Lafon | ................. | G08G 5/0021 |
| 2020/0162788 A1 * | 5/2020 | Cremer | ................ | H04N 21/442 |
| 2020/0228880 A1 * | 7/2020 | Iyer | .................. | H04N 21/23424 |
| 2020/0236415 A1 * | 7/2020 | Khanna | ............. | H04N 21/2353 |
| 2020/0296472 A1 * | 9/2020 | Chung | .............. | H04N 21/4826 |

* cited by examiner



FIG. 1



FIG. 2A



FIG. 2B



FIG. 2C



FIG. 2D



FIG. 3



FIG. 4



FIG. 5A



FIG. 5B



FIG. 5B1

FIG. 5B2



FIG. 5B3



FIG. 5B4



FIG. 6

FIG. 7



FIG. 8



Extracted text from image (184 chars)
**Program name:** Malcolm in the Middle
**Programmed time:** 3-3:30p
**Description:** "Lois' Sister," S5/Ep13, (2004), (TV-PG,L), Lois and her competitive sister must reconcile because Susan...
**Channel:** 885 FUSE
**Current time:** 3:24pm
**Other Information:** 3HDDOD, CatPG

FIG. 9



FIG. 10A





FIG. 10C



FIG. 10D



FIG. 10E



FIG. 10F



FIG. 10G



FIG. 10H



Fig. 10I



FIG. 10J



FIG. 11

FIG. 10K



FIG. 12



FIG. 13



FIG. 14



FIG. 15



FIG. 16



IS EVERYONE STILL WATCHING TV?...

FIG. 17

1800



1810

FIG. 18



FIG. 19



FIG. 20

180

182

Coremeter Data
Packages

184

186

188



FIG. 21A

FIG. 21B



FIG. 21C



FIG. 22



FIG. 23



FIG. 24



210

161

200

FIG. 25

US 10,932,002 B2

1

# CROSS-MEDIA MEASUREMENT DEVICE AND METHOD

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application claims priority from U.S. Provisional Patent Application Ser. No. 62/871,789, filed Jul. 9, 2019, the entire contents of which are incorporated herein by reference.

## FIELD

The present disclosure relates to the field of electronic media measurement, and particularly devices and methods for determining audience measurement for numerous media events.

## BACKGROUND

Media content has been an important part of modern life for well over a century. Media content consumed in homes includes various sources, including cable television, over-the-air (OTA) television, recorded video (e.g., DVD), gaming consoles, and various internet sources offering media content via a high speed internet connection (i.e., over-the-top (OTT) content). While consumers enjoy the ability to watch this media content at will, media providers and advertisers have a vested interest in knowing exactly what media content is actually being consumed (i.e., media that is actually viewed, watched, or otherwise on a screen). By knowing this information, media providers and advertisers are better equipped to create new content and strategically place ads within such content.

The use of statistics offers one convenient approach to measuring media content consumption across a large population. To accomplish this, a group of households are recruited to serve on a "panel" intended to be representative of a larger population (e.g., the individuals in ten homes representative of a neighborhood, the individuals in one hundred homes representative of a city, etc.). Each household includes a number of individual panelists, and each panelist has specific demographic information (e.g., age, sex, ethnicity, income, etc.). By determining what media content that individual panelists are watching, statistical projections can be made about what media content is being consumed by the population as a whole.

For many years, the primary means for measuring media consumption by individuals within a household was the use of diaries. Each panelist was instructed them to keep a physical log of all content that they watched during the week. At the end of every day, each panelist would have a diary log listing everything the panelist watched for the day. This diary approach is still used in local markets to determine what ads to show during local news, etc. While the diary approach is capable of generating valuable information, there are many shortcomings. For example, panelists are notoriously inconsistent on accurately recording what they watched. Panelists often forget to log data, or simply cannot remember all of the media content they watched. The diary approach is also slow to assemble data, as physical diary logs must be collected from each user, the data compiled, and assembled into a user format. These activities not only take a significant amount of time and manpower, but are also subject to human error, making the diary approach to measuring media consumption costly and unreliable.

2

Numerous attempts have been made to implement technological solutions to the measurement of household media consumption in the hopes of addressing the shortcomings of diaries. Inaudible watermarks are an example of one such technological solution that has been attempted in the past. With this approach, audio signals that are inaudible to the human ear are incorporated into media content and captured by listening devices worn by the panelist. The watermark may be, for example, a series of inaudible tones, chimes, or other audio that are periodically played during television programs and/or advertisements. Each panelist is assigned a pager or other listening device that is worn on the panelist while at home. When the watermark is played, it is inaudible to the panelist, but the pager assigned to the panelist records the watermark, and a determination is made that the panelist was watching the media content at the time the watermark was played. Of course, the watermark approach also has numerous shortcomings. For example, media content is often not associated to a panelist because the panelist forgets to wear their pager, or the pager loses power. Also, media content is often incorrectly associated with a panelist because the panelist removes the pager from his or her person and subsequently leave the room. As a result, inaccurate data is often collected by the pagers. Moreover, with the watermark approach, only content that includes a watermark is capable of being captured. Many types of media that a user enjoys may not have a watermark (e.g., non-participating programs and advertisements, DVDs and other recorded media, gaming systems, etc.). As a result, panelists may watch a significant amount of media that is not captured in any way by the system. Therefore, while watermark systems offer some benefits over the conventional diary approach, many deficiencies remain in these systems.

Another example of a past technological solution to measuring household media consumption is fingerprinting using various techniques such as audio or video "automatic content recognition" (ACR). Audio ACR involves recording all of the audio aired (either OTA or on cable TV) on various channels in order to provide a library of audio data within a database. The recorded audio include both programming and advertising. Data associated with each audio signal is also catalogued and saved to a programming grid that identifies all of the content played at different times on different channels. For example, for a particular program, information about the channel that aired the program, the time of airing, the actors in the program, title and other episode data may be catalogued and saved. Thereafter, audio ACR involves periodically recording a short clip of the audio signal (e.g., ten seconds) that is output from the television of the panelist. After an audio fingerprint is captured at a particular time, it is sent to the cloud and compared to each of the audio recordings in the library. When a match is found, i.e., when the fingerprint is matched to a particular portion of one of the audio recordings in the library, the media content is identified based on the grid. In this manner, audio ACR is capable of determining what content a user watched at any given time. However, because of difficulties with accurately collecting fingerprints for both programming and advertising, these libraries are generally separate, and either programming fingerprints or advertising fingerprints are captured for a single household, but not both.

Like other prior art solutions to measurement of household media consumption, audio ACR has numerous shortcomings. First, it will be quickly recognized that the computer resources required for audio ACR are enormous, including both the memory and processing power required to store massive amounts of audio content in the library and

US 10,932,002 B2

3

subsequently compare each captured audio fingerprint to the audio content in the library. Similarly, the time required for system processors to actually compare each fingerprint to all audio recordings in the library is also significant. Moreover, the time and resources required to actually create the programming grid are also enormous. Audio ACR also has other shortcomings. For example, the audio signal captured by audio ACR is often noisy (e.g., because of noisy households), and incapable of recognition. Also, determining who was watching the identified content is problematic because users are required to actively register in association with the content (e.g., by pressing a button on the audio ACR device). Furthermore, audio ACR is only capable of identifying content that is associated with aired programs (i.e., either on cable or OTA). Audio ACR is incapable of identifying media content associated with gaming or OTT content. Audio ACR is also incapable of determining both programming and advertising consumption for a single household of panelists. Therefore, while audio ACR is capable of providing some advantages, it has numerous shortcomings that do not address the current needs in the industry.

Video ACR (also known as pixel ACR) is another form of ACR that operates similar to audio ACR, but monitors a video fingerprint instead of an audio fingerprint. In particular, video ACR records a number of pixels as a particular location on the screen, and then compares the recorded pixels to a library of pixels associated with programming and advertising content. While video ACR solves a few of the problems of audio ACR, such as noise associated with the audio signal, video ACR has related shortcomings. For example, video ACR is only capable of monitoring aired content associated with a particular time and channel. Video ACR is not capable of identifying content provided from other sources such as gaming consoles, video players (e.g., DVD players), or OTT content.

In view of the foregoing, it will be recognized that consumer's media viewing habits have far outpaced current measurement technology solutions which are unable to truly capture an audience's media exposure. The media consumption measurement industry is relying on multiple measurement sources for each device and relies on modeling to infer the measurement gaps. It would be advantageous to provide a system for media content measurement that is robust, capable of identifying content from all media sources within a household, and is not burdened by the shortcomings of past devices and methods for collecting and identifying consumed media content.

SUMMARY

In accordance with one exemplary embodiment of the disclosure, there is provided a method of identifying media content presented on a display device. The display device includes a screen and a speaker, and is in communication with a content gateway. The media content presented on the display device is provided by a video signal comprising a series of frames. The method comprises determining, at a processor within the gateway, a selected input source providing the video signal, wherein the selected input source is one of a plurality of input sources including at least a first input source and a second input source. The method further comprises selecting a first set of content identification rules when it is determined that the selected input source is the first input source, wherein the first set of content identification rules define a first trigger event and a first algorithm for analyzing one or more of the frames of the video signal following the first trigger event. Furthermore, the method

4

comprises selecting a second set of content identification rules when it is determined that the selected input source is the second input source, wherein the second set of content identification rules define a second trigger event and a second algorithm for analyzing one or more frames of the video signal following the second trigger event, and wherein the second set of content identification rules is different from the first set of content identification rules. Additionally, the method comprises applying the selected first set or second set of content identification rules to the video signal in order to generate content identification data for the media content presented on the display device, wherein applying the selected first set of content identification rules includes waiting for the first trigger event and applying the first algorithm to one or more frames of the video signal following the first trigger event, and wherein applying the selected second set of content identification rules includes waiting for the second trigger event and applying the second algorithm to one or more frames of the video signal following the second trigger event.

In accordance with another exemplary embodiment of the disclosure, a non-transitory computer-readable medium is disclosed for identifying media content provided by a video signal delivered to and presented on a display device. The computer-readable medium includes a plurality of instructions stored thereon that, when executed by a processor, cause the processor to determine a selected input source providing the video signal, wherein the selected input source is one of a plurality of input sources including at least a first input source and a second input source. The instructions further cause the processor to select a first set of content identification rules when it is determined that the selected input source is the first input source, wherein the first set of content identification rules define a first trigger event and a first algorithm for analyzing one or more frames of the video signal following the first trigger event. The instructions also cause the processor to select a second set of content identification rules when it is determined that the selected input source is the second input source, wherein the second set of content identification rules define a second trigger event and a second algorithm for analyzing one or more frames of the video signal following the second trigger event, the second set of content identification rules being different from the first set of content identification rules. Additionally, the instructions cause the processor to apply the selected first set or second set of content identification rules to the video signal in order to generate content identification data for the media content presented on the display device, wherein application of the selected first set of content identification rules causes the processor to wait for the first trigger event and apply the first algorithm to one or more frames of the video signal following the first trigger event, and wherein application of the selected second set of content identification rules causes the processor to wait for the second trigger event and applying the second algorithm to one or more frames of the video signal following the second trigger event.

In accordance with yet another exemplary embodiment of the disclosure there is presented a gateway for identifying media content presented on a display device including a screen and a speaker. The gateway includes a plurality of input ports, an output port, and a processor. The plurality of input ports include at least a first input port and a second input port. The output port is configured to transfer a video signal received at the first input port or the second input port to the display device, wherein the video signal includes a series of frames that provide the media content. The pro-

US 10,932,002 B2

5

cessor is configured to execute a computer application comprising a plurality of instructions which are configured to, when executed, cause the gateway to determine a selected input port providing the video signal, and select a first set of content identification rules when it is determined that the selected input port is the first input port, wherein the first set of content identification rules define a first trigger event and a first algorithm for analyzing one or more frames of the video signal following the first trigger event. The instructions further cause the gateway to select a second set of content identification rules when it is determined that the selected input port is the second input port, wherein the second set of content identification rules define a second trigger event and a second algorithm for analyzing one or more frames of the video signal following the second trigger event, and wherein the second set of content identification rules is different from the first set of content identification rules. Additionally, the instructions cause the gateway to apply the selected first set or second set of content identification rules to the video signal in order to generate content identification data for the media content presented on the display device, wherein application of the selected first set of content identification rules causes the processor to wait for the first trigger event and apply the first algorithm to one or more frames of the video signal following the first trigger event, and wherein application of the selected second set of content identification rules causes the processor to wait for the second trigger event and apply the second algorithm to one or more frames of the video signal following the second trigger event.

The above described features and advantages, as well as others, will become more readily apparent to those of ordinary skill in the art by reference to the following detailed description and accompanying drawings. While it would be desirable to provide a method and system for media measurement that provides one or more of these or other advantageous features as may be apparent to those reviewing this disclosure, the teachings disclosed herein extend to those embodiments which fall within the scope of any eventually appended claims, regardless of whether they include or accomplish one or more of the advantages or features mentioned herein.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a diagram of a system for cross-media content measurement including a media content gateway positioned within a household and in communication with a remote server;

FIG. 2A shows a block diagram of the gateway of FIG. 1;

FIG. 2B shows a schematic arrangement for the electronic components within the gateway of FIG. 1;

FIG. 2C shows a perspective view of one embodiment of a housing for the gateway of FIG. 1;

FIG. 2D shows a perspective view of an alternative embodiment of a housing for the gateway of FIG. 1;

FIG. 3 shows a block diagram of the remote server of FIG. 1;

FIG. 4 shows inclusion of the gateway of FIG. 1 in an entertainment center of a household along with various other media components;

FIG. 5A shows a first flowchart of general operation of the gateway of FIG. 1;

FIG. 5B shows a second flowchart of general operation of the gateway of FIG. 1;

6

FIG. 5B1 shows a flowchart of implementation of a first set of content identification rules when a selected input source is OTA television;

FIG. 5B2 shows FIG. 5B1 shows a flowchart of implementation of a second set of content identification rules when a selected input source is a set-top box;

FIG. 5B3 shows a flowchart of implementation of a third set of content identification rules when a selected input source is OTT content;

FIG. 5B4 shows a flowchart of implementation of a fourth set of content identification rules when a selected input source is a disc player or a video game console;

FIG. 6 shows an illustration of content identified via the gateway of FIG. 1 from a household of exemplary panelists;

FIG. 7 illustrates a dataset of media consumption data for a panel collected at the remote server of FIG. 1;

FIG. 8 is a diagram showing exemplary inputs into the gateway of FIG. 1 and an associated HDMI output to the television;

FIG. 9 shows an example of media content presented on a television and metadata extracted from a frame of the content;

FIG. 10A illustrates an infrared trigger event used in association with a set of content identification rules in the gateway of FIG. 1;

FIG. 10B is illustrates a time based trigger event used in association with the gateway of FIG. 1;

FIG. 10C illustrates several content banners displayed on the television of FIG. 1;

FIG. 10D is an exemplary content log illustrating use of the content banner of FIG. 10C as a trigger event;

FIG. 10E illustrates several content mosaics displayed on the television of FIG. 1;

FIG. 10F is an exemplary content log illustrating use of the content mosaic of FIG. 10E as a trigger event;

FIG. 10G is an exemplary content log illustrating a user's path through one of the content mosaics of FIG. 10E;

FIG. 10H illustrates a network logo displayed on the television of FIG. 1;

FIG. 10I is an exemplary content log illustrating use of the network logo of FIG. 10H as a trigger event;

FIG. 10J illustrates a trigger event provided by a scene change within a series of video frames;

FIG. 10K illustrates a brand recognition trigger event used in association with the gateway of FIG. 1;

FIG. 11 is a plan view of an exemplary remote control for the gateway of FIG. 1;

FIG. 12 is a table of Wi-Fi handshake information collected at the gateway of FIG. 1;

FIG. 13 is a flowchart of a method for registering and de-registering panelists at the gateway based on a Wi-Fi signal strength detected at the gateway of FIG. 1;

FIG. 14 shows a perspective view of exemplary wearable electronic devices for use with panelist registration to the gateway of FIG. 1;

FIG. 15 is a flowchart of a method for registering and de-registering panelists at the gateway based on a Bluetooth communications with a wearable electronic device at the gateway of FIG. 1;

FIG. 16 is an exemplary television with media content presented on the screen and registered panelists displayed as avatars on the screen according to the method of FIG. 15;

FIG. 17 shows the exemplary television of FIG. 16 when the avatars are muted on the screen;

FIG. 18 shows an exemplary network traffic log when the gateway of FIG. 1 operates in a router mode.

US 10,932,002 B2

7

FIG. 19 is a flowchart of a method for detecting network traffic when the gateway of FIG. 1 operates in the router mode;

FIG. 20 is a flowchart of a method for detecting network traffic when the gateway of FIG. 1 operates in a promiscuous mode;

FIG. 21A is a tree diagram of exemplary data packages generated by the gateway of FIG. 1 based on different rule sets for different input sources;

FIG. 21B illustrates a database having exemplary data associated with the data packages of FIG. 21A;

FIG. 21C illustrates additional data within the database of FIG. 21B;

FIG. 22 is a flowchart of a method of determining television on/off state using HDMI-CEC detection at the HDMI output port of the gateway of FIG. 1;

FIG. 23 is a flowchart of a method of determining television on/off state using the AC power detection circuit in the gateway of FIG. 1;

FIG. 24 is a first exemplary embodiment of a graphical user interface for the gateway of FIG. 1; and

FIG. 25 is a second exemplary embodiment of a graphical user interface for the gateway of FIG. 1.

## DESCRIPTION

A system and method for cross-media content measurement is disclosed herein. As shown in FIG. 1, the system for cross-media measurement 100 includes a media gateway 110 connected to a television 200 or other display device within a household. The gateway 110 is connected to various media sources within a household 202, including both wired media sources 210 and wireless media devices 220. The gateway 110 is configured detect consumption of and identify media content presented on both the television 200 and the various wireless devices 220. The gateway 110 is further configured to associate one or more panelists 204 with the identified media content. Data collected by the gateway 110 is transmitted to a remote server 310 via the internet 290 or other wide area network. The remote server 310 may perform additional processing on the data collected by the gateway 110 in order to determine the specific media content consumed by each of the specific panelists.

Gateway Architecture

FIGS. 2A-2C show an exemplary embodiment of the media gateway 110 (which may also be referred to as a "content recognition meter" or "Coremeter"). FIG. 2A shows a block diagram of the gateway 110. Similarly, FIG. 2B shows a schematic layout for the gateway 110. FIG. 2C shows an exemplary housing 112 for the gateway. It will be appreciated that the embodiment of the media gateway 110 shown in FIGS. 2A-2C is only one exemplary embodiment of a media gateway. As such, the exemplary embodiment of the media gateway 110 of FIGS. 2A-2C is merely representative of any of various manners or configurations of the media gateway 110 or other data processing systems that are operative in the manner set forth herein.

The media gateway 110 is provided in a housing 112, cabinet or the like, and includes a number of ports and associated electronic components enclosed within the housing 112. As can be seen in FIG. 2C, the housing 112 is a simple cube-shaped box structure with a solid color provided on the base (e.g., a gray color), and a contrasting color provided on an upper portion of the housing above the base (e.g., a black color). The display 152 of the gateway 110 is visible on the upper portion of the housing. The simple design of the housing 112 is intended to be both rugged and

8

aesthetically pleasing. However, FIG. 2C is only one of numerous possible embodiments for the housing 112. FIG. 2D shows an alternative embodiment of the housing that does not include the display 152, but includes a number of additional antennas 128 associated with the wireless transceiver 124.

With particular reference now to FIG. 2A, the electronic components of the media gateway 110 include processing circuitry/logic 114, a memory 116, a communications module 120, an infrared receiver 122, a wireless transceiver 124, a cellular transceiver 126, a number of input/output ports 130, a power module 150, a display 152, a microphone 154, and a speaker 156.

The processing circuitry/logic 114 is operative, configured and/or adapted to operate the content gateway 110 including the features, functionality, characteristics and/or the like as described herein. To this end, the processing circuitry/logic 114 is operably connected to the memory 116, and various other components including the communications module 120, the I/O ports 130, the power module 150, the display 152, the microphone 154, and the speaker 156. The processing circuitry 114 may be provided by one or more commercially available microprocessors, such as a quad core 1.8 GHz or faster processor, such as those sold by Intel Corporation or AMD, Inc. The processing circuitry 114 may be included on a single board/processor, or may be split amongst a number of different boards and processors within the gateway 110. For example, in at least some embodiments, the processing circuitry includes a CPU, a motherboard, and one or more additional processing modules, such as a video capture module 115 (see FIG. 2B).

The memory 116 may be of any type of device capable of storing information accessible by the processor, such as solid state memory, hard drives, memory cards, ROM, RAM, write-capable memories, read-only memories, discs, flash memory, or any of various other computer-readable medium serving as data storage devices as will be recognized by those of ordinary skill in the art. In the embodiment, shown in FIG. 2B, the memory includes 4 GB (or more) DDR3 RAM as well as 8 GB (or more) SSD storage.

The memory 116 is configured to store both instructions 160 for execution by the processing circuitry/logic 114, as well as data 170 for use by at least the processing circuitry/logic when running one or more of the programs/software engines included in the instructions 160. In the embodiment described herein, the instructions 160 include various software programs/engines, including OTT apps 161, a content capture engine 162, a client-side content identification engine 164, a panelist registration engine 166, a content overlay engine 168, as well as numerous other computer programs. It will be recognized that the instructions 160 also include various additional programs that are not discussed in detail herein. For example, the instructions 160 include a hardware interface application programming interface (API) that allows the gateway 110 to interact with various hardware components such as the communications module 120 and associated transceivers 122, 124, 126, I/O ports 130, power module 150, display 152, etc.

The OTT apps 161 include any of various apps available to or downloaded by the user for use via the gateway 110. The OTT apps may 161 include any of various applications for streaming OTT content, such as the Amazon Prime app, Hulu, Netflix, etc.

The content capture engine 162 is configured to select, copy and save certain screenshots, video snippets, and/or audio associated with the selected video source that is delivered to the television 200. The content captured may be

US 10,932,002 B2

9                                                                                    10

from any of various media sources, including one of the sources connected to one of the I/O ports **130** (e.g., one of the HDMI-IN ports **132**) as well as any additional sources such as content provided by one of the OTT apps **161** included in the memory **116** of the gateway **110**. The content capture engine **162** captures/copies specific types of content (e.g., video frames) at certain times. The capture of content may occur periodically and/or be determined based on instructions from the content identification engine **164**. In at least some embodiments, the content capture engine **162** interacts with the hardware interface API and captures content every time an infrared signal is received from the remote control **206**. Content captured with the content capture engine **162** may be processed by the content identification engine **164** and/or transmitted to the remote server **310** for additional processing.

The client-side content identification engine **164** is configured to monitor, analyze and identify content presented on the television screen and other display devices using a multi-layered approach to content identification. As explained in further detail below, the multi-layered approach involves the application of different rules to content review and identification based on the source of the content. The content identification engine **164** advantageously uses machine learning to improve upon content identification over time. The content identification engine performs a first round of content recognition on the captured media by using machine learning models. If the client-side content identification engine **164** is able to detect the required information with enough accuracy, the detected information (e.g., channel and other metadata) are transmitted directly to the cloud and stored in a database of the remote server together with panelist registration information. On the other hand, if the content is not identified with an acceptable level of accuracy, the content is sent to the remote server **310** for further processing by more robust machine learning engines.

The panelist registration engine **166** operates in association with the content identification engine **164** to identify certain panelists for association with identified content. The panelist registration engine **166** works directly with the hardware interface API in order to detect the household member's presence using any of various means. For example, the panelist registration engine **166** may analyze the power of the Wi-Fi signal that arrives at the gateway **110** from wireless devices **220** (e.g., smartphones and other mobile devices) associated with each of the panelists. As another example, the panelist registration engine **166** may interact with a Bluetooth chipset **123** on the wireless transceiver **124** in order to detect the presence of Bluetooth wearables that are assigned to one or more of the panelists (typically child panelists). It will be recognized that the terms "register" and "registration" as used herein with respect to one or more panelists refers to the condition of a panelist being in proximity to the television or other display device such that the panelist is associated with identified content presented on the display device; the terms "register" and "registration" as used herein with respect to one or more panelists does not refer to such panelists being users of the system and/or simply having demographic information for the panelist saved in the system **100**.

The content overlay engine **168** is configured to display certain content on the television in association with media presented thereon. For example, as described in further detail below, the content overlay engine **168** is configured to overlay avatars representing the currently registered panelists over the video content presented on the television **200**. The content overlay engine **168** is also configured to provide various graphical user interfaces (GUIs) for use in association with gateway operation. In at least some embodiments, the content overlay engine **168** also includes the software that operates the video capture module **115** of the gateway **110**. In this embodiment, the content overlay engine **168** determines the video signal output at the HDMI-OUT port **133** of the gateway. Accordingly, the content overlay engine **168** may be configured to determine the programming/media content presented on the television in addition to any overlays on the programming/media content.

With continued reference to FIG. 2A, the data **170** stored in the memory **116** includes panelist data **172**, a viewing log **174**, training data **176**, and saved content. The panelist data **172** includes data related to all panelists **204** in the household **202**. The panelist data **172** may include any of various types of demographic data such as age, sex, income level, etc. for each panelist within the household **202**. In at least some embodiments, the panelist data **172** also includes personalized information collected about the panelist at the time of registration. For example, the panelist data **172** may include education level, type of smartphone owned, type of automobile owned, pet ownership, vacation preferences, sports preferences, food preferences, etc.

The viewing log **174**, includes information about the content viewed by the individual panelists. For example, the viewing log **374** may include individual data indicating that a particular panelist was watching a particular program at a particular time. For example, the viewing log **174** may include data indicating two panelists **204** from the household **202** were watching "Game of Thrones" on HBO via a cable box at 10 pm on Jul. 9, 2020. The viewing log **174** may be saved to the memory **116** of the gateway **110** for some period of time, and then periodically transmitted to the remote server **310** (e.g., at the end of every day), and/or erased after some period of time (e.g., after one month).

The training data **176** includes data that is used by the machine learning features of the client-side content identification engine **164**. The training data includes a number of exemplary video frames for different input sources, and the appropriate content identification for such video frames. The training data **176** is used to train the content identification engine **164** to appropriately identify content from a video frame. The training data **176** is periodically updated (e.g., daily, weekly, etc.) by uploading additional training data from the remote server **310**. This updated training data allows the content identification engine **164** to experience incremental learning, thus allowing the content identification engine to more reliably identify content from any of various input sources.

The saved content **178** includes frames of captured video that are saved for future reference. While much of the content identification process occurs locally on the gateway **110**, in certain situation frames that require further processing are temporarily stored in the saved content **178**. These frames may then be transmitted to the remote server **310** for further processing. For example, when certain types of frames that require more in-depth processing (e.g., face identification) are identified, these frames are temporarily stored with the saved content **178**, and then subsequently transferred to the remote server **310** for further processing. In some instances, transfer of the saved content occurs along with content data that was identified at the gateway **110** (e.g., text data associated with each frame).

In view of the foregoing, it will be recognized that the data **170** is used by the computer programs **162, 164, 166, 168** utilize the data **170** in order to provide the functionality of the cross-media content identification system **100** described

US 10,932,002 B2

11

herein. A computer program product implementing an embodiment disclosed herein, including any of the above-mentioned programs may comprise one or more computer-readable storage media storing computer instructions executable by a processor to provide an embodiment of a system or perform an embodiment of a method disclosed herein. Computer instructions (e.g., the client-side content identification engine **164**) may be provided by lines of code in any of various languages as will be recognized by those of ordinary skill in the art. A "non-transitory computer-readable medium" may be any type of data or storage medium that may store computer instructions, including, but not limited to a memory card, ROM, RAM, write-capable memories, read-only memories, hard drives, discs, flash memory, or any of various other computer-readable medium.

With continued reference to FIG. **2A**, the communication module **120** of the gateway **110** provides an interface that allows for various types of communication with any of various media devices. The communications module **120** is specifically configured for both wired and wireless communications with various media devices and other electronic devices. The communications module **120** is configured for wireless communications via the I/O ports **130**, and is configured for wireless communications via various wireless interfaces, including an infrared receiver **122**, a wireless transceiver **124**, and a cellular transceiver **126**.

The communications module **120** connects the gateway **110** to the household's internet service provided by an internet service provider (e.g., via cable or fiber delivered to a household modem). The connection to the internet may be by wired communication (e.g., over the Ethernet port **142**) or wireless communication (e.g., over the wireless transceiver **124**). For example, the wireless transceiver **124** connected to the communications module **120** specifically includes a Wi-Fi chipset **125**, thus allowing the communications module **120** to communicate with an existing Wi-Fi network provided by an internet service provider. Connection of the communications module **120** to the internet allows the gateway **110** to serve as a router in a new wireless network within the household. Thus, the gateway **110** serves as a Wi-Fi access point for all wireless network devices **220** within the household, including both mobile devices (e.g., smartphones and tablets) and stationary devices (e.g., desktop computers and the television **200**). Besides acting as a router/Wi-Fi access point, the Wi-Fi chipset **125** also allows the gateway **110** to sniff the traffic on each mobile device and detect mobile browsing history, searched keywords and target URLs. Additionally, the Wi-Fi chipset **125** detects the signal strength (e.g., RSSI) of each mobile device at the gateway, thus allowing the gateway **110** to detect proximity of a mobile device (and the associated user) to the gateway. Thus, it will be recognized that the Wi-Fi chipset **125** provides for triple functionality: (i) it can connect to a Wi-Fi network as a client (e.g., in order to transmit captured date to a central server or receive software updates); (ii) it can act as a Wi-Fi access point such that other Wi-Fi devices connect to it (e.g., in order to perform network sniffing functions to determine the kind of contents the user is consuming); and (iii) it can act as a Wi-Fi beacon in order to detect the proximity of a mobile device (e.g., in order to allow for passive user presence detection in the same room as the television).

In addition to the wireless transceiver **124** and associated Wi-Fi chipset **125**, the communications module **120** further includes a cellular transceiver **126** (or other wide area network transceiver) and associated chipset. The cellular

12

transceiver **126** may include a cellular modem that facilitates internet communications between the gateway **110** and any of various remote computers via the cellular telephony network (e.g., 3G/4G/5G/LTE networks within the American frequency specification). In this manner, the gateway **110** is equipped with redundant functionality that allows for internet communications via any one of various available network connections, including: (i) an Ethernet connection, (ii) a Wi-Fi connection, or (iii) the cellular telephony network connection.

In addition to the internet connection capabilities, including Wi-Fi and cellular capabilities as discussed above, the communications module **120** also includes further wireless communications capabilities. For example, the infrared receiver **122** allows the communications module **120** to receive infrared signals from a remote control or other infrared-equipped device. Additionally, the wireless transceiver **124** may also provide other communications capabilities using any of various known hardware, software and related communications protocols. For example, the wireless transceiver **124** is also configured to provide short-range wireless communications (e.g., via the low emissions Bluetooth chipset **123**) with any of various short-range communications devices. The short-range wireless communications provides additional functionality for the gateway **110**, such as additional remote control functionality, or panelist registration functionality as will be explained in further detail below.

The I/O ports **130** include a number of ports that are accessible through the housing **112** of the gateway **110**. As best shown in FIG. **2B**, the I/O ports **130** include a plurality of HDMI-IN ports **132** (e.g., 4-8 ports), an HDMI-OUT port **133**, a plurality of USB ports **134** (e.g., 2-4 ports), at least one CVBS-IN port **136**, a CVBS-OUT port **137**, and a digital antenna in port **138**. The HDMI-IN ports **132** are configured to connect any of a plurality of different wired media sources **210** to the gateway **110** using an HDMI cable having an HDMI connector. Typical media sources that may be connected to the gateway **110** via the HDMI-IN ports **132** include cable boxes, Blu-ray and DVD players, OTT streaming devices (e.g., Apple TV, Roku, Amazon Firestick, etc.), video game consoles (e.g., Sony PlayStation, Microsoft X-Box, Nintendo Switch, etc.), video cameras, and any number of other media devices.

Similar to the HDMI ports, the USB ports **134** are configured to connect any of a plurality of different wired media sources **210** to the gateway **110** using a USB cable with a USB connector. Typical media sources that may be connected to the gateway **110** via the USB ports **134** include video cameras and computer devices such as tablets, laptops, and desktop computers. The USB ports **134** are particularly equipped to allow system administrator to perform activities such as operating system updates, media files transfer, extend storage capacity, add external dongles of any kind to expand the hardware capacity, and connect peripheral accessories such as biometric readers, webcams or other sensors.

The at least one CVBS port **136** is available in the event that a wired media source **210** does not include an HDMI port (e.g., an older media device, such as a VCR), in the event that composite video cables are available but an additional HDMI cable is not available to the user during set-up of the gateway **110**, or in the event that all of the HDMI ports **132** are in use. The digital antenna in port **138** is generally a coax connection port that receives input from an HDTV antenna. The digital antenna in port is connected

US 10,932,002 B2

13

to a digital ATSC TV tuner **139** that allows the user to receive OTA content from any of a number of local TV providers.

Each of the video input ports, including the HDMI-IN ports **132**, USB ports **134**, CVBS-IN port **136**, and TV tuner **139** are connected to the video capture module **115**. The video capture module **115** is configured to receive video signal inputs from the various ports **132**, **134**, **136**, **139**, and act as a switch to select one of the inputs to be output to the television via the HDMI-OUT port **133** (or alternatively, the CVBS-OUT port **137**). Selection of the appropriate video signal for output via the HDMI-OUT port **133** is typically determined by user/panelist selection of one of the input ports via the remote control or other means, thus indicating the user's preferred viewing source. The video signal from the selected input port is then output to the television for presentation to the user. Accordingly, a single HDMI input is received at the television **200** from the gateway **110**, and there is no need for the user to switch video inputs at the television. Instead, selection of video inputs occurs at the gateway **110**. Furthermore, because the video signal to the television is directed through the gateway **110**, the content overlay engine **168** is configured to overlay additional content, such as legends, alerts and registered persons, on the television screen via the HDMI-OUT port **133** to the television **200**.

In addition to the video input ports, the I/O ports also include several additional ports including an SD card expansion slot **140**, an Ethernet port **142**, and an AC output port **144**. The SD card expansion slot **140** allows the user to insert an SD card so that content thereon can be read by the gateway **110**. For example, the SD card expansion slot **140** may be used as an expansion slot for additional storage capabilities when connectivity problems exist with the gateway **110** (e.g. due to faulty Wi-Fi at the household or problems with the cellular network). Alternatively, the SD card expansion slot **140** may be used to provide updates or other information for use by the processing circuitry **114**. The Ethernet port **142** (e.g., an RJ45 10/100 MBPS Ethernet port) is configured to connect to the household modem provided by an internet service provider (ISP). The Ethernet port **142** is typically used when the internet modem provided by the ISP is in close proximity to the gateway **110**. If this modem is not in close proximity to the gateway **110** (or otherwise available for wired connection), the gateway utilizes the wireless transceiver **124** or the cellular antenna **126** to connect to the household router provided by the ISP. The AC output port **144** is connected to the power module **150**. As explained in further detail below, the AC output port **144** is configured to receive the power cord from the television **200** and provide AC power to the television.

The power module **150** is adapted to provide power to both the gateway **110** as well as the television. To this end, the power module **150** includes an internal power supply that is configured to plug in to an AC power outlet within the household **202**. The power module **150** is also connected to an internal battery **148**. The power module charges the internal battery **148**, and in turn, receives power from the internal battery **148** in the event power from the household AC power outlet is not delivered to the power module **150**. As shown in FIG. 2B, the internal power supply is connected to the AC output port **144** and provides power to the AC output port. In order to facilitate delivery of AC power, the AC output port **144** includes an AC receptacle **145** that other electronic devices may be plugged into. When the television **200** is plugged into the receptacle **145** of the AC output port **144**, the television receives power via the gateway **110**.

14

The power module **150** also includes a TV ON/OFF detection circuit **151**. The TV ON/OFF detection circuit **151** is configured to determine whether the TV connected to the gateway **110** is on or off in one of two different ways. First, if the TV is plugged into the AC power port **144**, the circuit **151** detects the amount of power flowing to the television (e.g., via an AC loop sensor or other current sensor or via a shunt resistor or other voltage sensor). When the amount of power provided to the television **200** is less than a threshold amount (i.e., indicating that the screen is not illuminated), the television is determined to be powered off. When the amount of power provided to the television is greater than a threshold amount (i.e., indicating that the screen is illuminated), the television is determined to be powered on. Second, if an HDMI cable connects the gateway **110** to the television, the HDMI CEC (consumer electronics control) feature may be used to detect whether the television **200** is powered on or off. As explained in further detail below, determining whether the television **200** is powered on or off may be used to (i) establish the measurement on/off times based on the times the user is actually watching television, (ii) optimize resource usage by processing and transmitting information only when the user is watching television, and (iii) detect user presence only during television viewing times. Also, because the gateway can detect the ON/OFF television state, the power module **150** is further configured to automatically turn on (full power) when the television **200** is turned on, and automatically turn off (reduced power) when the television is turned off.

With continued reference to FIGS. **2A-2C**, the gateway **110** further includes additional electronic components such as a display **152**, a microphone **154**, and a speaker **156**. The display **152** may be a conventional LCD display (e.g., a 16×10 cm LCD display), as shown in FIG. **2C**. The display **152** provides simple information for the user such as the current time, date, selected media source (e.g., HDMI **2**), and registered panelists (e.g., 1, 3, 4). The display **152** may also be used by a technician to provide information during diagnostic testing and repair of the gateway **110**. However, the display **152** is not equipped to present video content from any of the sources connected to the ports **130**. In other words, the gateway itself is not capable of acting as a television for user viewing of video signals delivered thereto.

The microphone **154** may be any of various commercially available microphones that are commonly used with electronic devices. The microphone **154** allows the user to provide verbal instructions in lieu of instructions from a remote control or other source (e.g., "Alexa, tune to Netflix," or "Hey Google, what channel is playing the football game"). The speaker **156** is capable of providing audible cues, alerts, reminders, or audio instructions for the user. For example, the speaker **156** may sound an error tone, or may be used to respond to a verbal command from the user (e.g., "The football game is on NBC, channel 12"). In at least one embodiment, the microphone **154** is used to provide additional content identification capabilities, such as audio ACR.

Remote Server

With reference again to FIG. **1**, the remote server **310** is positioned at a location that is removed from the household **202** where the gateway **110** resides. The remote server **310** is configured to communicate with the gateway **110** via the internet **290**. Accordingly, both data and instructions may be communicated and shared between the gateway **110** and the remote server **310** via the internet **290**. While only a single remote server **310** is shown in FIG. **1**, it will be recognized that this single server **310** is representative of any number of

US 10,932,002 B2

15 16

remote/cloud servers that may be in communication with the gateway via the internet **290** or other wide area network.

As shown in FIG. **3**, the remote server **310** is provided in a housing **312**, cabinet or the like, and includes a number of electronic components enclosed therein. In particular, the remote server **310** includes processing circuitry/logic **314**, a memory **316**, a communications module **320**, and a number of input/output ports **330**. The communication module **320** of the remote server **310** provides an interface for communication with other devices, and particularly the gateway **110**, via the internet. As noted previously, the gateway **110** is connected to the internet using any of various means for establishing internet communications. The remote server **310** may be similarly configured, including configured for wired or wireless connection to the internet. To this end, the I/O ports **330** of the remote server provide the necessary ports, antennas, or other communications hardware required to establish the internet connection.

The processing circuitry/logic **314** of the remote server **310** is operably connected to the memory **316**, and various other components including the communications module **320** and the I/O ports **330**. Similar to the processing circuitry **114** of the gateway **110**, the processing circuitry **314** of the server **310** may be provided by one or more commercially available microprocessors, such as a quad core 1.8 GHz or faster processor, such as those sold by Intel Corporation or AMD, Inc. The memory **316** may also be of any type of device capable of storing information accessible by the processor, such as solid state memory, hard drives, memory cards, ROM, RAM, write-capable memories, read-only memories, discs, flash memory, or any of various other computer-readable medium serving as data storage devices as will be recognized by those of ordinary skill in the art. The memory **316** is configured to store both instructions **360** for execution by the processing circuitry/logic **314**, as well as data **370** for use by at least the processing circuitry/logic when running one or more of the programs/software engines included in the instructions **360**.

In the embodiment described herein, the instructions **360** include various software programs/engines, including a network-side content identification engine **364**. The network-side content identification engine **364** is similar to the client-side identification engine **160**, and is configured to identify content presented on a television. However, the network-side content identification engine **364** includes additional functionality and processing capabilities, such as increased machine learning functionality beyond that capable with the client-side content identification engine **160**.

The data stored in the memory **316** includes panel-wide data **372**, a viewing log **374**, and training data **376**. The panel-wide data **372** includes data related to all panelists in the system **100**, including the panelists **204** associated with the household **202**, as well as numerous additional panelists associated with additional households. The panel-wide data **372** may include any of various types of demographic data such as age, sex, income level, etc. for each panelist. The viewing log **374**, includes information about the content viewed by panelists, both individually and collectively. For example, the viewing log **374** may include individual data indicating that a particular panelist was watching a particular program at a particular time (e.g., panelist **1** from the household **202** was watching "Game of Thrones" on HBO at 10 pm on Jul. 9, 2020). Additionally, the viewing log **374** may include collective data that indicates that groups of panelists were watching a particular program at a particular time (e.g., 5% of all panelists, or 10% of all males between the ages of forty and fifty were watching "Game of Thrones" on HBO at 10 pm on Jul. 9, 2020). The training data **376** includes data that is used by the machine learning features of the network-side content identification engine **360**, as explained in further detail below.

General Gateway Operation

General operation of the gateway **110** is now be described with reference to FIGS. **4-7**. FIG. **4** shows the gateway **110** positioned in a living area of an exemplary household **202**. The gateway **110** is positioned in close proximity (e.g., within 5-10 feet) of the television **200**. The HDMI-OUT port **133** of the gateway **110** is connected to one of the HDMI-IN ports **201** of the television **200**. A plurality of wired media sources **210**, including a cable box **212**, Blu-ray/DVD player **214**, and a gaming console **216** are connected to the gateway **110** using cables connected to the HDMI-IN ports **132** of the gateway **110**. Wireless devices **220**, including a smartphone **222** and a wearable device **230** (e.g., a smart bracelet), are also connected to the gateway **110** via the wireless transceiver of the gateway **110**. A remote control **206** is also configured to communicate with the gateway **110**.

The gateway **110** is configured to identify content presented on the television **200** and associate one or more panelists **204** with the identified content. Additionally, the gateway **110** is configured to communicate with the smartphone **222** over a Wi-Fi connection in order to monitor media content presented on the smartphone **222**. The gateway **110** is also configured to register panelists **204** and associate registered panelists with identified media content on the television **200**. Registration of panelists is accomplished in one of several ways. First, passive registration of panelists may occur using the wireless connection with the smartphone **222** (or other mobile electronic device) to detect user presence in proximity to the gateway **110**. Second, passive registration of panelists may occur using the wireless connection, e.g., a Bluetooth connection, with the wearable device **230** in order to detect user presence in proximity to the gateway. Third, active registration of panelists may occur using the remote control **206**. To this end, the remote control **206** includes a plurality of dedicated registration buttons for active registration of the panelists to the gateway. Each of the dedicated registration buttons is associated with one of the panelists in the household **202**, such that the panelist only needs to press a button in order to actively register their presence in proximity to the television **200**. Further detail concerning registration of panelists is provided in further detail below in association with the "Active and Passive Panelist Registration" subheading (and related FIGS. **11-17**).

With reference now to FIGS. **5A-5B4**, a method **500** of cross-media content measurement is disclosed. The method **500** begins at block **502** when the gateway **110** is turned on (the terms "block" and "step" are used interchangeably herein). At block **504**, a check is made that the gateway **110** is receiving power from an AC wall outlet. If the gateway **110** is not receiving power from an AC wall outlet, the device is instructed at block **506** to operate from the battery until power is received from the AC wall outlet. At block **508**, the process continues and the gateway goes through the booting process. Once the booting process is complete, the processor is instructed to overlay information about the gateway **110** on the television screen via the HDMI output. At block **512**, the gateway detects whether this is the first-time use of the device within a household. If it is a first use, at block **514** the setup wizard is run, demographic data for each panelist in the household is entered, registration buttons from the remote control are associated to each of the

US 10,932,002 B2

17                                                      18

panelists, the MAC address of various wireless devices (e.g., smartphones and watches) are associated with the panelists, and wearable devices are associated with panelists (e.g., wearable bracelets for children). Then, at block 516 the gateway checks for an internet connection. If no internet connection is detected, the method continues to block 518 and an alert to request connectivity is issued, and the internet connection wizard is run.

Once an internet connection is established at the gateway 110, the method continues to block 520, and the gateway detects whether power to the television is on (e.g., via a current sensor or a CEC signal from the HDMI connection to the television). If power to the television is not on, no panelist presence or content identification is performed, and at block 522, the gateway 110 periodically sends a diagnostic signal (e.g., every hour) to be sure that the television remains operational. If the television is powered on, the method continues to block 526, and user registration (i.e., user presence in the vicinity of the television) is detected. As noted previously, the gateway 110 is capable of detecting user registration by any one of several means, including active user registration by a pressed button on the remote control 206, passive registration based on signal strength from a user mobile device (e.g., smartphone 222), or passive registration based on a wireless connection to a user wearable device (e.g., bracelet). If no panelists are detected, the method continues to block 528 and an alert is shown on the television instructing any panelists in the room to register (e.g., via the remote control). After one or more panelists are registered by the gateway 110, the method moves on and performs the acts associated with the additional blocks shown in FIG. 5B.

With reference now to FIG. 5B, after one or more panelists are registered with the gateway 110, the method continues at block 530 by determining which input source is selected for presentation on the television (e.g., HDMI 1-3 or OTA), and then obtaining content identification rules for the selected source. Again, the selected input source is the source that video capture module 115 has selected for delivery of the associated video signal to the television. This source may be selected by the user via the remote control, or may simply be the last selected source from a previous television viewing session. As will be explained in further detail below, the selected content identification rules may depend on the specific media input (e.g., cable box, OTA, OTT) as well as the specific device or content provider associated with such box (e.g., Spectrum cable box, Amazon Firestick, Roku, etc.). Depending on the selected input source, the method then implements the associated rules. As shown in FIG. 5B, the method continues at block 532 (and FIG. 5B1) when the selected input source is OTA television. The method continues at block 534 (and FIG. 5B2) when the selected input source is a satellite/cable box. The method continues at block 536 (and FIG. 5B3) when the selected input source is an OTT source (either connected to an input of the gateway 110 or on an app within the gateway). The method continues at block 538 (and FIG. 5B4) when the selected input source is a disc player or game console. While four exemplary methods associated with content identification rules are illustrated in FIGS. 5B1-5B4, it will be recognized that these are merely exemplary methods and numerous additional methods are contemplated for any of various input sources. Accordingly, the particular steps associated with each method, and any associated details (e.g., threshold amounts, times for processing, etc.) are merely illustrative and will change with different sets of content identification rules.

With reference now to FIG. 5B1, an exemplary method 540 associated with content identification rules for an OTA television signal is shown. The method 540 includes two different analysis routines 541 and 551 that are processed in parallel. The first routine 541 is a signal analysis routine. This routine 541 begins at step 542 where the tuned signal (from the digital ATSC TV tuner 139) is analyzed. Video signals transferred under the ATSC standard include metadata that identifies the tuned channel. Accordingly, analysis of the tuned signal with OTA content includes extracting the metadata from the signal in order to identify the content presented on the television screen. At block 543, a determination is made if a threshold period of time (e.g., 5 seconds) has elapsed since the last analysis of the tuned channel. If the period of time has elapsed the method 540 returns to block 542 and the tuned signal is analyzed again. If the threshold period of time has not elapsed, the method 540 proceeds to step 544 where a determination is made whether it is time to transmit the identified content data. If it is not yet time to transmit the data (e.g., once every two seconds) to the remote server 310, the method moves to block 546. However, if it is time to transmit the data, the routine 541 continues, and the identified content data is transmitted at block 545. Then, at block 546, a determination is made whether a change in the selected media source occurred. If a change did not occur, the method returns to block 543 and again analyzes the tuned signal. If a change in the selected media source did occur, the method moves to step 547, where the method returns to step 530 of FIG. 5B and the selected input source for presentation on the television is detected.

With continued reference to FIG. 5B1, in parallel with processing the metadata analysis routine 541, the method 540 associated with the OTA content identification rules also includes a video frame analysis routine 551. The video frame analysis routine 551 begins at block 548 where the processor waits for the next video frame from the OTA video signal. At block 552 a determination is made whether the next frame has been received. If the next frame has not been received, the method moves to step 546 and determines whether there was a change in the selected media source. On the other hand, if the next video frame has been received, the method continues to step 553, and the video frame is captured. Then, at block 554, a machine-learned frame analysis (e.g., logo analysis, face recognition, etc.) is performed on the video frame. At block 555, a determination is made whether the frame indicates a scene change (as explained in further detail below). If there is not scene change at block 555, the method continues to step 556, and a determination is made whether the frame has useful information (i.e., identified additional content data). If additional content data is identified, it is then transferred at block 557. If no useful content data is identified, the method returns to block 548, and waits for a new video frame. On the other hand, if a scene change is detected at block 555, the method continues to block 558 where a scene change timestamp is recorded and/or transmitted. This scene change timestamp is utilized to determine the length of an advertisement. At block 559, the method continues by waiting for a new non-blank screen. The new non-blank screen indicates the beginning of a new content piece (e.g., the start of a commercial, or return to regular programming). When a new non-blank screen is received, the method then returns to block 553 and captures the video frame.

With reference now to FIG. 5B2, an exemplary method 560 associated with content identification rules for a video signal from a satellite/cable box is shown. The method

US 10,932,002 B2

19

begins at step **561** where the processor waits for the next frame in the video signal. At step **562**, a determination is made whether the next frame is received. It will be recognized that the next frame may be an immediately next frame, or could also be a next frame of some predefined number of frames (e.g., one in ten). If the next frame has not been received, the method continues to block **572**, and a determination is made whether there was a change in the selected media source. On the other hand, if the next frame has been received, the method continues to block **563**, and the next frame is analyzed to detect whether a content grid (e.g., banner, guide, mosaic, etc.) or network logo is present within the frame. As explained in further detail below, the algorithms for determining the presence of a content grid or network logo may be considered to be "trigger events." At block **564** the method determines whether the analyzed video frame includes a trigger event in the form of a content grid or network logo. If a content grid or network logo is present, the method continues at step **565**, and a machine-learned content grid analysis is performed and/or machine-learned network logo analysis is performed. The content identification data generated by such analysis is then packaged in a data package and transmitted to the remote server **310**. The method then returns to block **561** where the method waits for the next video frame.

With continued reference to FIG. **5B2**, if no content grid or network logo is detected at step **564**, the method continues to step **567**, and a determination is made whether the analyzed video frame includes another trigger event in the form of a scene change. If a scene change is detected, the method continues to step **568**, and a timestamp of the scene change is generated and stored internally and/or transmitted to the remote server. Thereafter, at step **569**, the method waits for a new non-blank video frame. When a new non-blank video frame is received, this indicates the beginning of a new content piece (e.g., the start of a commercial, or return to regular programming). The method then returns to block **563** and reviews the new frame.

If no content grid or network logo is detected at step **564**, and if no scene change is detected at step **567**, the method **560** continues to step **570**. At step **570**, the method determines whether yet another trigger event has occurred in the form of a predetermined passage of time (e.g.. ten seconds) since the last video frame analysis. If the predetermined period has passed and it is time to review another video frame, the method **560** continues to step **571** and a machine-learned algorithm (which may also be referred to herein as a machine-learning module) performs an analysis on the frame. This machine-learned algorithm may be any of a number of machine-learned algorithms configured to detect content from a video frame, such as logo analysis, object detection, face recognition, etc. Following this analysis, the method continues on to step **566**, and any identified content is collected into a data package and transmitted to the remote server **310**.

If a determination is made at step **570** that it is not time to analyze another frame, the process **560** continues to block **572**, where the gateway **110** determines whether there has been a change in the selected media source. If there has been no change in the selected media source, the method **560** returns to step **561** and waits for the next video frame. On the other hand, if there has been a change in the selected media source, the method **560** proceeds to step **573**, where it is instructed to return to step **530** of FIG. **5B**.

With reference now to FIG. **5B3**, an exemplary method associated with content identification rules for a video signal from an OTT provider is shown. The method begins at step

20

**581** where the processor waits for the next frame in the video signal. At step **582**, a determination is made whether the next frame was received. If the next frame has not been received, the method continues to block **590**, and a determination is made whether there was a change in the selected media source. On the other hand, if the next frame has been received, the method continues to block **583**, and a machine-learned algorithm analyzes the frame to determine if one of a number of different objects or indicia can be found within the frame. At step **584**, the processor determines whether the frame includes a content mosaic. If the frame does include a mosaic, the process **580** continues to block **585** and a machine-learned mosaic analysis and content browsing path are determined (as described in further detail below under the "Content Grid Detection" subheading). Then, at step **586**, the data generated by the mosaic analysis and content browsing algorithm is transmitted to the remote server.

If no mosaic is identified at step **584**, the process **580** of FIG. **5B3** continues at step **587**, and a determination is made whether any additional content information was identified in step **583**. If some useful content information (e.g., logos, objects, faces, etc.), the method continues to step **588**, and that data is transmitted to the remote server. If no useful content information was identified at step **587**, the method continues to step **589**, and a determination is made whether a predetermined period of time has passed since the last video frame capture and/or analysis. If the predetermined period of time has passed, the method returns to block **583**, and the machine-learned frame analysis is performed on the next frame. On the other hand, if the predetermined period of time has not passed, the method continues to step **590**, and a determination is made whether there has been change in the selected media source. If there has been no change in the selected media source, the method **580** returns to step **581** and waits for the next video frame. On the other hand, if there has been a change in the selected media source, the method **580** proceeds to step **591**, and the method then returns to step **530** of FIG. **5B**.

With reference now to FIG. **5B4**, an exemplary method associated with content identification rules for a video signal from a disc player or video game console is shown.

FIGS. **5A**-**5B4** illustrate a simplified exemplary operation of the system **100**. It will be appreciated that numerous additional steps have been excluded for the sake of simplicity. For example, in addition to continually monitoring the media input source, the system also continually monitors whether user registration has changed. Again, this is accomplished by monitoring input from the active registration buttons on the remote control **206**, as well as the passive registration techniques associated with the mobile devices associated with each panelist (e.g., smartphones, watches, bracelets, etc.). As explained in further detail below, when user registration information has changed, the information is overlaid on the content currently presented on the screen of the television **200**.

Although not shown as a particular step in the methodology of FIGS. **5A** and **5B**, it will be recognized that router capabilities of the gateway **110** allow it to also serve as a Wi-Fi sniffer that detects content consumed on other Wi-Fi-equipped devices (e.g., smartphones, tablets, desktop computers, etc.). In particular, simultaneously with monitoring the content presented on the television **200**, the gateway **110** is also configured to monitor Wi-Fi traffic at any of various devices connected to the gateway's Wi-Fi network. The content sniffed by the gateway **110** is tied to the panelist associated with the Wi-Fi-equipped device that presented the content. In this manner, all media content consumed at a

US 10,932,002 B2

21

household **202** is collected by the gateway **110** and associated with individual panelists within the household. Methods associated with detecting content presented at Wi-Fi enabled devices is described in further detail below with reference to FIGS. **18-20** under the heading "Internet Activity Measurement."

By implementing the method of FIGS. **5**A and **5**B, the system **100** is equipped to improve upon conventional media content measurement devices. The system **100** implements unique hardware and software components and functionality in order to collect the appropriate data that is capable of providing an understanding of essentially all of the media content being consumed within a household and the specific panelists consuming such content.

FIG. **6** is an illustration showing a data series **600** collected from an exemplary household/family of panelists within a single day. The household includes the following panelists: (i) a 43 year old adult female, (ii) a 45 year old adult male, (iii) an 11 year old boy, and (iv) a 4 year old girl. As shown in the illustration, at some time between 9:00 am and 11:00 am, all of the panelists are present in the kitchen and the gateway identifies the program "CBS Sunday Morning" as presented on the kitchen television. The program airs for some period of time (e.g., from 9:15 to 11:00 am) and all panelists are identified with the show during this period of time. During this time a number of ads are also identified as been presented to the panelists. These ads include the Suave "Art Exhibit" ad, the Casper "Only Casper" ad, the Naked "Steps" ad, the Chipotle "Kitchen" ad, as well as a number of additional ads as shown in FIG. **6**. Also during this time, the gateway **110** identifies that content from the "Food Network" app was presented to the adult female on her device. The gateway also identifies that content from the "ESPN" app was presented to the adult male. The television is turned off around 11:00 am, at which time the 11 year old boy goes to the basement where he watches a "Spongebob Squarepants" episode in the basement using Roku via the Amazon Prime app. At some point after 11:30 am, the adult female and the 4 year old girl go to the bedroom and watch the PBS show "Daniel Tiger" via video on demand. The collection of data concerning consumed media content then continues throughout the day, until all devices are turned off by 10:45 pm. Advantageously, the data collected includes data describing the display device, where the device is located (i.e., if a non-mobile device such as a television), the platform and/or apps used to watch the media content (e.g., cable TV, Amazon Prime, etc.), the specific content watched (e.g., ads, programming, gaming, etc.), the specific the panelists watching the content, and the time the content was watched. The collected data for the household is periodically transmitted to the remote server **310** throughout the day.

FIG. **7** shows an exemplary set of data **700** collected from a number of different households on a particular day (e.g., Jan. 15, 2020). This data set **700** includes a number of fields **702** identifying the media consumed, a number of fields **704** identifying the panelist who consumed the data. Advantageously, the data may be processed in order to identify trends in the data. For example, the data may indicated that 25% of adults between the ages of 25 and 35 who subscribe to cable watched a particular network drama (e.g., "Game of Thrones") on this day, and 80% of those viewers were exposed to a particular advertisement. The data set **700** may also be further processed to expose additional information and trends. For example, the data set **700** may indicate that 5% of the viewers exposed to a particular advertisement actually searched for the advertised content on their smartphone within ten minutes of viewing the advertisement.

22

Therefore, by collecting and analyzing data using the gateway **110**, advertisers, programmers, and others in the media industry are equipped to learn the level of exposure of programming and advertisements, and responses to such programming and advertisements. This also equips those in the media industry to make informed decisions with respect to future programming and advertisements.

Multi-Layered Approach to Content Recognition

As noted above the gateway **110** is configured to identify media content presented on a television **200**. The gateway does this by first identifying what source is providing the television input, and then applying different rules to determine the content based on the identified source. Because of the different rules associated with different input sources, the gateway **110** is considered to take a "multi-layered approach" to content identification.

To further illustrate the multi-layered approach, consider the exemplary arrangement of FIG. **8** wherein five input sources are connected to the I/O ports of the gateway **110**. The input sources include four HDMI inputs, including a cable/satellite box **212** connected to the HDMI-IN 1 port, a Blu-Ray/DVD player **214** connected to the HDMI-IN 2 port, a video game console connected to the HDMI-IN 3 port, and an OTT device connected to the HDMI-IN 4 port. These four HDMI inputs are fed to the video capture module **115** of the gateway **110**. The fifth input source is a digital TV antenna input **219**, which is fed to the video capture module **115**. The video capture module **115** includes various hardware and software components for processing the received signals, including an ATSC tuner **139** (which receives the antenna input **219**), an HDMI capture API **163** (which may be considered part of the content capture engine **162**), and various OTT apps **161**. Using the remote control **206**, the user selects one of the four input sources for presentation (i.e., display) on the television **200**. The video capture module **115** then outputs the video signal associated with the selected input source to the television **200** via the HDMI-OUT port of the gateway **110**.

The video signals delivered to the video capture module **115** via the four HDMI inputs are all industry standard video signals. The video signals delivered to the video capture module **115** via the antenna and the ATSC tuner **139** are ATSC or other standard broadcast signals. The video signals delivered to the video capture module **115** may be characterized as a series of still images called "frames" (or screen shots) that are delivered in rapid succession at a constant interval (i.e., frame rate). As the frames of video are received by the video capture module **115**, the frames from the selected input source are passed on through the HDMI-OUT port **133** and to the television **200** where they are then presented on the television screen. During this time, the video capture module **115** analyzes selected frames of the video signal presented on the television. The frames selected for analysis are determined by a specific set of content identification rules that are dependent on the selected input source. The content identification rules define the method for processing the associated video signal, including rules for identifying video frames for content identification analysis, and what procedures for content identification will be applied to the identified video frames. In some rule sets, each and every frame from a particular source may be monitored and, based on certain trigger events, selected frames may then be subjected to additional in-depth analysis. In other rule sets, only predetermined frames are selected for in-depth analysis following the occurrence of a trigger event. As used herein, the term "trigger event" refers to some occurrence indicating that a subsequent more in-depth con-

US 10,932,002 B2

23                                                                    24

tent analysis should be conducted on one or more video frames in an attempt to determine the media content presented on a screen device (e.g., the television **200**). In at least some embodiments, the frames associated with a trigger event are not only analyzed, but also captured (i.e., stored in memory), and/or transmitted to the remote server **310** or cloud for additional processing.

A number of different trigger events are possible. In general, trigger events may be split into two categories: (i) video frame triggers (which may be referred to herein as "frame triggers"), and (ii) external triggers unrelated to the video frame (which may be referred to herein as "external triggers" or "non-frame triggers"). Frame triggers occur when a preliminary analysis is conducted on a video frame which indicates that some trigger event is happening. Frame triggers are often used in rule sets where the video frames associated with a video signal are regularly monitored (e.g., many, most or all of the frames are subjected to some preliminary frame analysis. A first type of frame trigger occurs when a programming grid or content banner is included in one frame of the stream of frames. For example, this trigger event may occur when the preliminary analysis of a video frame includes pixels indicative of content banner or programming grid (e.g., a box or grid structure overlaid on some portion of the screen that includes some programming information, including information for a single channel and/or information for multiple channels). A second type of frame trigger occurs when a scene change is detected in the video signal. For example, the preliminary analysis of the stream of video frames may include comparing consecutive frames in the video input in order to detect a temporary blank screen (e.g., five consecutive blank screens), or a threshold change in the pixel density from one frame to the next (e.g., as may be the case when the content changes from network programming to an advertisement). A third type of frame trigger occurs when a network logo appears or does not appear within a frame. Inclusion of a network logo is generally indicative of network program content. Similarly, a missing network logo may be indicative of advertising or other content that is not created by the network. While three frame triggers are mentioned herein, it will be recognized that numerous additional frame triggers are possible and contemplated for use in the field. As discussed in further detail herein, frame triggers are often provided by the analysis from one or more local machine learning engines configured to detect such frame triggers.

Unlike frame triggers, external triggers are not related to the video frame itself. A first type of external trigger occurs when an infrared signal (or other type of signal, such as a short-range RF signal) is sent to the gateway **110** from the remote control **206**. The signal may be any number of different possible signals sent from the remote control **206**, such as a channel change signal, volume change signal, input source change signal, menu signal, television guide signal, etc. A second type of external trigger occurs when a signal for the gateway **110** is received from a source other than the remote control, such as a user voice signal. Again, this signal may be any number of different signals associated with control of the television via the gateway. A third type of external trigger occurs is when the gateway **110** detects a change in panelist registration occurs (i.e., an individual considered to be consuming the displayed content) is detected. A fourth type of trigger event is the expiration of a threshold period of time since the last trigger event (e.g., 500 ms, one second, one minute, five minutes, etc.). This trigger event ensures that the input video signal is captured and analyzed at least periodically (e.g., every five minutes), even if no intervening trigger events occur. While four types of external triggers are mentioned herein, it will be recognized that numerous additional external triggers are also possible. Additional information and descriptions of various triggers, including examples of external triggers and frame triggers, are provided below under the "Exemplary Trigger Events" subheading.

As noted previously, each set of content identification rules defines different signal monitoring procedures and trigger events. When a trigger event occurs, the video capture module **115** strategically analyzes one or more frames of the selected video signal as defined by the rule sets. The gateway **110** may define any number of different rule sets for content identification. For example, in the embodiment of FIG. **8**, a first set of rules with a process flow similar to that of FIG. **5B**1 is used if the selected video signal for display on the television is received from the antenna input/ATSC tuner **139**. A second set of rules with a process flow similar to that of FIG. **5B**2 is used if the selected video input signal is received from the satellite/cable box **212**. A third set of rules with a process flow similar to that of FIG. **5B**3 is used if the selected video signal is received from the OTT device **218**. A fourth set of rules similar to that of FIG. **5B**4 is used if the selected video signal is received from the Blu-ray player **214** or the gaming console **216**. Following application of each rule set, a data package is generated that includes content identification data for the associated media content presented on the television. Because each rule set is different, it will be appreciated that each data package is also different.

One example of a content identification rule set procedure is now provided in the context of the selected video source being the satellite/cable box input **212** of FIG. **8**, and the rule set being a first set of rules. This first set of rules is uniquely adapted to analyze frames of the video signal from the satellite/cable box **212** and assemble a data package for the analyzed frames. As noted previously, the rule set defines the method for processing the associated video signal, including rules for identifying video frames for content identification analysis, and the specific in-depth content identification algorithms that will be applied to the identified video frames. In this example, consider that the exemplary rule set defines a process flow that is somewhat similar to that of FIG. **5B**2, but instead of analyzing each and every frame of the video signal for frame triggers, the rule set defines frame analysis windows that follow immediately after the occurrence of external triggers.

Each frame analysis window defines a short time period following a specific trigger event when one or more frames are captured and/or analyzed (e.g., one frame, two frames, ten frames, all frames, etc.). As an example, when the external trigger event is receipt of a remote control signal to change the channel, the rules define a frame analysis window that occurs between one and five seconds after the trigger event, and a frame is captured every 0.5 seconds during this time. The defined frame analysis window is based on the expected or possible occurrence of some content information being displayed on the television screen within the defined window. This content information may be displayed in any number of different ways, depending on the specific cable provider, such as different types of content grid (e.g., a banner overlaid along the bottom of the image, or a programming guide overlaid on some portion or most of the television screen), a simple display of text, or even audio played for the viewer (in the case of audio, the gateway is configured to store the audio as text). The first set of rules strategically defines this frame analysis window based on

US 10,932,002 B2

25                                                                          26

the particular input source (e.g., set-top box) connected to the gateway 110, which may include a specific model of set-top box. The term "model" of set-top box may refer to a specific content provider (e.g., AT&T Uverse, DirectTV, etc.) and/or a specific model number and/or part number of the set-top box. For example, an AT&T Uverse box having model number 123456 may place a content box with a blue-colored background along the bottom of the screen between one and four seconds after the receipt of a channel change signal. In this case, the content identification rules for this set-top box defines an associated frame analysis window (e.g., one to four seconds following detection of the banner) that utilizes a machine-learned algorithm to detect the presence of the AT&T content banner in one of the video frames within frame analysis window.

In addition to defining a frame capture window, the first set of rules incorporates machine learning modules within the content identification engine 164, and is configured to analyze an identified video frame (or multiple frames) and provide outputs that identify the content being watched on the screen. The outputs primarily include data identifying what is being watched on the television (e.g., program name, channel, time, etc.), but may also include additional information, such as identified logos, faces, characters, etc. Thus, the content identification engine 164 includes a number of different machine-learned algorithms, each of which implement a number of different tools/hidden layers. Examples of these tools include a text recognition tool (e.g., OCR), and other computer vision tools such as a logo recognition tool, a character recognition tool and/or a face recognition tool. Selected ones of these machine-learned algorithms may be executed in parallel to arrive at the defined content for a particular video frame.

The machine learning engine may also implement additional tools to arrive at the content identification data. For example the machine learning engine includes a text classification tool that identifies a category/field for all of the text extracted from a content grid from a particular provider (e.g., an identification that specific text is associated with a program name, program time, program description, channel, current time, etc.). The text classification tools are dependent at least in part on the particular provider (e.g., AT&T) and the expected position of certain information on a banner or other grid from such provider (e.g., the network is on the left side of the banner, the program name is in the middle of the banner, and the channel number is on the right side of the banner).

With reference now to FIG. 9, a screen shot 250 associated with an exemplary video frame captured by the gateway 110 is shown. FIG. 9 also shows content identification data 260 extracted from the video frame using the first set of rules described above (i.e., a rule set associated with the cable box 212). As shown in the screen shot 250, a programming banner 252 is overlaid on the program content 254 on a lower portion of the screen. The banner 252 includes a significant amount of text 256 that may be used to identify the program content. The machine learning engine reads the text 256, splits the text into different blocks of text, and then categorizes each block of text (e.g., program name, program time, program description, channel, current time, other information). Again, the categories for each block of text may be derived based on the known source (e.g., AT&T Uverse cable box), and the known location of data within the AT&T Uverse content grid/banner.

In the example of FIG. 9, the rule set has extracted 184 characters of text from the frame, split the extracted text into

blocks, and identified data categories and associated data for each category, as shown in the following table:

TABLE 1

| Data Category | Extracted Data |
| --- | --- |
| Program name | "Malcom in the Middle" |
| Program time | "3-3:30pm" |
| Description | "Lois' Sister," S5/Ep13, (2004), (TV-PG,L), Lois and her competitive sister must reconcile because Susan . . . " |
| Channel | 885 FUSE |
| Current time | 3:24 pm |
| Other information | 3HDDOD, CatPG |

While table 1 illustrates an example of extracted text from a frame of video, and categorization of such data in order to identify programming content, it will be recognized that additional data may also be extracted from a frame of video. Examples of such additional information include logos, faces, products (e.g., cars, shoes, etc.), image labels (e.g., houses, cars, trees, animals, etc.), or any other information that may be of assistance in content identification and that the machine learning engine is trained to recognize.

The content identification data is incorporated into a data package for each analyzed video frame. Each data package includes different information, depending on the input source of the content. For example, different types of additional information associated with different input sources may include a viewing source, viewing type, viewing platform/provider, application name, and program type, and system information from the time of capture. The input source may include, for example, paid TV, OTA TV, recorded content, streaming content, video game, mobile source, etc. The viewing type may include, for example Live TV, Playback, video on demand (VOD). The viewing platform/provider may include, for example, AT&T set top box, Comcast set top box, Xbox console, PlayStation console, AppleTV, Amazon Firestick, etc. The application name may include, for example, Netflix, Amazon Prime, Hulu, etc. The program type may include, for example, TV program, TV ad, movie, video game, etc. System information from the time of capture includes, for example, a timestamp, TV on/off status, etc. Additional information on various data packages is provide below under the "Data Packages" subheading.

Exemplary Trigger Events and Content Identification Algorithms

A more detailed explanation of various trigger events and associated content identification programs are now described with reference now to the exemplary triggers illustrated in FIGS. 10A-10L. As discussed previously, numerous sets of content identification rules are stored in the gateway, and each set of content identification rules includes one or more defined triggers. The gateway 110 applies one set of content identification rules to the video signal output to the television. The applied set of content identification rules is based on the selected input (i.e., the input to the television 200, which is the output of the gateway 110).

Infrared External Trigger Event

FIG. 10A illustrates a first exemplary external trigger event in the form of an infrared signal from a remote control. The trigger event is included with a particular set of content identification rules associated with a particular cable box (e.g., a Comcast cable box). In the example of FIG. 10A, the infrared signal is received from the gateway's remote con-

US 10,932,002 B2

27                                                    28

trol **206**, but it will be appreciated that the trigger event could be defined by an infrared signal from any remote control.

As shown in FIG. **10**A, when the user presses a button on the remote control **206**, an infrared signal is transmitted. The gateway **110** receives the infrared signal and performs the requested action (e.g., a channel change) on the selected source/device. When the gateway **110** receives the infrared signal, the content capture engine **162** performs a capture and/or analysis of one or more frames of the video signal that are presented on the television follow the trigger event. Again, the content identification rules define the number of video frames to analyze, what analysis should occur, and the timing of the analysis.

In the example of FIG. **10**A, consider a situation where the content identification rules indicate that one frame of the video signal should be captured and analyzed every 250 ms within a frame analysis window of three seconds. Based on these rules, the gateway **110** will capture 12 frames over the three seconds (i.e., 4 frames/second×3 seconds–12 frames) that follow the trigger event. The content identification rules also indicate that each of these frames should be analyzed with the grid detection algorithm. When a grid is detected (e.g., in the form of banner **252** of FIG. **10**A), the rules then indicate that the text from the grid should be subjected to a content extraction algorithm that is unique to banners associated with the particular content provider and device (e.g., the specific type of Comcast cable box connected to the gateway). The content extraction algorithm not only identifies text within the banner, but also categorizes the identified text. For example, the content extraction algorithm may determine blocks of text as indicating particular data based on any number of parameters such as the location of the text within the banner, the font of the text, the format of the text (e.g., a time format), proximity of the text to various indicia (e.g., a program timeline, icons, etc.), and any of various other parameters that the machine learning model determines to be significant. In at least some embodiments, the categorization portion of the content extraction algorithm is a machine-learned algorithm. In other embodiments, the categorization portion is a human-programmed algorithm.

In addition to identifying text, and classifying the text, the content identification rules further indicate when the content identification process should be terminated (e.g., prior to the full three second period). For example, in the embodiment of FIG. **10**A, the content identification period may terminate when either (1) two consecutive video frames are analyzed and identify the same content, or (2) a specific additional trigger event occurs (e.g., a new channel change signal from the remote control). When content is identified, the data may be saved in the internal memory of the gateway **110** and/or transmitted to the remote server **310**. It is also possible that the rules may instruct the gateway to discard (and/or do not transmit) the identified content the content was not presented on the television for a threshold period of time (e.g., a subsequent channel change signal was received within ten seconds).

When the content identification rules are executed in the example of FIG. **10**A, no grid may be detected for the first few frames that are captured following the trigger event (e.g., it may take 1 second for the content banner **252** to appear on the television **200**). Accordingly, the content identification process does not occur for the frames captured and analyzed during second one of the frame analysis window. However, if the banner **252** then appears during second two of the frame analysis window, the gateway detects the occurrence of the banner **252**, and the content identification rules applies a content extraction algorithm to the banner. The content extraction algorithm not only recognizes text, but also categorizes the text in order to determine specific data taken from the banner. For example, in FIG. **10**A, it may be determined that the text "Criminal Minds" is indicative of a program name and the text "2007" is indicative of a year when the program first aired. In this case, when data from two (or more) consecutive frames are identical, the rules instruct the gateway to terminate the analysis process, and the data associated with the identified content is saved and/or transmitted to the remote server. Because the data associated with each set of content identification rules is slightly different, it will be recognized that the data packages from different rule sets will also be different. Various examples of such data packages are described in further detail hereinafter with respect to FIG. **21**A under the "Data Packages" subheading.

While FIG. **10**A provides one example of an external trigger event and content identification rules associated therewith, it will be recognized that numerous variations of such rules and trigger events are possible. For example, in at least one embodiment, when an infrared signal is detected, the gateway **110** performs a media capture of the current incoming media, and all captured frames are stored in the gateway's memory without any analysis. Thereafter, the captured frames are transmitted to the remote server/cloud for analysis. In at least some embodiments the rules call for capture and/or analysis of all identified video frames within a frame analysis window, even if there is no useful information in them. For example, in the case when frame captures occurs because a user changes the volume level with his remote control, the captured frames may or may not contain useful information. On the other hand, when a user changes the channel, the captured frames have a high probability of containing useful information such as the program name, channel number, network name or other useful information.

Time-Based Frame Captures

FIG. **10**B illustrates a second exemplary external trigger event defined simply by the passage of time. The trigger event is included with a particular set of content identification rules associated with a particular game console (e.g., a Sony PlayStation). In the example of FIG. **10**B, the content identification rules indicate that a screen should be captured and/or analyzed every ten seconds. Accordingly, video frames are captured for content **410** displayed on the television **200** at time 10:05:20, content **420** displayed on the television **200** at time 10:05:30, and content **430** displayed on the television at time 10:05:40. Subsequent video frames are also captured every ten seconds for the entire time that content from the game console is displayed on the television (e.g., frame captures every ten seconds for an hour or other time that the game console is in use).

The content identification rules identify specific in-depth content analysis procedures to be performed on each screen captured. As noted previously, in-depth content analysis is often based on machine learning models. For the video game console of FIG. **10**B, the content identification rules may call for machine-learned algorithms, such as text recognition, logo/trademark recognition, character recognition, object identification, etc. These machine-learned algorithms are run sequentially or in parallel for each captured frame, as defined by the content identification rules. In some instances, these machine-learned algorithms are complex and require significant processing power. Accordingly, for these algorithms, the captured video frames are transmitted

US 10,932,002 B2

29
30

to the cloud/remote server **310** for further processing. In any event, the content data returned from the local and/or remote content identification engines provides valuable information concerning the particular content being played on the television. For example, in the example of FIG. **10**B, the content identification engine may determine that the user is playing the "Call of Duty: Advanced Warfare" game. As another example, in some instances the content identification engine may simply identify video game content in a generic manner, such as: "video game/war game." Again, the data collected based on the content identification rules is assembled into a unique data package and saved to the gateway **110** and or transmitted to the cloud/remote server **310**.

While FIG. **10**B illustrates one example of a time-based external trigger event applied on one set of content identification rules, it will be recognized any number of additional time-based trigger events are possible. For example, in at least one embodiment, a time-based trigger event could require a frame capture every one minute with programming from a cable box, if no other trigger event occurred within the past minute. In yet another embodiment, a time-based trigger event could occur every five seconds with OTA content in an attempt to capture all advertising content displayed while a panelist is watching a broadcast channel.

Content Grid Detection

FIGS. **10**C and **10**D illustrates a first exemplary frame trigger event based on content grid detection, wherein the content grid is provided in the form of a content banner **252**. The trigger event is included with a particular set of content identification rules associated with a particular cable box or satellite box (e.g., Comcast cable box, Direct TV satellite box, etc.; the term "set-top box" as used herein refers to either a cable box or a satellite box). In the example of FIGS. **10**C and **10**D, the content identification rules analyze each and every frame of video from a video signal and determine whether a content banner **252** is present on the television **200** (as noted on the left side of FIG. **10**C) or is not present on the television **200** (as noted on the right side of FIG. **10**C). When the content banner **252** is present, the content identification engine **164** performs further processing on the identified frames in order to identify the content provided within the banner (in a similar manner to that described above with reference to FIG. **10**A).

FIG. **10**D shows an exemplary log file **450** of the gateway **110** based on the analysis of a single video frame (and particularly a video frame with a content banner, such as that shown in FIG. **10**A). The log file illustrates the steps taken by the gateway **110** when implementing a set of content identification rules, and particularly those associated with extracting programming data from a content banner. At line **451**, the log file **450** shows that the gateway was reviewing video frames and waiting for a content grid to appear in one of the frames. At line **452**, the log file **450** shows that a content grid in the form of a banner was detected in one of the frames. At line **453**, the log indicates that further processing confirmed the presence of the content banner **252** within the frame. Accordingly, a trigger event is shown in lines **452** and **453** by the detection of a content banner. This trigger event resulted in further processing on the frame, as noted in lines **454-458** of the log **450**, in order to identify the content associated with the frame. In particular, at line **454**, the log **450** indicates that the process of extracting text from the grid was performed (e.g., via a text recognition tool such as OCR). At line **455**, the text categorization process identified the name of the program as "Criminal Minds (2007)". At line **456**, the text categorization process identified the

network as "ion HD". At line **457**, the text categorization process identified the channel number as "**531**". Then, at line **458**, the log **450** indicates that a data package with this information is assembled and transmitted from the gateway **110** to the remote server **310**. Finally, at line **459**, the log **450** shows that the gateway returned to reviewing video frames for another trigger event in the form of detection of another content banner. This process of extracting text from a grid and categorizing or otherwise identifying such text is one example of a content extraction algorithm defined by a set of content identification rules.

While FIGS. **10**C and **10**D illustrate a frame trigger and related processing based on the detection of a content banner, it will be recognized that other forms of content grids and subsequent processing are also possible. For example, as shown in FIG. **10**E, content grids may also take the form of content mosaics **352**. Content mosaics **352** include numerous blocks **354** of content (or content sources) that are simultaneously presented on a screen. The blocks **354** may be rectangular or any other shape, but they are selectable by a viewer in order to lead the viewer to desired content for presentation on the screen. Using a remote control, the user is able to move to any block on the mosaic by moving a selector. The current position of the selector (i.e., the block that the selector is current associated with) is highlighted in some way for the viewer. For example, the current block associated with the selector may be highlighted by an enhanced border, enhanced shading, an enlarged block relative to neighboring blocks, or any of various other highlighting techniques. As the user moves the selector from block to block, each selected block is highlighted. When the user wishes to view the content identified in the highlighted block, the user selects the block by taking an appropriate action, such as selecting an enter button on the remote control (e.g., the "OK" button).

The gateway **110** is configured to identify content presented on the television screen based on a user's manipulation of a content mosaic **352**. FIG. **10**F shows an exemplary log file **460** of the gateway **110** based on the analysis of a single video frame, and particularly a video frame with a content mosaic **352**, such as that shown in FIG. **10**E. The log file **460** illustrates the steps taken by the gateway **110** when implementing a set of content identification rules, and particularly those associated with extracting programming data from a content mosaic. At line **461**, the log file **460** shows that the gateway was reviewing video frames and waiting for a content mosaic to appear in one of the frames. At line **462**, the log file **460** shows that a content grid (in the form of a mosaic) was detected in one of the frames. At line **463**, the log indicates that further processing confirmed the presence of the content mosaic **352** within the frame. Accordingly, a trigger event is shown in lines **462** and **463** by the detection of a content mosaic. This trigger event resulted in further processing on the frame, as noted in lines **464-468** of the log **460**. In particular this further processing identified content selected from the mosaic by the viewer. At line **464**, the log **460** indicates that the process of extracting text from the mosaic was performed. At line **465**, the log indicates that the user selected one of the blocks of the mosaic. At line **466**, the log indicates that the text from the selected option was extracted. At line **467**, the text identification tool identified the selected option (e.g., "TV", "Game of Thrones", "Friends: The One Where Everybody Finds Out"). Then, at line **468**, the log **460** indicates that a data package with this information was assembled and transmitted from the gateway **110** to the remote server **310**. Finally, at line **469**, the log **460** shows that the gateway

US 10,932,002 B2

31                                                                                  32

returns to reviewing video frames for another trigger event in the form of detection of another content banner.

As illustrated in the foregoing examples, the gateway 110 maintains a log of various screens presented to a user and various selections made by the user. This log in combination with the various content identification rules allows the gateway 110 to actually track a user's path/journey as they make their way through various content options, including input sources, menus, mosaics, and any of various other options presented on the television screen. The information on such paths is extremely valuable to content providers because it can help content providers understand how to most effectively deliver content to consumers.

FIG. 10G illustrates an example of such a log 470 showing a user's path to selecting and watching a movie. As noted at the top of FIG. 10G, the user has selected the HDMI2 option for input to the television 200 from the gateway 110. In this case, the HDMI2 option is a Roku device. As noted in line 471, the user's journey began at the main menu of the Roku device. As noted in line 472, the user then selected the Disney+ App from the main menu of the Roku device. Line 473 shows that the user next browsed the main menu of the Disney+ App. As noted in line 474, the user then selected the Marvel category from the Disney+ menu. At line 475, the user browsed the "Marvel" menu. At line 476, the user selected the "Iron Man" category from the "Marvel" menu. As noted in line 477, the user chose the "Iron Man 3" movie. Then at line 478, the movie started. This simple example shows how a user's path through content may be tracked. The gateway can be configured to track this path at any level of detail, including for example, user movement through various input sources, menus, and blocks of a content mosaic. With this information in hand, the most advantageous positions within menus, mosaics, and other content display platforms may be determined.

Detection of Network Logos

FIGS. 10H and 10I illustrate another exemplary frame trigger event based on detection of network logos 258. Once again, the trigger event is included with a particular set of content identification rules associated with a particular input source (e.g., Comcast cable box). In the example of FIGS. 10H and 10I, the content identification rules analyze multiple frames per second (e.g., 30 frames per second) from a video signal and determine whether a network logo 258 is present on the television 200, or is not present on the television 200. While detection of network logos is a machine-learned process, this processing can typically be performed on the gateway because of the limited number of network logos currently in use (e.g., less than one thousand). The network logos that may be detected by the gateway 110 include the network logos that appear on any of various programming content, including that delivered by cable/satellite television providers (e.g., AT&T, Comcast, DirectTV etc.), OTT providers (e.g., Netflix, Amazon Prime, Hulu), video game console brands and game titles (e.g., Xbox, PlayStation), and various other providers.

Advantageously, the content identification rules may implement the network logo detection algorithm in various situations. Primarily, the presence of the network logo indicates the currently tuned network (or OTT provider, video game console, etc.). Identification of a network logo can improve the efficiency and accuracy of content detection by providing confirmation that other identified content is correct (e.g., that the content extracted from a grid is correct). Furthermore, the absence of a network logo in the transmission may also be valuable. For example, the absence of a network logo could mean that a television advertise-

ment/commercial is currently being broadcasted (logos are not typically present in commercials). Accordingly, the network logo detection algorithm may serve as a trigger event to run other content detection algorithms that are more associated with advertising (e.g., see the discussion below under "Brand Detection"). Alternatively, the absence of a network logo may indicate other activity, such as the user navigating a content grid, the user browsing other services provided by the cable operator, or that the cable set top box is on standby mode or displaying a screen saver. Thus, it will be recognized that detecting logo absences is also an important process in order to improve the efficiency and accuracy of the content recognition.

FIG. 10I shows an exemplary log file 480 of the gateway 110 based on the analysis of a single video frame (and particularly a video frame with a network logo 258, such as that shown in FIG. 10H). The log file illustrates the steps taken by the gateway 110 when implementing a set of content identification rules that includes determining the existence of a network logo 258. At line 481, the log file 480 shows that the gateway was reviewing video frames and detecting the existence of network logos in each frame. At line 482, the log file 480 shows that a network logo was detected in one of the frames. At line 483, the log indicates that further processing identified the logo as the "FOX SPORTS" logo. At line 484, the identified network logo was included in a data package and transmitted from the gateway 110 to the remote server 310. At line 485, the gateway continued reviewing frames for presence of a network logo. At line 486, a frame was identified that did not include a network logo. At line 487, the absence of a network logo was noted and transmitted to the remote server. As noted above, the absence of a network logo in a video frame could itself serve as a trigger event, causing the content identification rules to perform subsequent processing, such as analysis of advertisements.

Real-Time Scene Change Detection

FIG. 10J illustrates another exemplary frame trigger event based on detection of scene changes. Once again, the trigger event is included with a particular set of content identification rules associated with a particular input source (e.g., Comcast cable box). In the example of FIG. 10J, the content identification rules analyze all frames of the video signal and determine whether a scene change has occurred. A scene change may indicate a number of different events, including a transition to advertising, a channel change, or simply a new scene within a program. Advantageously, the machine-learned scene change algorithm is capable of identifying a scene change, and the content identification rules are configured to use the scene change as a trigger event for further processing (e.g., analyze for advertisement, new channel info, etc.).

The scene change algorithm may be configured to detect a scene change in a number of different ways. For example, the algorithm may monitor a series of consecutive frames and look for some threshold number of consecutive blank frames (e.g., three frames) within the series. In FIG. 10J, a series of consecutive frames 280 is shown with five consecutive blank screens 281 included within the series 280. The content identification rules detect this series of blank screens 281 as a trigger event to implement an advertisement identification algorithm which includes several in-depth machine processes, such as face recognition and/or brand logo recognition.

When a scene change is detected, the gateway immediately stores a timestamp of the event, and additional processing begins as defined by the selected content identifi-

US 10,932,002 B2

33

cation rules. When a brand is detected within the video frames following a scene change, the machine-learning model appends the scenes associated to that particular television ad, in order to obtain the final duration of the ad, start and end time. Other exemplary elements that may be detected following a scene change include landmark detection, persons detections, object detections, etc. A text version of the detected items may be stored in the database and incorporated into the data package output from the content identification rules. In at least some embodiment, the audio associated with a given advertisement may be captured from the HDMI signal and converted to text for storage in the local or remote database. This allows for further identification of advertisements in the event there is some question about what particular ad was presented on the television (e.g., the Coca-Cola ad with the polar bear, or the Coca-Cola ad with the puffin) when an advertisement occurs.

Another advantageous feature of the scene change detection algorithm is the ability to assign a length of time to the advertisement. For example, by reviewing a series of consecutive frames, the gateway 110 could register that a television commercial for Coca Cola ran from 11:23:30 to 11:24:00.

The scene change detection algorithm may also be used with other algorithms to specify a particular event (e.g., type of content change) occurred following a scene change. For example, if the frames immediately following a scene change do not include a network logo, the content identification engine may determine that a commercial is being played, and any of various advertisement identification algorithms may be run. On the other hand, if the frames immediately following a scene change still include a network logo, it is unlikely that the scene change was to a commercial, and the advertisement identification algorithms need not be run.

Brand Detection

The machine learning models further include algorithms configured to detect brand/trademark presences within content (e.g., Coca-Cola, Pepsi, Toyota, Ford, etc.). The detection of brands may be as simple as extracting text from a frame and identifying a particular string of text as a known brand. However, more complex machine-learned algorithms may also be used to identify brand logos. For example, in the example of FIG. 10K, the machine-learned brand recognition algorithm may be configured to not only extract the text "Coca-Cola" 283 from the video frame, but may also be configured to recognize the ribbon 285 as a brand logo for Coca-Cola. With certain rule sets, brand detection may be used as a frame trigger (e.g., to indicate that a commercial is airing). However, in most rule sets, brand detection is used for more in-depth content analysis following another trigger event. For example, if a detected scene change (or alternatively, the absence of a network logo) indicates that a commercial is occurring, various in-depth brand detection algorithms may be applied to the video frames following the scene change as part of an advertisement identification algorithm. In addition to identifying brands, the advertisement identification algorithms may also include other machine-learned algorithms that detect other components of a commercial. For example, the advertisement identification algorithms may indicate that a particular Coca-Cola commercial included people, a beach, and a dog. This identified content is of great value in determining specific advertising content that was viewed by specific panelists at a specific time.

In view of the above, it will be recognized that many of the trigger events associated with FIGS. 10C-10K are frame

34

triggers associated with internal machine learning models and algorithms. While some of these algorithms that that provide the frame trigger (e.g., grid detection) implement relatively simple machine-learned algorithms, others are much more complex (e.g., face recognition) and require significant processing power. Thus, while each of the machine-learned algorithms described above may be used as trigger events, the more complex machine-learned algorithms are more appropriate for in-depth content analysis than as frame triggers. Accordingly, it will be appreciated that different rule sets within the gateway will implement the machine learning models and algorithms differently. For example, one rule set may implement a logo recognition algorithm as a trigger event, while another rule set may only implement the logo recognition algorithm following a trigger event.

Changes in Signal Parameters of an OTA Content

The content identification rules for over-the-air (OTA) content is generally distinct from those used with any other input sources. When a user is watching OTA television, the digital tuner is constantly reading the incoming digital signal coming from the antenna. OTA transmissions inherently include specific content information such as network name, channel number and program name in their signal. Whenever the gateway 110 detects a change in these parameters (i.e., the content information in the OTA transmission), the gateway determines that the user has changed a channel. At that time, the gateway reads the parameters and registers them. In this way, the OTA transmission itself can serve as an external trigger (i.e., a non-frame trigger) causing the gateway to record new information each time the parameters of the OTA transmission changes. However, it will be recognized that the content identification rules for OTA content may also include any of various additional trigger and/or machine-learned algorithms discussed above. For example, the frames of an OTA transmission may be periodically reviewed (e.g., every five seconds) to determine if a network or brand logo is present. Alternatively, the frames of OTA content may be continually reviewed to determine whether a scene change occurred.

Machine Learning Modules and Training

As noted above, the gateway 110 makes use of numerous machine-learned algorithms (which may also be referred to herein as "machine-learning modules") within the various content identification rule sets. Each of these machine learning modules is trained remote from the gateway to perform a particular task. The trained modules are then transmitted from the cloud to the gateway 110 and stored as machine learning modules within the content identification engine 164. The content identification engine 164 implements these modules and provides various forms of content identification data as an output.

Each of the machine learning modules is trained to perform a particular task. For example, the content grid identification module may be trained to detect the occurrence of a content banner (or content grid) within a video frame. As another example, the network logo identification module may be trained to detect the occurrence of network logos in a video frame. In any event, the training process includes first creating a training set comprising a plurality of video frames. The training set includes a first plurality of video frames that include the occurrence of defined content (e.g., a content grid, network logos, text within a content grid, etc.) and a second plurality of video frames that do not include the occurrence of the defined content (e.g., no content grid, no network logos, etc.). The defined content may be, for example, any of the above defined frame triggers

(e.g., content grids, network logos, brands, scene changes, etc.). The training set is then used to train a machine-learned algorithm configured to detect the occurrence of the defined content within a video frame.

The machine-learning modules may be trained as neural networks with various layers (e.g., input layer, hidden layers, output layer) and nodes within each layer, as well as various weights applied to the nodes within each layer based on the training. It will be recognized that any number of different parameters and weights may be assigned to the various nodes in order to arrive at the probabilistic output. Moreover, the weights and nodes may be adapted over time as iterative training occurs. Because the content data output from the machine learning engine is actually a high probability prediction of content, the reliability of the identified content improves over time with additional learning. This additional learning typically occurs remotely and is transmitted periodically to the gateway 110 in order to update the various machine learning modules.

The output of the machine-learned algorithm indicates the occurrence or non-occurrence of the defined content within the video frame. The output of a machine-learning module within a given rule set may serve to generate data related to the media content itself (e.g., brands, logos, etc.), and/or may serve as a trigger for implementation of another machine-learning module (e.g., the existence of a content grid).

Various machine-learning modules within the gateway 110 may be utilized to perform a first round of content recognition on the captured media. If the gateway's content identification rules are able to resolve the content with enough accuracy, the generated content data is packaged and transmitted to a remote location where it is stored in a cloud-based database. On the other hand, when the gateway's content identification rules do not resolve the content with sufficient accuracy (e.g., there are missing or unknown pieces in the data package), the data package and any associated video frames may be transmitted to a remote location for further processing. This remote processing typically includes much more powerful machine learning modules that are not efficiently run at the gateway. For example, face recognition, character recognition, advanced game recognition modules, etc. may all be more efficiently performed with remote cloud-based software. The output of these modules may then be used to complete or supplement any data packages generated using the gateway's content identification rules.

In view of all of the foregoing, it will be appreciated that the gateway includes various machine learning models that perform real-time detection of elements included in the frames of an incoming video signal. Models are initially trained using cloud computing infrastructure, which provides high computing powered. Once the models are trained, they are deployed into the gateway 110 for it to perform recognition on the incoming video frames. Additional remote machine learning modules may be applied to captured video frames that are transmitted to the remote server 310 or other remote locations.

Active and Passive Panelist Registration

As noted above, the gateway 110 is configured to register panelists who are determined to be watching the television 200 connected to the gateway 110 at the time of registration. The gateway 110 is also configured to de-register panelists after some period of time when it is determined that the panelist is no longer watching the television 200. When a panelist is registered, that panelist is associated with the media content presented on the television during the period of registration. In particular, when content is analyzed in order to identify the content (e.g., using the methodologies discussed in the previous section), all the panelists registered with the gateway 110 at the time the content is presented on the television 200 are also associated with the data that identifies the content. Therefore, the data generated by the gateway 110 not only identifies content presented on the television, but also identifies all panelists who watched/consumed the content.

Registration of panelists at the gateway occurs by either active or passive registration. Active registration requires conscious actions from at least one panelist in order to register the panelists who are currently watching the television 200. In at least one embodiment, active registration of panelists occurs by the user pressing one or more buttons representing the panelists to be registered. These buttons may be presented in several ways, including physical buttons on the remote control 206 for each panelist, physical buttons on the gateway housing 112 for each panelist, and virtual buttons overlaid on the television screen 200 when a registration menu is activated.

In a first embodiment, the remote control includes a dedicated button for registration of each panelist. For example, as shown in FIG. 11, the remote control 206 for the gateway 110 includes a series of differently colored buttons 208 positioned along the bottom of the remote control 206. Each of these buttons 208 is associated with one of the panelists 204 when the gateway 110 is initially set up for the household 202. For example, if the buttons 208 include a red, green, yellow and blue button, the red button may be associated with a first adult female, the green button may be associated with a first adult male, the yellow button may be associated with a first child, and the blue button may be associated with a second child. Thereafter, when the television is on and one of these buttons is pressed, the panelist associated with that button is registered with the device at that time. An indication of panelist registration may then be overlaid on the television screen (e.g., an avatar for the panelist may be presented on the screen along with a welcome message, as described in further detail below), or may appear on the gateway display 152. When the panelist de-registers, an indication of de-registration may also be overlaid on the screen (e.g., an avatar for the panelist may be removed from the screen and a good-bye message presented).

The buttons 208 may be configured in any of various ways to register and de-register panelists. For example, in one embodiment, each of the buttons 208 is a toggle switch such that pressing a button the first time registers the associated panelist, and pressing the button a second time de-registers the associated panelist. In another embodiment, the number of times the button is pressed within a short period of time registers or de-registers the associated panelist (e.g., one press within two seconds registers the associated panelist, and two or more presses within two seconds de-registers the associated panelist). Panelists effectively use the buttons 208 by registering when they enter a room and begin watching media presented on the television 200, and then de-register when they leave the room or otherwise stop watching TV. Again, during a panelist's viewing session, all detected/captured content information will have the panelist's identification and current timestamp attached to it, in order to associate the content, to the viewed content.

While the foregoing paragraphs describe one exemplary embodiment of active registration, it will be recognized that other forms of active registration are contemplated. For example, active registration may occur using physical but-

US 10,932,002 B2

37                                                                                    38

tons provided on the gateway or virtual buttons provided on the television screen when a user enters a registration routine (e.g., a routine that may be call up using a physical button on the remote or virtual button in another menu). As yet another example, active registration may occur using voice commands provided to the gateway 110 (e.g., "Hey Google, Adam is watching television".)

In addition to active registration, the gateway 110 also provides for passive registration of panelists. Passive registration occurs automatically without any conscious effort by the panelist to register. The gateway 110 is generally configured to perform passive registration by detecting use proximity to the gateway 110 (and thus the proximity to the television 200). In at least one embodiment, passive registration occurs by detecting the signal strength at the gateway 110 from mobile devices that are in communication therewith and associated with particular panelists. The mobile devices may be provided (i) by mobile computing devices such as a smartphones, tablets, watches, or other mobile devices configured with Wi-Fi communications capabilities, and/or (ii) by wearable devices with short range wireless communications capabilities such as dedicated watches or bracelets with Bluetooth communications capabilities, or any of various other devices with Bluetooth communications capabilities, such as earbuds.

Mobile computing devices within a household are registered with the gateway 110 (i.e., identification data is shared and the device is configured for automatic connection to the gateway) at the time of gateway setup (or any time thereafter). Registrations of smartphones and smartwatches with the gateway are particularly advantageous because these mobile computing devices are typically carried by the panelist at all times. In any event, the unique identifier/MAC address of a mobile computing device that is associated with a panelist is stored in the panelist data 172 of the gateway 110. Each panelist's mobile computing device is configured to automatically connect to the same Wi-Fi network as the gateway 110. As discussed in further detail below, the gateway's Wi-Fi chipset 125 allows the gateway 110 to either (i) serve as a router and establish a new Wi-Fi network, or (ii) operate in a sniffer mode in order to detect network traffic within the existing Wi-Fi network. In either case, the gateway constantly scans for MAC Addresses from devices communicating over the Wi-Fi network. When the gateway recognizes the MAC Address of a mobile device associated with a panelist, the signal strength (e.g., RSSI) of that mobile device is recognized to determine the proximity of the mobile panelist to the gateway. When the signal strength from the mobile device is greater than a threshold strength, the panelist is determined to be in proximity to the gateway 110 and the television 200, and the panelist is registered at the gateway. All identified presented on the television 200 is then associated with the panelist during registration. When the signal strength from the mobile device is less than the threshold, the panelist is determined to be outside proximity to the gateway 110 and television 200, and the panelist is not registered with (or is de-registered from) the gateway 110.

With reference now to FIG. 12, a table 1200 of WPA handshakes collected at the gateway 110 is shown. The table includes a list of MAC addresses associated with WPA handshakes between various mobile devices and the wireless access point (e.g., provided at the gateway 110 or household router). The BSSID column 1210 shows the unique identifier/MAC address for a number of devices communicating over the wireless network. Other information is also shown in the table 1200, including a signal strength column 1220 which provides a numerical value representative of the

signal strength of the mobile device at the gateway 110. When the signal strength is greater than a threshold value (e.g., 25), the panelist associated with the mobile device is determined to be in proximity to the television 200 (e.g., 25 feet), and the panelist is registered at the gateway 110. When the signal strength is less than the threshold, the associated panelist is determined to not be in proximity to the television 200, and the panelist is not registered (or is un-registered) at the gateway 110. Advantageously, the threshold signal strength may be different for each gateway 110, depending on the size of the room where the gateway is installed. For example, in a first home, the gateway may be installed in a room that is 20 ft×20 ft, and in a second home the gateway may be installed in a room that is 30 ft×30 ft. Because of this, a panelist determined to be 25 feet away from the gateway in the first home is unlikely to be in proximity to the television, while a panelist determined to be 25 feet away from the gateway in the second home is likely to be in proximity to the television. Accordingly, when the gateways are initially configured in these two homes, the technician or user may make the threshold in the first home to be less than the threshold in the second room.

FIG. 13 is a flowchart summarizing the above-described method 1300 of registering a panelist based on the signal strength of a MAC address. The method begins at step 1310 when the gateway 110 is turned on and the gateway joins a household Wi-Fi network (or serves as a router therein). At step 1320, the method continues by conducting MAC address polling via the Wi-Fi beacon. At step 1330, a list of detected MAC addresses is analyzed (e.g., similar to that of FIG. 12). At step 1340, a determination is made whether a MAC address associated with one of the panelists is in the lists. If a MAC address associated with a panelist is in the list, the method continues to step 1350, and the power signal level associated with the MAC address is analyzed by comparing it to a threshold. As step 1360, if the power level is greater than the threshold, the associated panelist is considered to be in proximity to the television. On the other hand, if the power level is less than the threshold, the associated panelist is considered to be outside proximity to the television. At step 1390, when the panelist is determined to be in proximity to the television, the panelist is registered and an avatar for the panelist is shown on the television. However, if the panelist is not in proximity to the television, the method moves to step 1370, and a determination is made whether or not the panelist is currently registered with the gateway. If the panelist is not currently registered at step 1370, the method returns to step 1320 and continues to poll for MAC addresses. However, if the panelist is currently registered at step 1370, the method continues to step 1380. At step 1380, the panelist is de-registered at the gateway, and no avatar for the user is shown on the television.

As noted previously, in addition to passive registration based on the proximity of Wi-Fi-enabled mobile computing devices to the gateway, passive registration may also occur based on proximity of wearable electronic devices with short range wireless communications capabilities (e.g., Bluetooth) to the gateway. FIG. 14 shows an example of dedicated wearable electronic devices in the form of bracelets 1410 configured to be worn on the wrist and pendants 1420 configured to be worn around the neck or carried in the pocket of the panelist. Dedicated wearable devices are typically reserved for use by children or the elderly who do not own a smartphone or other mobile computing device capable of communicating with the household wireless network. However, dedicated wearable devices 1410, 1420, may also be used by adults who do not own a smartphone or

US 10,932,002 B2

39                                          40

do not regularly carry their smartphone around the house. Other examples of wearable electronic devices include headphones, earbuds, or other wearable speaker devices (e.g., iPods), with short range wireless communication capabilities. These devices are increasingly being carried by individuals at all times, and may be used to passively register panelists with the gateway 110.

Registration of panelists carrying wearable electronic devices is similar to registration of panelists with Wi-Fi-enabled mobile computing devices. However, instead of monitoring signal strength, the Bluetooth chipset 123 of the gateway 110 simply polls for Bluetooth signals from various wearable electronic devices. In particular, the gateway 110 continually sends a polling signal to ask whether any wearable devices are receiving Bluetooth signals from the gateway. The strength of the polling signals is such that only wearable electronic devices within a certain range (e.g., 25 feet) will receive the signal. The strength of the polling signal may be adjusted within the gateway 110 (e.g., by a technician via the gateway's configuration interface) in order to provide the proper signal range. When a response to the polling signal is received from one of the wearable electronic devices, the gateway recognizes the wearable device, and the associated panelist is registered at the gateway 110.

FIG. 15 is a flowchart summarizing the above-described method 1500 of registering a panelist based on Bluetooth communications with a wearable electronic device. The method begins at step 1510 when the gateway 110 is turned on and the gateway Bluetooth chipset 123 is powered up. At step 1520, the method continues with the Bluetooth transceiver sends Bluetooth polling signals, and listens for responses from any Bluetooth devices that are within range of the polling signal. At step 1530, a determination is made whether any confirmation signals have been received from wearable devices in proximity to the gateway 110. If a confirmation signal is received from a wearable device, the method continues to step 1540 where the panelist associated with the wearable device is determined to be in proximity to the television. In this case, the panelist is registered at the gateway 110 and an avatar for the panelist is displayed on the television. At this time, the registered panelist is associated with all identified content presented on the screen until the panelist is subsequently de-registered. On the other hand, if no confirmation signal is received from the wearable device, it is determined the panelist associated with the wearable device is not in proximity to the television, and the method moves on to step 1550. At step 1550. If the panelist is not currently registered at step 1550, the method returns to step 1520 and simply continues to poll for Bluetooth communications from wearable electronic devices. However, if the panelist is currently registered at step 1550, the method continues to step 1560 where the panelist is de-registered at the gateway 110, and no avatar for the user is shown on the television. From this moment, the previously registered user will no longer be associated with any identified content presented on the television until the panelist is re-registered.

In view of the foregoing described processes of active and passive user registration, it will be recognized that registration of panelists may occur in any of several forms, including passive registration only, active registration only, or some combination of passive and active registration. In general, active registration and de-registration is only necessary in cases where a panelist is not carrying his or her smartphone or other mobile electronic device (e.g., wearable device), or if the mobile electronic device has run out of battery power. Passive registration and de-registration occurs automatically when the user is carrying a fully powered mobile electronic device. In some embodiments, a warning message is shown prior to automatic de-registration of a panelist (e.g., "It appears that Adam has left the room; please press Adam's registration button on the remote control if this is incorrect.") These warning messages are designed to guard against de-registration when the user is actually still in the room but appears to have left the room for some reason (e.g., a panelist may appear to have left a room because his or her phone died, a child or other third party carried the user's smartphone out of the room, the user turned off the Wi-Fi on the phone, etc.). In further embodiments, when the system 100 detects that active and passive registration are often inconsistent, a message may be displayed on the television asking the panelist to take care to comply with registration protocols. For example, if a panelist repeatedly performs the active de-registration procedure but leaves his or her smartphone in the same room as the gateway 110, a message may be sent asking the panelist to keep the phone on his or her person, or find a different charging station for the phone.

While exemplary methodologies for active and passive registration and de-registration are described herein, it will be recognized that various additional devices and methodologies may be used in addition to or in lieu of those described herein to confirm registration or de-registration of a panelist. For example, in at least one alternative embodiment, the gateway 110 is further equipped with a camera and is able to perform facial recognition on individuals within proximity of the gateway.

HDMI Overlay

The gateway 110 is equipped with HDMI overlay capabilities that allow content generated by the gateway 110 to be overlaid on content from the input source and displayed on the television 200. The HDMI overlay capabilities are provided by the content overlay engine 168 (see FIG. 2A), which is configured to overlay legends, messages, icons, avatars, and other additional content/information on the media content provided to the television via the cable connected to the HDMI out port 133. The HDMI overlay engine 168 may be configured to overlay different types of information on the television at different times during operation of the gateway.

One instance in which the content overlay engine 168 overlays information on the media content is during panelist registration and de-registration. As described above, a panelist who is associated in the gateway 110 with a properly configured mobile electronic device (e.g., a smartphone or wearable electronic device) will be registered when the gateway detects that the mobile electronic device is in proximity to the gateway 110. Each panelist in the household is associated with a unique avatar. When a panelist is registered, the gateway 110 display the panelist's avatar over the content presented on the television for some period of time along with a welcome message to the newly registered panelist. When the panelist is de-registered, the gateway 110 displays a good-bye message and removes the panelist's avatar from the screen.

FIG. 16 shows an exemplary television 200 with a plurality of avatars 270 overlaid on the program content 254 presented on the television screen. Six avatars 270 are overlaid on the program content 254 in the example of FIG. 16, indicating that six panelists are currently registered and are being associated with the program content 254 within the gateway 110. The six avatars 270 are all included in a single row across the top left side of the television 200. Avatars 270

41

for the currently registered panelists are all temporarily displayed on the television for a short period of time when a panelist registers or de-registers with the gateway **110**. For example, the avatars **270** may be shown for five to ten seconds after an additional panelist registers with the gateway **110**. After the short period of time, the avatars **270** disappear and only the program content **254** is shown on the television screen. Alternatively, in at least one embodiment, the avatars **270** are displayed in full color during the short period of time, but after expiration of the short period of time the avatars are muted (e.g., shown as dim colors, translucent, minimized, ghosted, replaced with small substitute icons) or completely hidden.

In the example of FIG. **16**, the Jerry Smith recently entered the room where the television **200** is located carrying his smartphone. At this time, the power signal level associated with the MAC address for his smartphone exceeded the predetermined threshold and Jerry Smith was automatically registered with the gateway **110**. This new registration prompted a welcome message **274** on the television (i.e., "Welcome Jerry"). Jerry Smith's avatar **272** was then displayed at the top of the television with the other avatars **270** for the currently registered panelists. Thereafter, during Jerry Smith's viewing session, all captured/identified content shown on the television **200** will be associated with Jerry Smith as well as any other registered panelists at the time of content identification (i.e., the data identifying the content will have the registered panelist's id and current timestamp attached to it).

After displaying the avatars **270** and welcome message **274** for a short period of time (e.g., five seconds), the welcome message **274** disappears, and the avatars **270** are muted on top of the television. For example, as shown in FIG. **17**, the avatars **270** are replaced on the screen by small icons/shapes **271** (e.g., small circles) that are each personal to one of the panelists. These icons/shapes are significantly smaller than the avatars **270** and are intended to not be overly invasive on top of the media content **254** displayed on the screen. When the icons are all the same shape, each panelist may be associated with a different color (e.g., Jerry Smith is blue and Julie Smith is red) such that the panelists may quickly identify their personal registration icon on the screen.

Following registration of a panelist, the gateway continually scans for signals associated with panelists in order to determine panelist proximity to the television (i.e., by monitoring for signal strengths in excess of the threshold from any of various wireless devices associated with the panelist). If the panelist's mobile electronic device remains in proximity to the gateway **110** (i.e., the signal strength remains in excess of the threshold), the user will continue to be registered. However, when the gateway **110** does not detect the user's mobile device in proximity to the gateway, the user is de-registered and a good-bye message (e.g., "Goodbye Jerry Smith") is displayed on the television for some period of time (e.g., 5 seconds). At this time, the user's ID and timestamp will no longer be attached to the detected/captured content information.

While the foregoing discussion related to avatars **270** and related content overlaid on the television screen was discussed in the context of passive panelist registration and de-registration, it will be recognized that avatars **270** are similarly displayed during active panelist registration and de-registration. For example, if a user enters the room without any mobile electronic device, the user may actively register by simply pressing the active registration button on the remote control and his or her avatar will be overlaid on

42

the screen with a welcome message. In at least one embodiment, when a panelist passively registers or de-registers, a message is overlaid on the screen requesting confirmation of such registration or de-registration with the remote control. For example, if the signal strength associated with a registered panelist's mobile device is lost or is less than a threshold, a message is overlaid on the television asking the remaining panelists to actively de-register the departing panelist (e.g., "If Jerry Smith is no longer watching, please de-register him using the remote control."). In this manner, active means are used to control which panelists are registered, but passive means are used to prompt active registration or deregistration.

In yet another embodiment the gateway **110** is configured to periodically request panelist registration status. This periodic confirmation request may occur when the same panelists have all been registered for a long period of time (e.g., more than an hour). For example, as shown in FIG. **17**, a message banner **276** is shown at the bottom of the screen asking "Is everyone still watching TV." This prompts the current viewers to look at the avatars **270** or registration icons **271** shown on the screen and make sure that all the registered panelists are still in the room. The remote control may then be used to actively de-register any panelists who are no longer in the room.

In view of the foregoing, it will be recognized that the gateway **110** is configured to overlay different legends, specific messages, or any of various other additional content directly over existing media content on the television **200**. This is accomplished without the need of secondary screens or smaller displays that are hard to see. By using the television **200** as the display interface, the gateway **110** is capable of conveniently displaying any of various graphics, messages, and high-quality images to the users. As a result, the gateway **110** is equipped with numerous features that make the device highly functional and user-friendly.

Internet Activity Measurement

In addition to identifying media content presented on the television **200**, the gateway **110** is also configured to identify media content presented on any of various wireless devices within the household. To this end, the gateway **110** is configured to act as a Wi-Fi router or sniffer. Operational software for wireless networking features is retained in the memory **116** of the gateway. The wireless networking software may be retained in a separate memory of the communications module **120**, or may be retained with other instructional programs in the main memory of the gateway. In any event, this wireless software interacts with the networking hardware components (e.g., the Wi-Fi chipset **125**) in order to provide routing services, and at the same time perform network sniffing that allows the gateway to detect each panelist's Internet activity on their associated mobile device and/or computer. The gateway **110** has two different operation modes that allow it to identify and measure the online mobile device/computer activity in the households: a router mode and a Wi-Fi Sniffer mode.

When operating in the router mode, the Wi-Fi chipset **125** allows the gateway **110** to operate as wireless access point or wireless signal repeater for the household **202**. When operating in this mode, mobile/desktop clients connect directly to the gateway **110** in order to obtain an Internet connection. Thus, all the wireless traffic for the household **202** goes through the gateway **110**. The gateway **110** is configured to capture the network packets, identify media content presented on specific devices, and generally log all the Internet traffic passing through the gateway.

US 10,932,002 B2

43

With reference now to FIG. **18**, an exemplary log **1800** is shown of network traffic captured by the gateway **100** when operating in the router mode. As shown in FIG. **18**, the log **1800** includes a list of data packets **1810** transferred to various mobile devices via the gateway. Each data packet **1810** includes and/or is further associated with the following information at the gateway **110**: date, time, MAC address of mobile device (or computer device), origin IP address, destination IP address, consumed URL, time to live, and user agent. This data is then stored in the memory of the gateway **110**, and/or transferred to the remote server **310** for further processing and storage.

FIG. **19** shows an exemplary flowchart of a method **1900** of capturing network traffic at the gateway **110** operating in the router mode. The method **1900** begins when the gateway **110** is turned on at step **1910**. At step **1920**, the Wi-Fi chipset **125** begins operation in the route mode and the gateway **110** broadcasts the network name (SSID) to all wireless computing devices (including mobile devices and standalone devices) within the household **202**. At step **1930**, devices within the household are joined to the wireless network provided by the gateway **110**. When each wireless device is initially joined to the network, the gateway **110** asks the user to associate one of the panelists within the household with the device. If a panelist is identified, the MAC address for the device is associated with the identified panelist within the gateway **110**. If no panelist is associated with the device, the device is simply considered a generic traffic device. As shown in step **1940**, the gateway **110** serves as the wireless access point for the wireless devices within the household, and routinely captures web traffic data, including web traffic data identifying all media content presented at the each MAC address. At step **1950**, each time web traffic is captured, a determination is made whether the traffic is associated with one of the panelist's devices. If the web traffic is associated with a panelist's device, the method continues at step **1960** and associates the identified web traffic with the panelist. On the other hand, if the web traffic is not associated with a panelist's device, the method continues at step **1970**, and the web traffic is associated to a generic network device (e.g., guest device). At step **1980**, all the web traffic collected by the gateway **110** is compressed prior to transmission to the remote server **310**. Thereafter, at step **1990**, all the filtered and compressed traffic data is sent to the remote server(s) **310** for further analysis. In particular, if the gateway **110** does not include sufficient processing power to identify media content from the network traffic, such processing occurs at the more powerful remote server **310**.

In addition to the router mode, the gateway **110** is also configured to operate in the Wi-Fi sniffer mode (which may also be referred to as the "promiscuous mode"). In this mode, the gateway **110** does not serve as a router, but instead join the household's existing wireless network (e.g., provided by the ISP's router within the household). After joining the household's existing wireless network, the gateway **110** then operates in the promiscuous mode and sniffs network packets that are passed through the network between various wireless devices and the network router. In general, the promiscuous mode causes the gateway **110** to pass all traffic/frames it receives to its microprocessor **114** (i.e., including traffic intended for other devices) for further processing, rather than passing only the traffic/frames specifically intended for the gateway **110**. In this manner the gateway **110** analyzes all network traffic, and not only the traffic intended for the gateway **110**. Data collected in the promiscuous mode includes the following for each data

44

packet: SSID, BSSID, signal strength/power, beacons, data, channel, encryption type, authentication type, and URL.

FIG. **20** shows an exemplary flowchart of a method **2000** of capturing network traffic at the gateway **110** operating in the promiscuous mode. The method **2000** begins when the gateway **110** is turned on at step **2010**. At step **2020**, the gateway **110** joins the household's Wi-Fi network and the Wi-Fi chipset **125** begins operation in the promiscuous mode. At step **2030**, the Wi-Fi sniffer process runs, and the gateway looks for all traffic on the household's Wi-Fi network, including traffic not intended for the gateway **110**. At step **2040**, the gateway captures network traffic, and particularly URLs, consumed by/delivered to other network devices. At step **2050**, each time web traffic is captured, a determination is made whether the traffic is associated with one of the panelist's devices. If the web traffic is associated with a panelist's device, the method continues at step **2060** and associates the identified web traffic with the panelist. On the other hand, if the web traffic is not associated with a panelist's device, the method continues at step **2070**, and the web traffic is associated to a generic network device (e.g., guest device). At step **2080**, all the web traffic collected by the gateway **110** is compressed prior to transmission to the remote server **310**. Thereafter, at step **2090**, all the filtered and compressed traffic data is sent to the remote server(s) **310** (e.g., in the cloud) for further analysis. In particular, if the gateway **110** does not include sufficient processing power to identify media content from the network traffic, such processing occurs at the more powerful remote server **310**.

The foregoing process of collecting an identifying media content presented at various wireless devices is run in parallel with the other gateway processes, and in particular the process of identifying content presented on the television (e.g., see FIGS. **5A**-**5D** and **8**-**10K**) and the associated process of panelist registration (e.g., see FIGS. **12**-**17**). With these processes all run in parallel on the gateway **110**, it will be recognized that the gateway **110** is configured to identify content presented on all or nearly all media devices within the home, including one or more televisions **200** (with a gateway connected thereto), and any number of different wireless devices within the household. This capability allows the gateway **110** to serve as a single source capable of identifying all media content consumed within the household. Media content identified by the gateway **110** is conveniently summarized in data packages, as described below, and transmitted to the remote server.

Data Packages

FIG. **21A** shows a schematic diagram of exemplary data packages **180** generated by the gateway **110**. As shown in FIG. **21A**, the exemplary data packages include each of the following: content data packages **182**, presence data packages **184**, demographic data packages **186**, and system data packages **188**. One or more of these data packages are automatically generated following a trigger event wherein a video frame is analyzed in-depth and the associated content identified. In particular, at least a content data package and a presence data package **184** are generated following a trigger event. These data packages may be immediately transferred to the remote server **310** and/or the cloud, or may be temporarily stored on the gateway **110** for subsequent transfer. The data packages **180** may be combined or otherwise associated with each other during transmission from the gateway **110**. For example, a content data package **180** (i.e., identifying media content) and a presence data package **182** (i.e., identifying registered panelists associated with the identified content) may be automatically combined and

US 10,932,002 B2

45

transmitted following a trigger event. The remote server **310** may periodically request data from the gateway, such as a system data package **186** that provides diagnostic information about the gateway **110**.

The content data packages **182** and presence data packages **184** transmitted to the remote server **310** are considered to be audience measurement "raw data". This data is further analyzed with additional processing engines at the remote server **310** (or any number of additional remote/cloud servers). The remote server **310** (or servers) apply the appropriate editing rules in order to structure the data as "clean" data for final consumption by clients. "Clean" data may simply be data that is standardized in some manner. For example, is the content data from one cable provider states a program name of "Criminal Minds (2007)", the remote editing rules may recognize that the "2007" parenthetical is a year of first showing, not the actual program name and may standardize the program name so simply be "Criminal Minds" so that it is consistent with the data collected from other cable providers. An exemplary database **190** including records/data packages of clean data is shown in FIGS. **21**A and **21**B. As noted in the figures, exemplary fields for the data package include viewership identification data (i.e., panelist identification), household identification data, content data, media source data, content provider, network data, channel data, program data, viewership room data (i.e., the room in the household where the content was viewed) viewership file, television provider, and any number of additional fields of data collected by the system **100**.

Once the gateway **110** and/or remote server **310** has finished filtering, the resulting compliant (i.e., clean) data is stored by in a separate database. This data is prepared for generating reports and be consulted through a data provisioning portal and API. Final, clean data is available to various end game customers through an authenticated API that they can connect to their own systems for further processing, such as weighting, reporting or business intelligence systems. The aforementioned distributed processing/ networking approach, wherein some of the analysis and machine learning routines are performed at the gateway **110** and additional machine learning is performed at the remote server, is advantageous. In particular, much of the data can be processed without the need of the transmission of the media files over the internet, thus saving costs of bandwidth and cloud infrastructure usage. At the same time, advanced processing at the remote server **310** means that the gateway **110** does not need the same advanced processing capabilities, thus resulting in various savings with respect to cost of each gateway.

The data generated and transmitted by the cross-media measurement system **100** is integrated with Blockchain. The use of Blockchain provides a reliable mechanism for audit automation and validation. By incorporating Blockchain in all the layers of the media measurement process, the system can ensure that all registrations, transactions and data generation are traceable and secure. In its simplest form, a Blockchain can be considered to be a distributed ledger which contains the relevant details for every transaction that has ever been processed. The validity and authenticity of each transaction is protected by digital signatures (cryptography). With Blockchain, there is no central administration, and anyone can process transactions using the computing power of specialized hardware. By using Blockchain, a distributed, cryptographic and immutable database is created. The database is considered to be distributed because, unlike most databases that control who can access the information in a system, any computer in the system can

46

access the Blockchain. This creates a system of trust since there is no centralized data. The database is considered to be cryptographic because every transaction recorded in the system is cryptographically verified to ensure its authenticity. Cryptography allows the system's components to collaborate in an automated system of mathematical trust. The database is considered to be immutable because no records can be changed or altered; only new records can be appended to the distributed database. This ensures that data cannot be modified or altered in a way that would change the data generated by the system **100**.

Remote Processing

As discussed above, the system **100** is configured to process data captured by the gateway **110** at either the gateway itself, or at one or more remote computing devices, such as remote server **310**. The remote server **310** is merely representative of any number of remote computing devices and/or cloud based software that may be utilized by the system **100**. The use of remote computing devices and cloud based software allows for increased processing power, expanded memory, and overall increased system functionality.

One example of additional functionality with cloud-based software is increase machine learning processing. In at least one embodiment, all software functions associated with content recognition and processing may run directly in the cloud, and not on physical server or even virtual servers. In this embodiment, the content recognition features work on-demand, and every time a new media capture arrives to the cloud storage, these functions automatically execute to process each piece of media individually. The training/ machine learning models that power the cloud-based recognition are much more robust than the ones running locally in the gateway **110**. Although the output data is generally the same in structure, the level of training and accuracy of these models may be more advanced since the computing power in the cloud is higher than that running in the gateway itself.

In addition to machine learning, the remote processing capabilities of the system **100** also include raw data storage and processing. The remote software interprets the data generated from the machine learning process and stores all the found metadata into a high-performance big-data database. This data has not yet been processed with editing rules; it is stored directly as it arrives from the machine learning process.

The remote processing power of the system further facilitates the application of compliance rules to the data collected from the gateway **110**. Compliance rules are needed for any audience measurement process. These rules are applied to the raw data, in order to determine which households and household members are compliant and adequate to participate in the measurement for a particular day. In the present system, the compliance rules include (i) filtering of households that have a problem with the device or have disconnected it (i.e., diagnostic routines report trouble with the gateway), (ii) filtering of households that have more televisions than gateways **110** installed (i.e., all televisions of the household must be measured in order to accurately measure media consumption within the household), and (iii) filtering of household members that have more than some predetermined threshold period (e.g., 24 hours) of continuous TV viewing (i.e., thus indicating that the panelist is not actually watching the content presented). Once the processing module (e.g., at remote server **310**) has finished filtering, the resulting compliant (clean) data is stored by this module in

US 10,932,002 B2

47                                                                 48

a separate database. This data is prepared for generating reports and be consulted through the data provisioning portal and API.

In at least one embodiment, the remote server **310** is configured to provide a web-based piece of software that allows clients to access the collected data and visualize in on a GUI. The GUI may include a dashboard visualization where all the viewing session of a particular household is displayed. This may include the person recognition information (times where a user was watching television), and a timeline that is constructed based on the time a user spent watching a specific platform, source, channel, network or program. FIG. **6** serves as an example of an exemplary dashboard for a GUI, but it will be recognized that numerous other dashboards are also possible.

In at least one embodiment, a data API is provided for clients via the remote server **310**. Clients are able to "pull" the information collected from various gateways **110** directly from the API in order to generate their own reports or to connect our data to existing systems. User administration, permission control and setup are performed by an in-house team.

Television ON/OFF State Detection

It will be appreciated based on the foregoing description that the gateway **110** is configured to identify content consumed by panelists across numerous devices, including content delivered to wireless devices **220** (e.g., smartphones, tablets, etc.) and content delivered to the television **200**. The gateway **110** is configured to continually monitor and identify content delivered to the mobile devices **110**. However, the gateway **110** is only configured to monitor and identify content delivered to the television **200** when the television itself is turned on (i.e., such that the television screen and capable of presenting content to panelists within the household). By limiting content identification to times when the television is actually turned on, content consumption is more accurately determined. Furthermore, limiting content identification times further optimizes the use of computing resources within the gateway **110** and saves data consumption associated with data transmission through the gateway's Wi-Fi or cellular network connections.

The gateway **110** is configured to determine the on/off state of the television in two ways. First, the gateway **110** is configured to determine the on/off state of the television **200** by monitoring the consumer electronics control (CEC) pin on the HDMI connection between the television **200** and the gateway **110** (i.e., at the HDMI OUT port). Second, the gateway is configured to determine the on/off state of the television **200** by monitoring power flowing to the television **200** via the gateway **110**.

AC Detection Through HDMI-CEC

CEC is a control function that lets one A/V component control another if they are connected via HDMI cables. If the television **200** is CEC-enabled, power detection can be performed through the HDMI cable connected to the HDMI OUT port **133** of the gateway **110**. By monitoring the CEC pin of the HDMI cable, the gateway **110** can detect signals indicating that the television has been turned on or turned off. As noted previously, in at least some embodiments the gateway **110** is configured to save energy and stop performing television audience measurement computing processes (including content identification and panelist registration) when the television is off. Additionally, in at least some embodiments, the gateway **110** is configured to power itself down whenever the television **200** is turned off. This is especially true in embodiments where the gateway **110** is not

monitoring mobile device traffic, and is only monitoring content consumed at the television.

FIG. **22** shows a flowchart **2100** of a process used by the gateway **110** for determining television state based on CEC. The process begins with step **2110** when the gateway **110** is turned on. Thereafter, as step **2120**, the CEC pin at the HDMI output port **133** is monitored to detect whether the television is on or off. At step **2130**, a signal is received at the CEC pin. If the CEC pin indicates that the television is on, the AC status in the gateway **110** is set to "1" at step **2140**. If the CEC pin indicates that the television is off, the AC status in the gateway **110** is set to "0" at step **2150**. At step **2160**, the television status is made available for output to other components and devices via an application programming interface (API). The process ends at step **2170**, but the process is periodically repeated starting with step **2120** in order to determine television status based on the HDMI-CEC port.

AC Detection Through Gateway Power Detection

In addition to being configured to determine power via the CEC control function, the gateway **110** is also configured to monitor power delivered to the television via the AC output port **144**. To this end, the AC output port **144** of the gateway **110** includes a receptacle that receives the television's AC plug. When the television plug is connected to the AC output port **144** of the gateway **110**, the gateway is able to determine whether power is flowing to the television.

As discussed previously in association with FIG. **2**B, the gateway **110** includes an integrated power supply **150** that powers all the electronic components inside of the housing **112**. The gateway **110** also includes a TV ON/OFF detection circuit **151** that is capable of sensing that alternating current (AC) is flowing to the television's power cable through the AC output port **144**. Through an embedded API, the gateway **110** software obtains the readings from the TV ON/OFF detection circuit **151** to detect if the TV Set is turned on (i.e., alternating current is flowing to the television in excess of a threshold) or is turned off (no/low alternating current to the television).

FIG. **23** shows a flowchart **2200** of a CoreMeter process for determining television state based on AC detection using an AC sensor provided by the TV ON/OFF detection circuit **151**. The process begins at step **2210** when the gateway is turned on. Then at step **2220**, the TV ON/OFF detection circuit **151** of the gateway **110** monitors AC power flowing to the television **200** (e.g., via a current sensor). If AC power is detected at step **2230**, the process moves to step **2240** and a determination is made that the current provided to the television is within a calibration threshold. If the current is within the threshold, the process moves to step **2250**, and the gateway status of AC to the television is set to "1". On the other hand, if no AC current is detected as step **2230**, or if the AC current detected is not within the predetermined threshold at step **2240**, the process moves to step **2260**, and the gateway status of AC to the television is set to "0". At step **2270**, the television status is made available for output to other components and devices via an application programming interface (API). The process ends at step **2280**, but the process is periodically repeated starting with step **2220** in order to determine television status based on the AC to the television.

Advantageously, the two different mechanisms for monitoring power to the television **200** (i.e., CEC detection and AC detection) allows the gateway **110** to provide diagnostic information/warnings to the household when there are issues with the connections between the gateway and the television. As a first example, if the power cord of the television

US 10,932,002 B2

49                                                                    50

200 is improperly plugged into an AC wall outlet instead of the AC output port **144** of the gateway **110**, but the CEC pin on the HDMI OUT port **133** indicates that the television **200** was recently turned on, the gateway **110** may send a warning message for display on the television **200** instructing the user to plug the television into the AC output port **144** of the gateway **110**. As another example, if the power cord of the television **200** is properly plugged into the AC output port **144** of the gateway **110**, but there is no signal at the CEC pin on the HDMI OUT port **133**, this may indicate that the HDMI connection between the television **200** and the gateway **110** has become disconnected, and a warning message can be delivered to the user to check the HDMI connection (e.g., a message delivered via the LCD display **152** or microphone **154** of the gateway).

Graphical User Interface

The main user interface of the gateway is user-friendly, attractive, and generally makes use of all media sources easy and convenient. This encourages panelists to consume media content via the gateway, thus allowing the gateway **110** to perform the measurement functions. There are at least two options for the gateway's main user interface. FIG. **24** shows a first option for the gateway main user interface wherein the currently selected media source (e.g., TV, game console, etc.) plays in the background, HDMI sources **210** are provided along an arc on a left side of the display, and OTT sources **161** are provided along an arc on a right side of the display. FIG. **25** shows a second option for the gateway main user interface wherein the currently selected media source plays in the background, HDMI sources **210** are provided on a top row of the display, and OTT sources **161** are provided along lower rows of the display.

Exemplary Technological Improvements

Based on the foregoing description, it will be recognized that the system and method for cross-media measurement described herein provides a technological improvement in the form of improved hardware and software devices for reviewing, analyzing and capturing media content presented on a television and various additional media presentation devices within a household. The system provides specific improvements of the conventional systems and related methods. Examples of these improvements over conventional ACR systems are included below. However, the improvements over conventional systems and method are not limited to the examples provided below.

As discussed previously, ACR technology is based on the use of an audio fingerprinting/matching technology, where binary files are compared to a series of audio/pixel references to determine which channels are being watched. In contrast to ACR technology, the gateway **110** leverages machine learning technologies (e.g., computer vision) to perform channel, content and advertising detection directly from the incoming video source, from its embedded OTA Tuner, and from the network traffic coming in/out connected devices. The gateway does not take a single approach for all media consumption options. Instead, the gateway considers the various methods of viewing media, and takes a multi-layer approach to determine the content presented to panelists. The methodology of the gateway does not need to assume the source of content, but instead bases content analysis on the source. This provides for more accurate content recognition and analysis. Furthermore, the gateway is able to definitively identify the decision-making path of content selection.

In order to comprehensively support an ACR solution, the library used for its implementation must include continuous recording of all available TV signals. Recorded stations and geographically distributed backups must be installed at different locations nationwide. The libraries should further include original content that is available across every available streaming service. Advantageously, the gateway **110** does not rely on a reference library. Instead, the gateway makes use of trained machine learning models in order to detect particular items in the watched signal. This is significant both from an accuracy perspective as well as a comprehensive analysis perspective. The gateway is able to reliably detect and measure content that may not be included in an ACR library.

ACR is completely unable to detect a channel/channel provider when an event or program is being transmitted simultaneously in different channels. In contrast, the gateway does not have simulcast detection problems since it does not rely on audio. The gateway explicitly tracks the specific source of the content and ads that are delivered to the television. With this methodology we are also able to measure simulcast events (same content broadcasted at the same time in different channels), which is not possible with the ACR approach. The ability to identify sources allows for accurate reporting across the various television platform and device options which then translates to accurate allocation of measurement for both content and ads.

With ACR, beyond schedule supported content environments (i.e., viewing through the use of additional external devices such as video game consoles, DVD players, OTT sources, etc.) are difficult or impossible to detect. The conventional solution to this is a content matching methodology wherein validation of exposure/source must occur via manual panelist confirmation (e.g., manual button pushing). In contrast, the gateway is configured to detect and measure content from any number of different sources (e.g., video games, cable boxes, Blu-ray players, OTT sources, etc.). Thus, the gateway is configured to determine viewing behavior outside of non-linear environments (AppleTV, Roku, Video Game Console, etc.), inclusive of source, content, and ads. Marketers need validated measurement of these environments in order to shift their ad dollars into them.

In addition to the above, conventional ACR systems are not capable of measuring content presented at secondary devices (e.g., mobile phones, computers, etc.). Accordingly, additional hardware, software and meter components are needed in order to measure secondary devices in the ACR environment. In contrast, the gateway includes a dedicated chipset that allows it to act as wireless access point to capture the traffic going through it. This allow the entire household's media traffic to be analyzed and reported by the gateway. The gateway thus provides a single-source cross-platform solution to audience measurement that is capable of detecting media consumption overlaps across television platforms and secondary devices.

With conventional ACR, the timeliness of reporting is reliant on the ACR match-back process which needs at least 24 hours for the various confirmations needed to make the inferences of measurement. In the event of recording quality issues, reprocessing has to be re-run, and information delivery can be importantly delayed or entirely left out. The gateway **110** delivers content detection as it happens, and the information can be delivered to the cloud essentially in real time.

Conventional ACR and related systems require additional peripheral hardware to perform TV ON/OFF detection. In particular, the use of ACR microphones to detect TV ON/OFF is unreliable as the microphones tend to pick up signals from other sources which skews the output data (e.g.,

US 10,932,002 B2

51

the microphone may detect television on when the audio is actually from a radio). In contrast to conventional ACR, the configuration of the gateway 110 allows it to definitively identify TV ON/OFF without reliance on a microphone or any peripheral device. All hardware required for TV ON/OFF detection is included inside the gateway 110, thus allowing TV ON/OFF detection as a built-in feature. As described above, in various embodiments, an AC Loop circuit detects the power consumed by the television connected to the gateway. Additionally, for those televisions that support the HDMI CEC protocol, the detection of TV ON/OFF state can be done via the HDMI output port of the gateway.

Conventional ACR is dependent on the capture of very high quality audio via microphones external to the television. This is problematic and unreliable for numerous reasons, including the possibility for muted televisions, ambient noise, etc. In contrast, the gateway 110 is configured to perform recognition through video content analysis, and particularly analysis of the video signal itself (e.g., in the case of an OTA television signal) or the selected frames of an input source (e.g., in the case of content provided by a cable box). Video analysis (e.g., video frame analysis) is more accurate and effective than audio detection because video analysis avoid the problems associated with audio capture including probability of interference and lack accurate identification and detection.

ACR supported methodologies utilize consumer-grade off the shelf hardware (e.g., portable tablets) which is not meant for the panel environment (thus resulting in short shelf lives). ACR supported methodologies also cannot support a variable device multimedia entertainment system. A patched together approach of several devices is usually necessary and implemented. In contrast to ACR, the gateway is a self-contained system wherein every component required to support each layer of the measurement solution is soldered to the main board. No delicate parts can be easily broken which results in long shelf lives that support the panel environment. The hardware is specifically designed for the in-home panel environment. It is configured to analyze and detect numerous different methods of media consumption. The gateway allows for a passive panelist experience which results in the most accurate, comprehensive and granular single-source data output.

In addition to the above, the consumer-grade off the shelf hardware components and devices (e.g., portable tablet computers) common to many ACR systems are attractive for panelists to use for tasks outside of panel measurement objectives. These devices are thus subject to abuse and a generally shorter lifespan. These devices must also be repeatedly turned on and off and charged, such that a relatively short lifespan is inherent with the device. In contrast, the minimalist design of the gateway 110 results in an innocuous presence in the household that discourages tampering. This reduces the opportunities for equipment loss due to fraud and allows for consistent presence within the household for audience measurement purposes. The gateway is specifically designed for continuous audience measurement (i.e., 24 hours a day, seven days a week) without the need for the user to take any particular action.

Because ACR technologies implement consumer-grade off-the-shelf hardware devices, user experiences are often forced upon the panelist experience when interacting with these devices that would otherwise not be in the home. In contrast, the gateway provides a friendly user interface that leverages the use of the television as a display to show high impact graphics. The panelist experience and behaviors are

52

consistent with those prior to our installation of the gateway. The ability to communicate on the television screen allows the user interface to remain native to the user's existing media consumption environment.

The aforementioned combination of several components, devices, and consumer-grade off-the-shelf hardware with conventional ACR systems has long-term cost implications. The multiple points of failure results in high equipment churn, replacement, and repair costs. This equipment churn also impacts panelist satisfaction/drop-out, which in-turn results in panelist replacement costs. In contrast, the gateway includes all the necessary hardware in one device, is extremely durable, is built for continuous audience measurement real-world environment, has an innocuous presence, and includes an all-in-one measurement approach. As a result, the gateway 110 not only delivers higher data integrity, but also facilitates unique data outputs that can produce higher return on investment.

Although the various embodiments have been provided herein, it will be appreciated by those of skill in the art that other implementations and adaptations are possible. Furthermore, aspects of the various embodiments described herein may be combined or substituted with aspects from other features to arrive at different embodiments from those described herein. Thus, it will be appreciated that various of the above-disclosed and other features and functions, or alternatives thereof, may be desirably combined into many other different systems or applications. Various presently unforeseen or unanticipated alternatives, modifications, variations, or improvements therein may be subsequently made by those skilled in the art which are also intended to be encompassed by the following claims.

What is claimed is:

1. A method of identifying media content presented on a display device in communication with a content gateway, the media content provided by a video signal comprising a series of frames, the method comprising:

determining, at a processor within the gateway, a selected input source providing the video signal, wherein the selected input source is one of a plurality of input sources including at least a first input source and a second input source;

selecting a first set of content identification rules when it is determined that the selected input source is the first input source, wherein the first set of content identification rules define a first trigger event and a first algorithm for analyzing one or more of the frames of the video signal following the first trigger event;

selecting a second set of content identification rules when it is determined that the selected input source is the second input source, wherein the second set of content identification rules define a second trigger event and a second algorithm for analyzing one or more frames of the video signal following the second trigger event, wherein the second set of content identification rules is different from the first set of content identification rules; and

applying the selected first set or second set of content identification rules to the video signal in order to generate content identification data for the media content presented on the display device, wherein applying the selected first set of content identification rules includes waiting for the first trigger event and applying the first algorithm to one or more frames of the video signal following the first trigger event, and wherein applying the selected second set of content identification rules includes waiting for the second trigger event

US 10,932,002 B2

53

and applying the second algorithm to one or more frames of the video signal following the second trigger event.

**2.** The method of claim **1** further comprising, transmitting the generated content identification data to a remote computing device.

**3.** The method of claim **1** wherein the first trigger event is detection of a content grid within one of the frames of the video signal, and wherein application of the first set of content identification rules includes periodically applying a grid detection algorithm to the frames of the video signal.

**4.** The method of claim **3** wherein the grid detection algorithm is applied to every frame of the video signal provided by the selected input source.

**5.** The method of claim **3** wherein the first algorithm is a content extraction algorithm applied to the detected content grid.

**6.** The method of claim **1** wherein the first input source is a specific model of set-top box, and wherein selection of the first identification rules is based at least in part on the specific model of set-top box.

**7.** The method of claim **1** wherein the second trigger event is passage of an amount of time since a previous frame capture, and wherein the second algorithm is a logo recognition algorithm.

**8.** The method of claim **1** wherein the second trigger event is detection of a scene change in the series of frames, and wherein the second algorithm is a brand recognition algorithm.

**9.** The method of claim **1** wherein the display device includes a screen and a speaker, wherein the first algorithm is a first machine-learned algorithm, and wherein the second algorithm is a second machine-learned algorithm.

**10.** A non-transitory computer-readable medium for identifying media content provided by a video signal delivered to and presented on a display device, the computer-readable medium having a plurality of instructions stored thereon that, when executed by a processor, cause the processor to:
  determine a selected input source providing the video signal, wherein the selected input source is one of a plurality of input sources including at least a first input source and a second input source;
  select a first set of content identification rules when it is determined that the selected input source is the first input source, wherein the first set of content identification rules define a first trigger event and a first algorithm for analyzing one or more frames of the video signal following the first trigger event;
  select a second set of content identification rules when it is determined that the selected input source is the second input source, wherein the second set of content identification rules define a second trigger event and a second algorithm for analyzing one or more frames of the video signal following the second trigger event, wherein the second set of content identification rules is different from the first set of content identification rules; and
  apply the selected first set or second set of content identification rules to the video signal in order to generate content identification data for the media content presented on the display device, wherein application of the selected first set of content identification rules causes the processor to wait for the first trigger event and apply the first algorithm to one or more frames of the video signal following the first trigger event, and wherein application of the selected second set of content identification rules causes the processor

54

to wait for the second trigger event and apply the second algorithm to one or more frames of the video signal following the second trigger event.

**11.** The non-transitory computer-readable medium of claim **9** wherein the first trigger event is detection of a content grid within one of the frames of the video signal, wherein application of the first set of content identification rules includes periodically applying a grid detection algorithm to the frames of the video signal, and wherein the first algorithm is a content extraction algorithm applied to the detected content grid.

**12.** The non-transitory computer-readable medium of claim **9** wherein the first input source is a specific model of set-top box, and wherein selection of the first identification rules is based at least in part on the specific model of set-top box.

**13.** The non-transitory computer-readable medium of claim **9** (i) wherein the second trigger event is one of passage of an amount of time since a previous frame capture or detection of a scene change in the series of frames, and (ii) wherein the second algorithm is a logo recognition algorithm or a brand recognition algorithm.

**14.** A gateway for identifying media content presented on a display device including a screen and a speaker, the gateway comprising:
  a plurality of input ports including at least a first input port and a second input port;
  an output port configured to transfer a video signal received at the first input port or the second input port to the display device, wherein the video signal includes a series of frames that provide the media content; and
  a processor configured to execute a computer application comprising a plurality of instructions which are configured to, when executed, cause the gateway to:
    determine a selected input port providing the video signal;
    select a first set of content identification rules when it is determined that the selected input port is the first input port, wherein the first set of content identification rules define a first trigger event and a first algorithm for analyzing one or more frames of the video signal following the first trigger event;
    select a second set of content identification rules when it is determined that the selected input port is the second input port, wherein the second set of content identification rules define a second trigger event and a second algorithm for analyzing one or more frames of the video signal following the second trigger event, wherein the second set of content identification rules is different from the first set of content identification rules; and
    apply the selected first set or second set of content identification rules to the video signal in order to generate content identification data for the media content presented on the display device, wherein application of the selected first set of content identification rules causes the processor to wait for the first trigger event and apply the first algorithm to one or more frames of the video signal following the first trigger event, and wherein application of the selected second set of content identification rules causes the processor to wait for the second trigger event and apply the second algorithm to one or more frames of the video signal following the second trigger event.

**15.** The gateway of claim **14** further comprising a housing, wherein the processor, the plurality of input ports, and the output port are all retained within the housing, and

US 10,932,002 B2

55

56

wherein the plurality of input ports and the output port are accessible through the housing.

**16**. The gateway of claim **15** wherein the first input port and the second input port are both HDMI ports.

**17**. The gateway of claim **16** wherein the first input port is connected to a set-top box, and wherein the second input port is connected to one of a video game console, a disc player, or an OTT device.

**18**. The gateway of claim **14** further comprising a storage apparatus and a transceiver, wherein the first set of content identification rules and the second set of content identification rules are retained in the storage apparatus, wherein the transceiver is configured to communicate with a remote server, and wherein at least one of the first algorithm and the second algorithm is stored at the remote server, and wherein application of the first application or the second application causes the processor to capture and transmit one or more frames of the series of frames to the remote server via the transceiver for application of the first algorithm or the second algorithm.

**19**. The gateway of claim **14** further comprising a router, wherein the processor is further configured to detect additional media content presented at a mobile device via the router.

**20**. The gateway of claim **15**, wherein the processor is configured to register a panelist for association with media presented on the display device based on a signal strength of the mobile device at the router.

\* \* \* \* \*

# EXHIBIT F

HyphaMetrics Issued Patent For Cross-Platform Measurement Next TV


Broadcasting + Cable
Multichannel News

 Broadcasting+Cable



**PROMO CODES AVAILABLE**
Capital One Shopping
SEE FREE CODES
The coupon-finding browser extension

Advertisement

# HyphaMetrics Issued Patent for Cross-Platform Measurement

By [Jon Lafayette](#) ( [Broadcasting & Cable](#) ) published March 10, 2021

Single-source system based on optical recognition, A.I. and machine learning

  



HyphaMetrics got a patent for its cross-platform measurement system (Image credit: HyphaMetrics)

HyphaMetrics, an independent media measurement company, was issued a U.S. patent for [its next-generation cross-platform measurement system](#).

Patent No. 10,932,002 covers the company's unique coreMeter hardware, its methodology for collecting data from all media sources in a household, and how the company determines individuals' media consumption within a household.

HyphaMetrics' system "can facilitate the measurement of everything occurring in someone's home. We're able to measure across all the walled





HyphaMetrics Issued Patent For Cross-Platform Measurement | Next TV



gardens, across all the various silos," said CEO and co-founder Joanna Drews. "What that produces is a true cross-platform single-source metric."

The patent will enable HyphaMedia to deploy a "complete proprietary measurement system that is absolutely going to solve for a lot of the Holy Grail issues about omni-channel, cross-screen person-level measurement that the entire industry has been debating and asking for for a very long time," said Mike Bologna, the long-time advanced advertising head at GroupM who joined HyphaMetrics as chief revenue officer last year.

Joanna Drews, co-founder and CEO, HyphaMetrics (Image credit: HyphaMetrics)





Drews was director of product management and emerging assets at Comscore and a partner in GroupM's research practice.

Large measurement companies including Nielsen and Comscore are working on their own cross-media measurement systems.

Drews sees HyphaMetrics as a compliment for those systems, rather than a replacement.

"All of those solutions are really great at scale. They lack the granularity and the definition that we provide," she said, adding someday, Nielsen might be one of HyphaMetric's customers.

HyphaMetrics issued Patent For Cross-Platform Measurement

HyphaMetrics is in pilot mode now, according to Bologna.



Michael Bologna
(Image credit:
HyphaMetrics)

"We are about to launch a field trial," he said, putting its coreMeter boxes into about 100 homes while working with a few select partners." He did not name the partners.

Bologna noted that the boxes are costly and that it's expensive to recruit panels. The company previously raised $2 million, but will be raising additional funds via an equity round of financing in order to continue growing.

A lot of measurement systems use audio content recognition or automatic content recognition to determine what's being watched. HyphaMetrics' technology uses artificial intelligence and machine learning to read what's on the screen, Drews said. Its boxes are attached to each TV in a household. The boxes also have a router that enabled them to determine what's being watched on streaming devices.

The systems allow HyphaMetrics to determine co-viewing, viewing personas and household viewing, Drews said.

HyphaMetrics' three products so far are ClearviewMetrics, which measures unduplicated viewing data at the individual level across every network, program, advertisement, product placement, streaming app, gaming environment for every single device in the household; ContentMetrics, which collects real time data about who is watching what content and in what format -- live, time-shifted, or streaming – on TVs within an entire household; and MobileMetrics, granular data which demonstrates time spent in apps, simultaneous app usage, multitasking metrics, and more across mobile media environments.

## Broadcasting & Cable Newsletter

The smarter way to stay on top of broadcasting and cable industry. Sign up below.

> Your Email Address

☐ * To subscribe, you must consent to Future's privacy policy.

**SIGN ME UP**

By submitting your information you agree to the **Terms & Conditions** and **Privacy Policy** and are aged 16 or over.

 **Jon Lafayette**
 

Pushed to Mid-Season and Big Ten Football on Saturday Nights

5  B+C Hall of Fame Speeches: Wonya Lucas, Hallmark Media CEO

Advertisement

Advertisement



Jon has been business editor of Broadcasting+Cable since 2010. He focuses on revenue-generating activities, including advertising and distribution, as well as executive intrigue and merger and acquisition activity. Just about any story is fair game, if a dollar sign can make its way into the article. Before B+C, Jon covered the industry for TVWeek, Cable World, Electronic Media, Advertising Age and The New York Post. A native New Yorker, Jon is hiding in plain sight in the suburbs of Chicago.

| MORE ABOUT BROADCASTING AND CABLE | LATEST |
| --- | --- |



**The CW Picks Up '61st Street' From AMC** ▶



**XFL Championship, NBA Playoffs: What's on This Weekend in TV Sports (May 13-14)** ▶



**Parties Spar at FCC as SG/Tegna Financing Deadline Looms** ▶

**SEE MORE LATEST** ▶



**BET Plus To Launch Ad-Supported Tier in June**
By R. Thomas Umstead 5 days ago



**CNN Averages Only 3.3 Million Viewers for Reputation-Wilting Trump Town Hall**
By Daniel Frankel 5 days ago



**NBCUniversal Pitches Comscore, Innovid for Local Ad Deals**
By Jon Lafayette 5 days ago

Broadcasting+Cable is part of Future US Inc, an international media group and leading digital publisher. **Visit our corporate site**.

Terms and conditions

Contact Future's experts

Privacy policy

Cookies policy

Accessibility statement

Careers

Advertise with Us

Contact Us

Do not sell or share my personal information

© Future US, Inc. Full 7th Floor, 130 West 42nd Street, New York, NY 10036.

# EXHIBIT G

# User's Guide

# Contents

## 1. Safety Information, *P3-4*

1.1 Warning, *P3*

1.2 Precautions, *P3-4*

1.3 Handling Cautions, *P4*

## 2. Introduction, *P5-7*

2.1 Package Contents, *P5*

2.2 Product Features, *P5*

2.3 Remote Controller, *P6*

2.4 Setup Connection, *P7*

2.5 Display when Power Up, *P7-8*

## 3. Settings, *P8-21*

3.1 WiFi, *P9*

3.2 Bluetooth, *P10*

3.3 Ethernet, *P10*

3.4 More···, *P11*

3.5 Sound and notification, *P12*

3.6 Display, *P13-15*

3.7 Storage&USB, *P16*

3.8 Apps, *P17*

3.9 Memory, *P17*

3.10 Location, *P18*

3.11 Security, *P18*

3.12 Language & input, *P19*

3.13 Reset, *P19*

3.14 Accounts, *P20*

3.15 Google, *P21*

3.16 Date time, *P21*

3.17 About MediaBox, *P22*

## 4. Apps Install & Uninstall, *P23*

## 5. Firmware Update, *P24*

## 6. Trouble Shooting/FAQ, *P25*

## 7. Repairs, *P26*

## 8. Specification, *P27*

## 9. Trademark Notice, *P28*

2

# 1. Safety Information

Read and understand all instructions before using this product. If damage is caused by failure to follow the instructions, the warranty does not apply.

## 1.1 Warning

To reduce the risk of electric shock, DO NOT remove the cover (or back).

DO NOT attempt to repair the product, this could lead to the risk of injury, damage to the product .

To reduce the risk of fire or electric shock, keep this product away from exposed direct sunlight, naked flames or heat, large amounts of moisture, dust, and sand.

FCC Note (for U.S.A)

This equipment has been tested and found to comply with the limits for a Class B digital device, pursuant to Part 15 of the FCC rules. These limits are designed to provide reasonable protection against harmful interference in a residential installation. This equipment generates, uses and can radiate radio frequency energy and, if not installed and used in accordance with the instructions, may cause harmful interference to radio or television reception, which can be determined by turning the equipment off and on.

The user is encouraged to try to correct the interference by one or more of the following measures.

- Reorient or relocate the receiving antenna.

- Increase the separation between the equipment and receiver.

- Consult the dealer or an experienced radio/ technician for help.

- This class B digital product meets all requirements of the Canadian Interference - Causing Equipment Regulations.

## 1.2 Precautions

Important Safety Instructions

Read these operating instructions carefully before using the unit. Follow all safety instructions listed below.

Keep these operating instructions handy for future reference.

1.2.1 Read these instructions.

1.2.2 Keep these instructions.

1.2.3 Heed all warnings.

1.2.4 Follow all instructions.

1.2.5 DO NOT use this apparatus near water.

1.2.6 DO NOT clean with any chemical detergent. Clean only with a dry cloth.

1.2.7 DO NOT block any ventilation openings. Install in accordance with the manufacturer's instructions.

1.2.8 DO NOT install near any heat sources such as radiators, heat registers, stoves, or other apparatus that produce heat.

1.2.9 Protect the power cord from being walked on or pinched particularly at plugs,

3

convenience receptacles, and the point where it exits the apparatus.

1.2.10 Only use attachments/accessories specified by the manufacturer.

1.2.11 Use only with the cart, stand, tripod, bracket, or table specified by the manufacturer, or sold with the apparatus. When a cart is used , use caution when moving the cart/apparatus combination to avoid injury from tip-over.

1.2.12 Unplug this apparatus during lightning storms or when unused for long period of time.

1.2.13 Refer all servicing to qualified service personnel. Servicing is required when the apparatus has been damaged in any way, such as when the power-supply cord or plug is damaged, liquid has been spilled or objects have fallen into the apparatus, the apparatus has been exposed to rain or moisture, does not operate normally, or has been dropped.

## 1.3 Handling Cautions

1.3.1 DO NOT expose this apparatus to dripping or splashing. Do not put objects filled with liquids, such as vases on the apparatus.

1.3.2 To turn this apparatus off completely, you must pull the power plug out of the wall socket. Consequently, the power plug must be easily and readily accessible at all times.

1.3.3 DO NOT plug multiple electric devices into the same wall socket. Overloading a socket can cause it to overheat, resulting in a fire.

1.3.4 Before connecting other components to this player, be sure to turn them off.

1.3.5 If the product makes an abnormal noise or produces a burning smell or smoke, turn off the power switch immediately and disconnect the power plug from the wall outlet. Then, contact the nearest customer service center for technical assistance. Do not use the product. Using the product as it is may cause a fire or an electric shock.

4

# 2. Introduction

## 2.1 Package Contents

CM03

IR Remote Controller (IR RC)

Power Adapter, Input: AC100 ~ 240V, 50/60Hz, Output: 5V, 2A

## 2.2 Product Features

- Quad Core CPU,Penta GPU, frequency is 2.0GHz, RAM is 2G, built in 8G EMMC. Powered by Android 7.1 OS
- Built in browser and support virtual private network access
- RJ45 10/100M Ethernet interface
- Support 4k2k video local media playback from SD card or USB HDD
- Built in 802.11b/g/n AC WIFI module with antenna inside, WiFi frequency range is 2.4G/5.8G
- Rj45:Wired internet connection
- HDMI video output, connect to HD for HD video playback
- 2 external USB interface , support mobile HDD, support mouse and keyboard operating
- Support weather, calendar, and desktop clock gadgets
- Support USB mouse and keyboard operation
- Support simple IR remote control with mouse function
- Support music player, picture player and more family entertainment
- Support Micro SD card
- Support Google Chrome browser
- App Installer for application installation from USB/SD card

## 2.3 Remote Controller



| ① Power | ⑩ Home |
|---|---|
| ② Mode | ⑪ Background App |
| ③ Mute | ⑫ Menu |
| ④ Upwards | ⑬ Vol+ |
| ⑤ Towards the left | ⑭ Notification |
| ⑥ Towards the right | ⑮ Page Up |
| ⑦ Downwards | ⑯ Vol- |
| ⑧ OK | ⑰ Page Down |
| ⑨ Return | |

Note: Button Battery 2025 3V insert with correct polarity (+/-).

## 2.4 Setup Connection

Place CM03 on a flat platform near the , and make sure nothing block the remote control signal.

## 2.5 Display when Power Up

2.6.1 After power up, the    will first show Geniatech logo,starting with     boot animation. When finished, it will go to Home screen.



2.6.2 Home Screen display.



## 3. Settings

Using Navigation (4 directions), OK, EXIT, and Menu keys of Remote Controller to select the options, the option selected will be highlighted and confirmed by pressing OK key. Same operation for text input if needed.

Select  icon then press OK key to settings interface.

Or Select icon to settings interface.

8



## 3.1 WiFi

3.1.1 It will automatically scan ambient WiFi networks when select "ON".

3.1.2 Connect an available WiFi network. If connect a secured WiFi network, corresponding password will be input firstly. Or fail to connect and need reset password.

3.1.3 Once build up the connection with a certain WiFi network successfully, CM03 will connect this WiFi network automatically when restart.

Note: If factory reset, the password of WiFi network have to be reset.



## 3.2 Bluetooth



## 3.3 Ethernet

Connect Box and Router by RJ45 network cable.

Press " ON" in  Ethernet setting, it will connect to network automatically.

## 3.4 More...



### 3.4.1 VPN
Edit VPN profile



3.4.2 Portable hot spot
3.4.2.1 Enable Portable hot spot
3.4.2.2 Set up WiFi hot spot
     WiFi and hot spot connection can not be applied at same time. Disconnect WiFi and connect Ethernet while using hot spot function.

## 3.5 Sound and notification

3.5.1 Sound
Increase or decrease sound volumes



3.5.2 Touch Sounds
Choose Other sounds,you can set touch sound , if enable Touch sound, sound will be heard while move remote controller.



12

## 3.6 Display



### 3.6.1 Wallpaper

You can choose different wallpaper from gallery, live wallpaper and wallpaper.



### 3.6.2 Sleep



### 3.6.3 Daydream



### 3.6.4 Font size

Change the font size of OSD



## 3.7 Storage&USB

Shows the storage used of the OS and SD card.



## 3.8 Apps

List all apps installed.



You can choose an application and force to shut down the app, uninstall the app, clear user data, move to SD card and clear cache data.

## 3.9 Memory



## 3.10 Location



## 3.11 Security



## 3.12 Language & input



Change OSD language and input method.

The default input method is android standard keyboard.

If you are using our IR remote control, enter into "Default" option and switch to remote controller input method.

## 3.13 Reset



Factory data reset

This will erase all data from your mbox's internal storage,including:

· Your Google account

· System and app data and settings

· Downloaded apps

· Music\Photos

· Other user data

You can reset all the settings and apps to factory default.

Note: Once you choose to reset to factory default, all data/apps will be deleted.

## 3.14 Accounts



### 3.15 Google



### 3.16 Date time



## 3.17 About MediaBox



## 4. Apps Install & Uninstall

On CM03, you can install apps from Android Market over the Internet or other sources, such as other online sources, the internal storage and the USB storage device and SD card that you have mounted onto CM03.

You also can manage apps on CM03 and SD card, install/uninstall apps, stop running apps, or select other options.

## 5. Firmware Update

You can download newest firmware from Geniatech Official website:
www.geniatech.com

# 6. Trouble Shooting/FAQ

## 6.1 No Picture

Refer to the    user manual for how to select the correct video input channel.

## 6.2 USB Content cannot be read

. The format of USB storage device is not supported
. The supported memory size is 32G maximum.
. Make sure that this player supports these files.

## 6.3 Remote Controller cannot respond quickly to the pressing of keys

Make sure that batteries have enough power.

## 6.4 The firmware updating is not complete after a long time

If you update the firmware over the online service, it may take a long time to download the firmware update files from the server. To save your time, update the firmware through the SD card.

# 7. Repairs

If you contact us to repair your player, an administration fee may be charged if either:

An engineer is called out to your home at your request and there is no defect in the product.

You bring the unit to a repair center and there is no defect in the product.

We will provide you with the amount of the administration fee before we make a home visit or begin any work on your player.

We recommend you read this manual throughly, search for a solution on line at www.geniatech.com, or contact Geniatech Customer Care before seeking to repair your player.

# 8. Specification

| | |
|---|---|
| CPU | Quad Core ARM Cortex-A53 CPU up to @ 2.0GHz |
| GPU | Mali 450 GPU @ 750MHz+(DVFS) |
| RAM | 2G DDR3(1G optional) |
| ROM | 8G EMMC |
| OS | Android 6.0 OS |
| Optional | DOLBY |

| | |
|---|---|
| USB | USB2.0 x2 |
| HDMI | V2.0 |
| DC Input | 5.0V-2A |
| SD Slot | Max: 32G |
| Video Output | HDMI/CVBS |
| Audio Output | HDMI/RCA |
| IR receiver | / |

| | |
|---|---|
| LAN | RJ45 10/100M   Ethernet interface |
| WiFi | IEEE 802.11 B/G/N AC 2.4G（5.8G Optional） |
| BT | Optional |

| | |
|---|---|
| Audio Decoder | Low power Media CPU with DSP audio processing |
| | Supports MP3,AAC,WMA,RM,FLAC,Ogg and programmable with7.1/ 5.1 down-mixing |
| Video/Picture Decoder | VP9 Profile-2 up   to 4Kx2K@60fps |
| | H.265 HEVC MP-10@L5.1 up to 4kx2k@60fps |
| | H.264 AVC HP @L5.1 up to 4kx2k@30fps |
| | H.264 MVC up to 1080P@60fps |
| | MPEG-1 MP/HL up to 1080P@60fps |
| | MPEG-2 MP/HL up to 1080P@60fps |
| | MPEG-4 ASP@L5 up to 1080P@60fps |
| | WMV/VC-1 SP/MP/AP up to 1080P@60fps |
| | RealVideo 8/9/10 up to 1080P@60fps |
| | Multiple language and multiple format sub-title video support |
| | MJPEG and JPEG unlimited pixel resolution decoding |
| | Supports JPEG thumbnail,scaling,rotation and transition effects |

| | |
|---|---|
| Size | 82X 82 X 19mm |
| Net Weight | 159g |

## 9. Trademark Notice



The terms HDMI and HDMI High-Definition Multimedia Interface, and the HDMI Logo are trademarks or registered trademarks of HDMI Licensing LLC in United States and other countries.

**Warning:**

This device complies with Part 15 of the FCC Rules. Operation is subject to the following two conditions: (1) this device may not cause harmful interference, and (2) this device must accept any interference received, including interference that may cause undesired operation.

Changes or modifications not expressly approved by the party responsible for compliance could void the user's authority to operate the equipment.

NOTE: This equipment has been tested and found to comply with the limits for a Class B digital device, pursuant to Part 15 of the FCC Rules. These limits are designed to provide reasonable protection against harmful interference in a residential installation. This equipment generates, uses and can radiate radio frequency energy and, if not installed and used in accordance with the instructions, may cause harmful interference to radio communications. However. there is no guarantee that interference will not occur in a particular installation.

If this equipment does cause harmful interference to radio or television reception which can be determined by turning the equipment off and on, the user is encouraged to try to correct the interference by one or more of the following measures:

--Reorient or relocate the receiving antenna.

-- Increase the separation between the equipment and receiver

--Connect the equipment into an outlet on a circuit different from that to which the receiver is connected.

--Consult the dealer or an experienced radio/TV technician for help

NOTE: This device and its antenna(s) must not be co-located or operation in conjunction with any other antenna or transmitter

**RF Exposure Statement**

To maintain compliance with FCC's RF Exposure guidelines. This equipment should be installed and operated with minimum distance of 20cm the radiator your body. This device and its antenna(s) must not be co-located or operation in conjunction with any other antenna or transmitter

# EXHIBIT H

# Annex A

## External Photos

Test Model: CM03

Photo 1



Photo 2



Photo 3



Photo 4



Photo 5



Photo 6



Photo 7



Photo 8



Photo 9



# EXHIBIT I

**EXHIBIT I**

**Claim Charts for U.S. Patent No. 11,652,901**

| Element of Claim 1 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| A network communications monitor to log network traffic within a household that is monitored by an audience measurement entity, the network communications monitor comprising: | HyphaMetrics is an audience measurement entity. *See* Complaint Ex. C. *https://www.hyphametrics.com* (last accessed April 11, 2023) ("We serve as the objective technology standard globally for the precise measurement of media at the individual level."). |
| | HyphaMetrics audience measurement solution includes a coreMeter that monitors every aspect of digital entertainment in the home. The coreMeter "acts as a router for network traffic measurement." *See* Complaint Ex. D, Cohen, Rafi, "Hyphametrics comes out swinging with hyper-surveillance attribution," Rethink Technology Research, March 25, 2021, available at https://rethinkresearch.biz/articles/hyphametrics-comes-swinging-hyper-surveillance-attribution/. |
| | HyphaMetrics first patent, U.S. Patent No. 10,932,002 covers elements of HyphaMetrics' audience measurement methodology "including the tracking of IP traffic." *See* Complaint Ex. D, Cohen, Rafi, "Hyphametrics comes out swinging with hyper-surveillance attribution," Rethink Technology Research, March 25, 2021, available at https://rethinkresearch.biz/articles/hyphametrics-comes-swinging-hyper-surveillance-attribution/. |
| | Figure 2D of U.S. Patent No. 10,932,002 shows a "gateway 110" that is configured to detect consumption of and identify media content presented on various wireless devices within a household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 7, lines 27-38; col. 42, lines 58-67. |

| Element of Claim 1 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| | 

FIG. 2D

Source: Complaint Ex. E, U.S. Patent No. 10,932,002.

According to the '002 patent, the gateway 110 includes wireless software "that allows the gateway to detect each panelist's Internet activity on their associated mobile device and/or computer." *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 38-54; col. 7, lines 27-38; col. 43, lines 20-23; Fig. 1. More specifically:

When operating in the router mode, the Wi-Fi chipset 125 allows the gateway 110 to operate as wireless access point or wireless signal repeater for the household 202. When operating in this mode, mobile/desktop clients connect directly to the gateway 110 in order to obtain an Internet connection. Thus, all the wireless traffic for the household 202 goes through the gateway 110. The gateway 110 is configured to capture the network packets, identify media content presented on specific devices, and generally log all the Internet traffic passing through the gateway. Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 58-67. |

2

Exhibit I

| Element of Claim 1 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| | The gateway 110 described in U.S. Patent No. 10,932,002 is visually similar to the coreMeter pictured in HyphaMetrics' Federal Communications Commission application.<br><br>Photo 5<br><br><br><br>Source: Complaint Ex. H, https://fcc.report/FCC-ID//2AYHD-A20DC6/5091730, January 22, 2021. |

Exhibit I

3

| Element of Claim 1 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| a network interface; | The coreMeter is a network communications monitor to log network traffic within a household that is monitored by an audience measurement entity as recited by claim 1. |
| | The coreMeter includes a Wi-Fi module. *See* Complaint Ex. G, coreMeter User Manual, Section 2.2, January 22, 2021, available at https://fcc.report/FCC-ID/2AYHD-A20DC6/5091681; *see also* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 11, lines 28-41 (communications module 120 of the gateway 110 includes a wireless transceiver 124 and Wi-Fi chipset 125). |
| | The Wi-Fi module of the coreMeter is a network interface. |
| a processor; and | The coreMeter includes a central processing unit. *See* Complaint Ex. G, coreMeter User Manual, Section 2.2, January 22, 2021, available at https://fcc.report/FCC-ID/2AYHD-A20DC6/5091681; *see also* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 8, lines 7-25 (gateway 110 includes processing circuitry/logic 114 in the form of a commercially available microprocessor). |
| | The central processing unit is a processor. |
| a non-transitory computer-readable medium having stored therein instructions that are executable to cause the network communications monitor to perform operations comprising: | The coreMeter includes a memory storing instructions for execution by the central processor. *See* Complaint Ex. E, U.S. Patent No. 10,032,002, col. 8, lines 32-45. |
| | The memory is a non-transitory computer-readable medium. |
| detecting, via the network interface, multiple network communications transmitted on a wireless network within the household via a network gateway of the wireless network, | The instructions stored by the memory of the coreMeter include operational software for wireless networking features, hereinafter "wireless networking software". The wireless networking software is executable to cause the coreMeter to detect each panelist's Internet activity on their associated mobile device and/or computer. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 38-67; col. 43, lines 14-36; Fig. 19. |
| | The wireless networking software is executable to cause the coreMeter to operate in a router mode. In the router mode, the coreMeter operates as a wireless access point, such that all wireless traffic |

4

Exhibit I

| Element of Claim 1 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| | for the household goes through the coreMeter. Further, in the router mode, the coreMeter logs the wireless traffic for the household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, line 54 – col. 43, line 12.<br><br>The coreMeter is a network gateway. And the wireless networking software that is executable to cause the coreMeter to log the wireless traffic for the household that goes through the coreMeter contains instructions that are executable to perform the recited operation of detecting, via a network interface, multiple network communications transmitted on a wireless network within the household via the network gateway. |
| wherein the network gateway is configured to route the multiple network communications within the wireless network, | The wireless networking software of the coreMeter interacts with the networking hardware components to provide routing services. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 11, lines 28-49; col. 42, lines 38-67.<br><br>The coreMeter is configured to route the multiple network communications within the wireless network. |
| accessing panelist data that associates a panelist of the household with a panelist device of the panelist, | The coreMeter stores panelist data that associates (i) a MAC address of a panelist device within a household with (ii) a panelist within the household. When the coreMeter captures web traffic identifying media content presented at a MAC address, the coreMeter determines whether the traffic is associated with the panelist device using the panelist data. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 14-39; Fig. 19.<br><br>The wireless networking software that is executable to cause the coreMeter to determine whether the traffic is associated with the panelist using the panelist data contains instructions that are executable to perform the recited operation of accessing panelist data that associates a panelist of the household with a panelist device of the household. |
| determining, based on the panelist data, that a network communication of the multiple network communications is | The coreMeter determines that identified web traffic is associated with the panelist device by determining that the MAC address associated with the web traffic matches the MAC address of the panelist device. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 14-39; col. 37, lines 33-36; Fig. 19. |

5

Exhibit I

| Element of Claim 1 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| associated with the panelist device by determining that a media access control (MAC) address associated with the network communication matches a MAC address of the panelist device, and | The wireless networking software that is executable to cause the coreMeter to determine that web traffic is associated with the panelist device by matching the MAC address associated with the web traffic with the MAC address of the panelist device contains instructions that are executable to perform the recited operation of determining, based on the panelist data, that a network communication of the multiple network communications is associated with the panelist device by determining that a MAC address associated with the network communication matches a MAC address of the panelist device. |
| causing storage of data identifying the network communication in association with the panelist, | If web traffic is associated with a panelist's device, the coreMeter associates the identified web traffic with the panelist of the household that is associated with the panelist device. *See* U.S. Patent No. 10,932,002, col. 43, lines 35-39. The coreMeter stores data indicative of this association in the memory. *See* Complaint Ex. E, U.S. Patent No. 10,923,002, col. 42, line 64 – col. 43, line 12; col. 43, lines 34-44; Fig. 19.<br><br>The wireless networking software that is executable to cause the coreMeter to store data indicative of the association between the identified web traffic and the panelist of the household contains instructions that are executable to perform the recited operation of causing storage of data identifying the network communication in association with the panelist. |
| wherein: the network communications monitor is located within the household; and | As noted above, the coreMeter is provided to a panelist household and located therein. *See also* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 7, lines 27-38; col. 43, lines 20-23; Fig. 1. |
| the network communications monitor is implemented by the network gateway. | As noted above, in the router mode, the coreMeter serves as a router/wireless access point, which is a network gateway, and logs wireless traffic within the household. *See also* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 39-67. |

6

Exhibit I

| Element of Claim 2 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| The network communications monitor of claim 1, wherein: the panelist data associates the MAC address of the panelist device with the panelist, and | As noted above, the coreMeter stores panelist data that associates (i) a MAC address of a panelist device within a household with (ii) a panelist within the household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 14-28; col. 37, lines 33-36. |
| the panelist device is a source of the network communication or a destination of the network communication. | As noted above, the coreMeter is configured to detect consumption of and identify media content presented on various wireless devices within a household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 7, lines 27-38. The panelist device is a source or a destination of the network communication. |

| Element of Claim 3 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| The network communications monitor of claim 1, wherein the panelist device is a mobile device that is wirelessly connected to the wireless network. | As noted above, the coreMeter is configured to detect consumption of and identify media content presented on various wireless devices within a household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 7, lines 27-38; col. 11, lines 41-49; col. 37, lines 26-41. |

| Element of Claim 4 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| The network communications monitor of claim 3, wherein detecting the multiple network communications includes inspecting traffic passing through the network gateway. | As noted above, the coreMeter detects network communications by capturing network packets for wireless traffic that passes through the coreMeter. Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 58-67; Fig. 19. |

Exhibit I

7

| Element of Claim 5 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| The network communications monitor of claim 4, wherein the data identifying the network communication includes a timestamp and network data extracted from a header of the network communication. | The log of network traffic captured by the coreMeter includes a list of data packets, with each data packet including and/or associated with date, time, origin IP address, destination IP address, consumer URL, and user agent. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 1-12. Origin IP address and destination IP address are commonly included in a header of a network communication. *See* https://www.techtarget.com/searchnetworking/definition/packet. User agent is also included in a header of a network communication. *See Id.*, col. 43, line 10.<br><br>The date and/or time is a timestamp, and the origin IP address, destination IP address, and user agent are network data extracted from a header. |

| Element of Claim 8 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| The network communications monitor of claim 2, wherein the operations further comprise:<br><br>obtaining identification data that identifies the MAC address of the panelist device and indicates that the panelist device is associated with the panelist; and | When the panelist device is initially joined to the wireless network, the coreMeter asks the user to associate the panelist with the panelist device, and associates the MAC address for the panelist device with the panelist. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 23-27.<br><br>The wireless networking software that is executable to cause the coreMeter to associate the MAC address of the panelist device with the panelist contains instructions that are executable to perform the recited operation of obtaining identification data that identifies the MAC address of the panelist device and indicates that the panelist device is associated with the panelist. |
| generating the panelist data that associates the MAC address with the panelist. | The coreMeter repeats the above-referenced association process for multiple wireless devices within the household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 23-27. The wireless networking software that is executable to cause the coreMeter to add the newly determined association to a list of associations for other panelist devices contains instructions that are executable to perform the recited operation of generating the panelist data that associates the MAC address with the panelist. |

Exhibit I

8

| Element of Claim 9 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| The network communications monitor of claim 1, wherein causing storage of the data identifying the network communication in association with the panelist includes causing the data identifying the network communication in association with the panelist to be added to a log of network traffic. | As noted above, the coreMeter logs the wireless traffic for the household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, line 54 - col. 43, line 12. |

| Element of Claim 10 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| The network communications monitor of claim 9, wherein the operations further include causing transmission of the log of network traffic to a server that collects and processes logs of network traffic from a plurality of households. | The coreMeter sends traffic logs to a remote server for further analysis. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 42-46; col. 21, lines 50-51. The remote server collects and processes logs of network traffic from a plurality of households. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 21, line 52 – col. 22, line 5 and col. 46, lines 48-54; col. 43, lines 42-49; Figs. 1, 19.<br><br>The wireless networking software that is executable to cause the coreMeter to send the traffic log to the remote server contains instructions that are executable to perform the recited operation of causing transmission of the log of network traffic to a server that collects and processes logs of network traffic from a plurality of households. |

Exhibit I

9

| Element of Claim 11 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| The network communications monitor of claim 9, wherein the operations further include: detecting an additional network communication transmitted on the wireless network within the household, | As noted above, the coreMeter serves as the wireless access point for multiple wireless devices in the household, and captures web traffic data identifying media content presented at each wireless device. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 13-36; Fig. 19.

The wireless networking software that is executable to cause the coreMeter to capture web traffic identifying media content presented at each wireless device contains instructions that are executable to perform the recited operation of detecting an additional network communication transmitted on the wireless network within the household. |
| determining, using the panelist data, that the additional network communication is not associated with any known panelist devices of the panelists of the household, and | As noted above, the coreMeter determines whether web traffic is associated with a panelist's device. If the web traffic is not associated with a panelist's device, the web traffic is associated to a generic network device (e.g., guest device). *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 34-42; Fig. 19.

The wireless networking software that is executable to cause the coreMeter to determine that captured web traffic is not associated with a panelist's device contains instructions that are executable to perform the recited operation of determining, using the panelist data, that the additional network communication is not associated with any known panelist devices of the panelists of the household. |
| causing storage of data identifying the additional network communication in the log of network traffic in a manner that distinguishes the additional network communication from the network communication. | As noted above, if the web traffic is not associated with a panelist's device, the coreMeter associates the web traffic to a generic network device (e.g., guest device). *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 34-42; Fig. 19. The coreMeter stores data indicative of this association in the memory. *See* Complaint Ex. E, U.S. Patent No. 10,923,002, col. 42, line 64 – col. 43, line 12; Fig. 19.

The wireless networking software that is executable to cause the coreMeter to associate the web traffic to a generic network device contains instructions that are executable to perform the recited operation of causing storage of data identifying the additional network communication in the log of network traffic in a manner that distinguishes the additional network communication from the network communication. |

10

Exhibit I

| Element of Claim 12 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| The network communications monitor of claim 1, wherein the storage of the data identifying the network communication in association with the panelist is performed in response to determination that the one or more of the network communication [sic] is associated with the panelist device. | As noted above, if web traffic is associated with a panelist's device, the coreMeter associates the identified web traffic with the panelist of the household that is associated with the panelist device. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, line 64 - col. 43, line 12; col. 43, lines 34-44; Fig. 19.

The wireless networking software that is executable to cause the coreMeter to associate the identified web traffic with the panelist of the household if the web traffic is associated with the panelist's device contains instructions that are executable to perform the recited operation of causing storage of data identifying the network communication in association with the panelist in response to determination that the network communication is associated with the panelist device. |

| Element of Claim 13 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| A method for logging network traffic within a household that is monitored by an audience measurement entity, the method comprising: | HyphaMetrics is an audience measurement entity. *See* Complaint Ex. C, *https://www.hyphametrics.com* (last accessed April 11, 2023) ("We serve as the objective technology standard globally for the precise measurement of media at the individual level.").

HyphaMetrics audience measurement solution includes a coreMeter that monitors every aspect of digital entertainment in the home. The coreMeter "acts as a router for network traffic measurement." *See* Complaint Ex. D, Cohen, Rafi, "Hyphametrics comes out swinging with hyper-surveillance attribution," Rethink Technology Research, March 25, 2021, available at https://rethinkresearch.biz/articles/hyphametrics-comes-swinging-hyper-surveillance-attribution/.

HyphaMetrics first patent, U.S. Patent No. 10,932,002 covers elements of HyphaMetrics' audience measurement methodology "including the tracking of IP traffic." *See* Complaint Ex. D, Cohen, Rafi, "Hyphametrics comes out swinging with hyper-surveillance attribution," Rethink Technology |

11

Exhibit I

| Element of Claim 13 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
|  | Research, March 25, 2021, available at https://rethinkresearch.biz/articles/hyphametrics-comes-swinging-hyper-surveillance-attribution/.<br><br>Figure 2D of U.S. Patent No. 10,932,002 shows a "gateway 110" that is configured to detect consumption of and identify media content presented on various wireless devices within a household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 7, lines 27-38; col. 42, lines 58-67.<br><br>110<br><br>112<br><br>128<br><br>130<br><br>144<br><br>145<br><br>FIG. 2D<br><br>Source: U.S. Patent No. 10,932,002.<br><br>According to the '002 patent, the gateway 110 includes wireless software "that allows the gateway to detect each panelist's Internet activity on their associated mobile device and/or computer." *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 38-54; col. 7, lines 27-38; col. 43, lines 20-23; Fig. 1. More specifically: |

12

Exhibit I

| Element of Claim 13 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| | When operating in the router mode, the Wi-Fi chipset 125 allows the gateway 110 to operate as wireless access point or wireless signal repeater for the household 202. When operating in this mode, mobile/desktop clients connect directly to the gateway 110 in order to obtain an Internet connection. Thus, all the wireless traffic for the household 202 goes through the gateway 110. The gateway 110 is configured to capture the network packets, identify media content presented on specific devices, and generally log all the Internet traffic passing through the gateway. Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 58-67.

The gateway 110 described in U.S. Patent No. 10,932,002 is visually similar to the coreMeter pictured in HyphaMetrics' Federal Communications Commission application. |

13

Exhibit I

| Element of Claim 13 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| | Photo 5 |
| |  |
| | Source: Complaint Ex. H, https://fcc.report/FCC-ID/2AYHD-A20DC6/5091730, January 22, 2021. |
| | The method performed by the coreMeter to measure network traffic within a household is a method for logging network traffic within a household that is monitored by an audience measurement entity as recited by claim 13. |

14

Exhibit I

| Element of Claim 13 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| detecting, *via a network interface of a network communications monitor located within the household*, multiple network communications transmitted on a wireless network within the household *via a network gateway of a wireless network,* | As noted above, the coreMeter operates as a network communications monitor located within a household.<br><br>The coreMeter includes a Wi-Fi module. *See* Complaint Ex. G, coreMeter User Manual, Section 2.2, January 22, 2021, available at https://fcc.report/FCC-ID/2AYHD-A20DC6/5091681; *see also* U.S. Patent No. 10,932,002, col. 11, lines 28-41 (communications module 120 of the gateway 110 includes a wireless transceiver 124 and Wi-Fi chipset 125).<br><br>The Wi-Fi module of the coreMeter is a network interface.  Further, in line with the discussion above, the coreMeter operates as a network gateway.<br><br>The coreMeter includes operational software for wireless networking features, hereinafter "wireless networking software".  The wireless networking software is executable to cause the coreMeter to detect each panelist's Internet activity on their associated mobile device and/or computer. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 38-67; col. 43, lines 14-36; Fig. 19.<br><br>The wireless networking software is executable to cause the coreMeter to operate in a router mode. In the router mode, the coreMeter operates as a wireless access point, such that all wireless traffic for the household goes through the coreMeter.  Further, in the router mode, the coreMeter logs the wireless traffic for the household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, line 54 – col. 43, line 12.<br><br>The coreMeter is a network gateway.  And the coreMeter logging the wireless traffic for the household that goes through the coreMeter performs detecting, via a network interface of a network communications monitor located within the household, multiple network communications transmitted on a wireless network within the household *via a network gateway of a wireless network*. |

Exhibit I

| Element of Claim 13 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| wherein the network gateway routes the network communications within the wireless network; | The wireless networking software of the coreMeter interacts with the networking hardware components to provide routing services. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 11, lines 28-49; col. 42, lines 38-67.<br><br>Hence, the coreMeter routes the multiple network communications within the wireless network. |
| accessing panelist data that associates a panelist of the household with a panelist device of the panelist; | The coreMeter stores panelist data that associates (i) a MAC address of a panelist device within a household with (ii) a panelist within the household. When the coreMeter captures web traffic identifying media content presented at a MAC address, the coreMeter determines whether the traffic is associated with the panelist device using the panelist data. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 14-39; Fig. 19.<br><br>The coreMeter determining whether the traffic is associated with the panelist using the panelist data performs accessing panelist data that associates a panelist of the household with a panelist device of the household. |
| determining, via a processor of the network communications monitor, based on the panelist data, that a network communication of the multiple network communications is associated with the panelist device by determining that a media access control (MAC) address associated with the network communication matches a MAC address of the panelist device; and | The coreMeter includes a central processing unit. *See* Complaint Ex. G, coreMeter User Manual, Section 2.2, January 22, 2021, available at https://fcc.report/FCC-ID/2AYHD-A20DC6/5091681; *see also* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 8, lines 7-25 (gateway 110 includes processing circuitry/logic 114 in the form of a commercially available microprocessor).<br><br>The central processing unit is a processor.<br><br>The coreMeter determines, using the central processing unit, that identified web traffic is associated with the panelist device by determining that the MAC address associated with the web traffic matches the MAC address of the panelist device. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 14-39; col. 37, lines 33-36; Fig. 19.<br><br>The coreMeter determining, via the central processing unit, that web traffic is associated with the panelist device by matching the MAC address associated with the web traffic with the MAC address of the panelist device performs determining, via a processor of the network |

Exhibit I

16

| Element of Claim 13 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| | communications monitor, based on the panelist data, that a network communication of the multiple network communications is associated with the panelist device by determining that a MAC address associated with the network communication matches a MAC address of the panelist device. |
| based on determining that the network communication is associated with the panelist device, storing data identifying the network communication in association with the panelist. | If web traffic is associated with a panelist's device, the coreMeter associates the identified web traffic with the panelist of the household that is associated with the panelist device. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 35-39. The coreMeter stores data indicative of this association in the memory. *See* Complaint Ex. E, U.S. Patent No. 10,923,002, col. 42, line 64 – col. 43, line 12; col. 43, lines 34-44; Fig. 19.

The coreMeter storing data indicative of the association between the identified web traffic and the panelist of the household if the web traffic is associated with the panelist's device performs storing data identifying the network communication in association with the panelist based on determining that the network communication is associated with the panelist device. |

| Element of Claim 14 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| The method of claim 13, wherein: the panelist data associates the MAC address of the panelist device with the panelist, and | As noted above, the coreMeter stores panelist data that associates (i) a MAC address of a panelist device within a household with (ii) a panelist within the household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 14-28; col. 37, lines 33-36. |
| the panelist device is a source of the network communication or a destination of the network communication. | As noted above, the coreMeter is configured to detect consumption of and identify media content presented on various wireless devices within a household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 7, lines 27-38. Hence, the panelist device is a source or a destination of the network communication. |

17

Exhibit I

| Element of Claim 15 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| The method of claim 13, wherein the panelist device is a mobile device that is wirelessly connected to the wireless network. | As noted above, the coreMeter is configured to detect consumption of and identify media content presented on various wireless devices within a household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 7, lines 27-38; col. 11, lines 41-49; col. 37, lines 26-41. |

| Element of Claim 16 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| The method of claim 15, wherein detecting the multiple network communications includes inspecting traffic passing through the network gateway. | As noted above, the coreMeter detects network communications by capturing network packets for wireless traffic that passes through the coreMeter. Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 58-67; Fig. 19. |

| Element of Claim 17 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| The method of claim 16, wherein the data identifying the network communication includes a timestamp and network data extracted from a header of the network communication. | The log of network traffic captured by the coreMeter includes a list of data packets, with each data packet including and/or associated with date, time, origin IP address, destination IP address, consumer URL, and user agent. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 1-12. Origin IP address and destination IP address are commonly included in a header of a network communication. *See* https://www.techtarget.com/searchnetworking/definition/packet. User agent is also included in a header of a network communication. *See Id.*, col. 43, line 10.<br><br>The date and/or time are a timestamp, and the origin IP address, destination IP address, and user agent are network data extracted from a header. |

18

Exhibit I

| Element of Claim 18 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| An audience measurement system comprising: | HyphaMetrics is an audience measurement entity. *See* Complaint Ex. C, *https://www.hyphametrics.com* (last accessed April 11, 2023) ("We serve as the objective technology standard globally for the precise measurement of media at the individual level."). |
| | HyphaMetrics audience measurement solution includes a coreMeter that monitors every aspect of digital entertainment in the home. The coreMeter "acts as a router for network traffic measurement." *See* Complaint Ex. D, Cohen, Rafi, "Hyphametrics comes out swinging with hyper-surveillance attribution," Rethink Technology Research, March 25, 2021, available at https://rethinkresearch.biz/articles/hyphametrics-comes-swinging-hyper-surveillance-attribution/. |
| | HyphaMetrics first patent, U.S. Patent No. 10,932,002 covers elements of HyphaMetrics' audience measurement methodology "including the tracking of IP traffic." *See* Complaint Ex. D, Cohen, Rafi, "Hyphametrics comes out swinging with hyper-surveillance attribution," Rethink Technology Research, March 25, 2021, available at https://rethinkresearch.biz/articles/hyphametrics-comes-swinging-hyper-surveillance-attribution/. |
| | Figure 2D of U.S. Patent No. 10,932,002 shows a "gateway 110" that is configured to detect consumption of and identify media content presented on various wireless devices within a household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 7, lines 27-38; col. 42, lines 58-67. |

Exhibit I

19

| Element of Claim 18 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| |  FIG. 2D<br><br>Source: Complaint Ex. E, U.S. Patent No. 10,932,002.<br><br>The gateway 110 described in U.S. Patent No. 10,932,002 is visually similar to the coreMeter pictured in HyphaMetrics' Federal Communications Commission application. |

20

Exhibit I

| Element of Claim 18 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| | Photo 5 |
| |  |
| | Source: Complaint Ex. H, https://fcc.report/FCC-ID/2AYHD-A20DC6/5091730, January 22, 2021. As detailed below, the coreMeter is part of HyphaMetrics' audience measurement system. |
| a server; and | The coreMeter sends traffic logs to a remote server for further analysis. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 42-46; col. 21, lines 50-51. The remote server collects and processes logs of network traffic from a plurality of households. *See* Complaint Ex. E, U.S. Patent |

21

Exhibit I

| Element of Claim 18 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| a network communications monitor to log network traffic within a household, the network communications monitor located within the household, | No. 10,932,002, col. 21, line 52 – col. 22, line 5 and col. 46, lines 48-54; col. 43, lines 42-49; Figs. 1, 19. |
| | According to the '002 patent, the gateway 110 includes wireless software "that allows the gateway to detect each panelist's Internet activity on their associated mobile device and/or computer." *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 38-54; col. 7, lines 27-38; col. 43, lines 20-23; Fig. 1. More specifically: |
| | When operating in the router mode, the Wi-Fi chipset 125 allows the gateway 110 to operate as wireless access point or wireless signal repeater for the household 202. When operating in this mode, mobile/desktop clients connect directly to the gateway 110 in order to obtain an Internet connection. Thus, all the wireless traffic for the household 202 goes through the gateway 110. The gateway 110 is configured to capture the network packets, identify media content presented on specific devices, and generally log all the Internet traffic passing through the gateway. Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 58-67. |
| | The coreMeter is a network communications monitor to log network traffic within a household. |
| the networks communications monitor including a network interface, a processor, and a non-transitory computer-readable medium having stored therein instructions that are executable to cause the network communications monitor to perform operations comprising: | The coreMeter includes a Wi-Fi module. *See* Complaint Ex. G, coreMeter User Manual, Section 2.2, January 22, 2021, available at https://fcc.report/FCC-ID/2AYHD-A20DC6/5091681; *see also* U.S. Patent No. 10,932,002, col. 11, lines 28-41 (communications module 120 of the gateway 110 includes a wireless transceiver 124 and Wi-Fi chipset 125). |
| | The Wi-Fi module of the coreMeter is a network interface. |
| | The coreMeter includes a central processing unit. *See* Complaint Ex. G, coreMeter User Manual, Section 2.2, January 22, 2021, available at https://fcc.report/FCC-ID/2AYHD-A20DC6/5091681; *see also* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 8, lines 7-25 (gateway 110 includes processing circuitry/logic 114 in the form of a commercially available microprocessor). |
| | The central processing unit is a processor. |

Exhibit I

| Element of Claim 18 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| | The coreMeter includes a memory storing instructions for execution by the central processor. *See* Complaint Ex. E, U.S. Patent No. 10,032,002, col. 8, lines 32-45. |
| | The memory is a non-transitory computer-readable medium. |
| detecting, via the network interface, multiple network communications transmitted on a wireless network within the household via a network gateway, | The instructions stored by the memory of the coreMeter include operational software for wireless networking features, hereinafter "wireless networking software". The wireless networking software is executable to cause the coreMeter to detect each panelist's Internet activity on their associated mobile device and/or computer. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 38-67; col. 43, lines 14-36; Fig. 19. |
| | The wireless networking software is executable to cause the coreMeter to operate in a router mode. In the router mode, the coreMeter operates as a wireless access point, such that all wireless traffic for the household goes through the coreMeter. Further, in the router mode, the coreMeter logs the wireless traffic for the household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, line 54 – col. 43, line 12. |
| | The coreMeter is a network gateway. And the wireless networking software that is executable to cause the coreMeter to log the wireless traffic for the household that goes through the coreMeter performs instructions that are executable to perform the recited operation of detecting, via a network interface, multiple network communications transmitted on a wireless network within the household via the network gateway. |
| wherein the network gateway is configured to route the multiple network communications within the wireless network; | The wireless networking software of the coreMeter interacts with the networking hardware components to provide routing services. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 11, lines 28-49; col. 42, lines 38-67. |
| | Hence, the coreMeter is configured to route the multiple network communications within the wireless network. |

23

Exhibit I

| Element of Claim 18 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| accessing panelist data that associates a panelist of the household with a panelist device of the panelist; | The coreMeter stores panelist data that associates (i) a MAC address of a panelist device within a household with (ii) a panelist within the household. When the coreMeter captures web traffic identifying media content presented at a MAC address, the coreMeter determines whether the traffic is associated with the panelist device using the panelist data. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 14-39; Fig. 19.<br><br>The wireless networking software that is executable to cause the coreMeter to determine whether the traffic is associated with the panelist using the panelist data performs instructions that are executable to perform the recited operation of accessing panelist data that associates a panelist of the household with a panelist device of the household. |
| determining, based on the panelist data, that a network communication of the multiple network communications is associated with the panelist device by determining that a media access control (MAC) address associated with the network communication matches a MAC address of the panelist device; | The coreMeter determines that identified web traffic is associated with the panelist device by determining that the MAC address associated with the web traffic matches the MAC address of the panelist device. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 14-39; col. 37, lines 33-36; Fig. 19.<br><br>The wireless networking software that is executable to cause the coreMeter to determine that web traffic is associated with the panelist device by matching the MAC address associated with the web traffic with the MAC address of the panelist device performs instructions that are executable to perform the recited operation of determining, based on the panelist data, that a network communication of the multiple network communications is associated with the panelist device by determining that a MAC address associated with the network communication matches a MAC address of the panelist device. |
| causing storage of data identifying the network communication in association with the panelist; and | If web traffic is associated with a panelist's device, the coreMeter associates the identified web traffic with the panelist of the household that is associated with the panelist device. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 35-39. The coreMeter stores data indicative of this association in the memory. *See* Complaint Ex. E, U.S. Patent No. 10,923,002, col. 42, line 64 – col. 43, line 12; col. 43, lines 34-44; Fig. 19. |

Exhibit I

24

| Element of Claim 18 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| | The wireless networking software that is executable to cause the coreMeter to store data indicative of the association between the identified web traffic and the panelist of the household performs instructions that are executable to perform the recited operation of causing storage of data identifying the network communication in association with the panelist. |
| transmitting the log of network traffic to the server, | As noted above, the coreMeter sends traffic logs to a remote server for further analysis. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 42-46; col. 21, lines 50-51. |
| | The wireless networking software that is executable to cause the coreMeter to send the traffic log to the remote server performs instructions that are executable to perform the recited operation of transmitting the log of network traffic to the server. |
| wherein the network communications monitor is implemented by the network gateway. | As noted above, in the router mode, the coreMeter serves as a router/wireless access point, and logs wireless traffic within the household. *See also* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 39-67. |

| Element of Claim 19 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| The audience measurement system of claim 18, wherein the server is configured to determine media exposure data based on the log of network traffic and logs of network traffic from other households. | The remote server analyzes data collects from coreMeters located in a plurality of households, to determine the level of exposure of programming and advertisements. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 21, line 52 – col. 22, line 7; col. 43, lines 42-46. |

Exhibit I

25

| Element of Claim 20 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| At least one non-transitory computer readable storage medium comprising instructions that, when executed, cause at least one processor of a network communications monitor to at least: | HyphaMetrics is an audience measurement entity. *See* Complaint Ex. C, *https://www.hyphametrics.com* (last accessed April 11, 2023) ("We serve as the objective technology standard globally for the precise measurement of media at the individual level."). |
| | HyphaMetrics audience measurement solution includes a coreMeter that monitors every aspect of digital entertainment in the home. The coreMeter "acts as a router for network traffic measurement." *See* Complaint Ex. D, Cohen, Rafi, "Hyphametrics comes out swinging with hyper-surveillance attribution," Rethink Technology Research, March 25, 2021, available at https://rethinkresearch.biz/articles/hyphametrics-comes-swinging-hyper-surveillance-attribution/. |
| | HyphaMetrics first patent, U.S. Patent No. 10,932,002 covers elements of HyphaMetrics' audience measurement methodology "including the tracking of IP traffic." *See* Complaint Ex. D, Cohen, Rafi, "Hyphametrics comes out swinging with hyper-surveillance attribution," Rethink Technology Research, March 25, 2021, available at https://rethinkresearch.biz/articles/hyphametrics-comes-swinging-hyper-surveillance-attribution/. |
| | Figure 2D of U.S. Patent No. 10,932,002 shows a "gateway 110" that is configured to detect consumption of and identify media content presented on various wireless devices within a household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 7, lines 27-38; col. 42, lines 58-67. |

26

Exhibit I

| Element of Claim 20 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| |  FIG. 2D<br><br>Source: Complaint Ex. E, U.S. Patent No. 10,932,002.<br><br>The gateway 110 described in U.S. Patent No. 10,932,002 is visually similar to the coreMeter pictured in HyphaMetrics' Federal Communications Commission application. |

27

Exhibit I

| Element of Claim 20 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| | Photo 5  Source: Complaint Ex. H, https://fcc.report/FCC-ID/2AYHD-A20DC6/5091730, January 22, 2021. According to the '002 patent, the gateway 110 includes wireless software "that allows the gateway to detect each panelist's Internet activity on their associated mobile device and/or computer." *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 38-54; col. 7, lines 27-38; col. 43, lines 20-23; Fig. 1. More specifically: |

28

Exhibit I

| Element of Claim 20 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| | When operating in the router mode, the Wi-Fi chipset 125 allows the gateway 110 to operate as wireless access point or wireless signal repeater for the household 202. When operating in this mode, mobile/desktop clients connect directly to the gateway 110 in order to obtain an Internet connection. Thus, all the wireless traffic for the household 202 goes through the gateway 110. The gateway 110 is configured to capture the network packets, identify media content presented on specific devices, and generally log all the Internet traffic passing through the gateway. Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, line 58 - col. 43, line 12. |
| | The coreMeter is a network communications monitor. |
| | The coreMeter includes a central processing unit. *See* Complaint Ex. G, coreMeter User Manual, Section 2.2, January 22, 2021, available at https://fcc.report/FCC-ID/2AYHD-A20DC6/5091681; *see also* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 8, lines 7-25 (gateway 110 includes processing circuitry/logic 114 in the form of a commercially available microprocessor). |
| | The central processing unit is at least one processor. |
| | The coreMeter includes a memory storing instructions for execution by the central processor. *See* Complaint Ex. E, U.S. Patent No. 10,032,002, col. 8, lines 32-45. |
| | The memory is a non-transitory computer readable storage medium. |
| detect multiple network communications transmitted on a wireless network within a household via a network gateway, | The instructions stored by the memory of the coreMeter include operational software for wireless networking features, hereinafter "wireless networking software". The wireless networking software is executable to cause the coreMeter to detect each panelist's Internet activity on their associated mobile device and/or computer. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, lines 38-67; col. 43, lines 14-36; Fig. 19. |

29

Exhibit I

| Element of Claim 20 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| | The wireless networking software is executable to cause the coreMeter to operate in a router mode. In the router mode, the coreMeter operates as a wireless access point, such that all wireless traffic for the household goes through the coreMeter. Further, in the router mode, the coreMeter logs the wireless traffic for the household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 42, line 54 – col. 43, line 12. |
| | The coreMeter is a network gateway. And the wireless networking software that is executable to cause the coreMeter to log the wireless traffic for the household that goes through the coreMeter performs instructions that, when executed, cause at least one processor to detect multiple network communications transmitted on a wireless network within the household via the network gateway. |
| wherein the network gateway is configured to route the multiple network communications within the wireless network; | The wireless networking software of the coreMeter interacts with the networking hardware components to provide routing services. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 11, lines 28-49; col. 42, lines 38-67.

Hence, the coreMeter is configured to route the multiple network communications within the wireless network. |
| access panelist data that associates a panelist of the household with a panelist device of the panelist; | The coreMeter stores panelist data that associates (i) a MAC address of a panelist device within a household with (ii) a panelist within the household. When the coreMeter captures web traffic identifying media content presented at a MAC address, the coreMeter determines whether the traffic is associated with the panelist device using the panelist data. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 14-39; Fig. 19.

The wireless networking software that is executable to cause the coreMeter to determine whether the traffic is associated with the panelist using the panelist data performs instructions that, when executed, cause the at least one processor to access panelist data that associates a panelist of the household with a panelist device of the household. |
| determine[,] based on the panelist data, that a network communication of the multiple | The coreMeter determines that identified web traffic is associated with the panelist device by determining that the MAC address associated with the web traffic matches the MAC address of the |

30

Exhibit I

| Element of Claim 20 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| network communications is associated with the panelist device based on a determination that a media access control (MAC) address associated with the network communication matches a MAC address of the panelist device; and | panelist device. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 43, lines 14-39; col. 37, lines 33-36; Fig. 19.<br><br>The wireless networking software that is executable to cause the coreMeter to determine that web traffic is associated with the panelist device by matching the MAC address associated with the web traffic with the MAC address of the panelist device performs instructions that, when executed, cause the at least one processor to determine, based on the panelist data, that a network communication of the multiple network communications is associated with the panelist device based on a determination that a MAC address associated with the network communication matches a MAC address of the panelist device. |
| store data identifying the network communication in association with the panelist. | If web traffic is associated with a panelist's device, the coreMeter associates the identified web traffic with the panelist of the household that is associated with the panelist device. *See* U.S. Patent No. 10,932,002, col. 43, lines 35-39. The coreMeter stores data indicative of this association in the memory. *See* Complaint Ex. E, U.S. Patent No. 10,923,002, col. 42, line 64 – col. 43, line 12; col. 43, lines 34-44; Fig. 19.<br><br>The wireless networking software that is executable to cause the coreMeter to store data indicative of the association between the identified web traffic and the panelist of the household performs instructions that, when executed, cause the at least one processor to store data identifying the network communication in association with the panelist. |

| Element of Claim 21 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| The at least one non-transitory computer readable storage medium of claim 20, wherein the panelist device is a mobile device that is wirelessly | As noted above, the coreMeter is configured to detect consumption of and identify media content presented on various wireless devices within a household. *See* Complaint Ex. E, U.S. Patent No. 10,932,002, col. 7, lines 27-38; col. 11, lines 41-49; col. 37, lines 26-41. |

31

Exhibit I

| Element of Claim 21 | HyphaMetrics, Inc. ("HyphaMetrics") |
|---|---|
| connected to the wireless network. | |

Exhibit I

# EXHIBIT J



ad exchanger

## MUST READ



**PODCAST: ADEXCHANGER TALKS**
It's Time To Defund Misinformation And Take A More Rational Approach To Brand…



**ONLINE ADVERTISING**
Working With Buyers Isn't The Only Way For SSPs To Stand Out From Competitors



**ON TV AND VIDEO**

# Alt Panel Provider HyphaMetrics Is On A Mission To Democratize TV Measurement



**By Allison Schiff**

Thursday, November 4th, 2021 – 12:35 am



**Joanna Drews,
CEO & Cofounder**

❋ HyphaMetrics

Nielsen's panel woes mean alternative measurement providers are having their moment.

"We're getting a lot of inbounds," said Joanna Drews, CEO and co-founder of HyphaMetrics, a measurement startup that launched last year and now has a panel that's working to scale to 5,000 homes and roughly 15,000 devices.

But the recent wave of interest in new cross-media measurement approaches is about more than Nielsen undercounting audiences during the pandemic or the fact it lost its Media Rating Council accreditation for local and national TV measurement in late August as a result.

"The buy side and the sell side have both been investing to better understand consumer behavior, because the options they have aren't providing the information necessary to make the right business decisions," Drews said. "The pandemic added fuel to the fire – but the frustration was brewing for many years."

HyphaMetrics tracks person-level media usage across devices through a piece of hardware it calls the coreMeter, which is a box that serves as a hub for HDMI feeds emanating from TV sets, set-top boxes and gaming consoles. The coreMeter uses a proprietary measurement approach to analyze each feed, including IP traffic on the router, which HyphaMetrics in turn uses to generate metrics, such as who's watching what content in real time and a deduplicated view of consumption for individuals in a household across devices.

Drews, a Comscore and GroupM vet, founded HyphaMetrics in November 2020 with $2 million in pre-seed funding. Former GroupM colleague Michael Bologna now serves as the company's president and CRO.

In mid-October, HyphaMetrics struck a partnership to integrate its panel data into VideoAmp's measurement solution.

Drews spoke with AdExchanger.

ADVERTISEMENT

**AdExchanger: What's unique about your approach?**

JOANNA DREWS: One of the main things that makes us different from Comscore or Nielsen or any walled garden or data platform out there is that, unlike them, we put our data into a marketplace so that everyone can access it.

It's our belief that the data wars will continue and it will only get harder to understand how people consume media. Everyone should be able to speak the same language when it comes to data.

**What are the battle lines in the data wars?**

It's TV versus digital and understanding the convergence between the data sets. What do behaviors look like from a cross-platform standpoint?

But it's also about understanding the entire omnichannel experience, from TV and linear to streaming and video gaming, regardless of whether someone is using a set-top box or an antenna.

**How do you avoid being a black box?**

Our technology is a non-intrusive media player that serves as an intermediary between the TV and all the secondary devices in a home, and we get permission from the household.

The result is what we call zero-party data. It's a layer deeper than first-party data and measures the moment of exposure to media, ads, product placements or content. This allows us to be a source of truth for the industry, like a common language.

**How do you ensure data quality and accuracy?**

In two ways. First, the people in our panel go through a rigorous recruitment process. We use sample surveys, but we also validate everything, including demographic and ethnographic information.

Then we use computer vision and optical character recognition so we can understand what's happening on the glass. It's fed through a machine learning algorithm and parsed by source. If you're watching TV on your Apple TV versus a set-top box versus playing a video game, we apply a different set of rules to address different viewing environments.

We don't listen to audio snippets or make inferences, like, "Oh, this is Seinfeld, season three, episode six, so it could have been playing on any one of these three apps."

**Does the definition of a panel need to change as new data sets come in?**

Panels are changing because of the rise in consumer-facing products. It's great for scale – a panel can never provide that [scale]. But our devices are in the household, so we know who is sitting on the couch.

We take an old-school approach to panels. They need to be representative of the US population, appropriately distributed across the nation and match back to US census data – there are no shortcuts.

**Old school … but what about the blockchain connection? You're also the measurement chair of AdLedger.**

We're part of AdLedger [an independent nonprofit consortium building open-source technical specs for applying blockchain and cryptography to advertising and media] and we recently wrote about pairing panels with blockchain and cryptography.

We already use CryptoRTB [an open-source protocol that relies on the blockchain to validate media transactions and identity in the supply chain] to power our permissions and give access to our panel data. Using cryptography, I think we can get to a world where anyone can be a ratings provider.

**Speaking of the still-dominant ratings provider, though, what do you think of Nielsen's recent struggles?**

There are a lot of reasons this happened: fragmentation, changes in buying behavior and media consumption and, of course, growing frustration on both the buy and the sell side for many years. We're at a point of inflection, and the market is responding. That's why ViacomCBS is using VideoAmp and NBCU put out its RFP.

Currency providers of the future will not be the most powerful black box in town. We'll see a more democratized situation with multiple data players and providers to help brands meet specific objectives. We're already seeing buyers and sellers moving in that direction.

**One year from now, is Nielsen still the primary currency for TV and video?**

A year from now, we'll see more of the same. Nielsen isn't going anywhere, and companies like VideoAmp will make more announcements.

What I'm curious about is three to five years from now — by then we could see a drastic change. I'm not sure who will lead it or if we'll have multiple currencies, but I do know that change is coming. Things are going to get very interesting.

*This interview has been edited and condensed.*

## RELATED STORIES



ON TV AND VIDEO

**CTV Publishers Can Learn A Lot From Linear TV Ads (Really)**

Joe Hirsch,



PODCAST: ADEXCHANGER TALKS

**Blazing An Alternative Measurement Trail With WarnerMedia's Andrea Zapata**



DIGITAL TV AND VIDEO

**Nielsen, Comscore And VideoAmp CEOs Debate Measurement At IAB ALM**



DIGITAL TV AND VIDEO

**Nielsen And VideoAmp Don't Agree On Much — But They Do Agree On MRC Accreditation**

## ENJOYING THIS CONTENT?

Sign up to be an AdExchanger Member today and get unlimited access to articles like this, plus proprietary data and research, conference discounts, on-demand access to event content, and more!

JOIN TODAY!

1 comment

Add a comment

# 1 Comment

1. *Josh Chasin* November 5, 2021

   Joanna, Gerardo, Michael, and unsung hero Chuck Shuttles have done a great job at HyphaMetrics designing a 21st century panel to enrich and enhance the big data measurement that companies like ours are providing. VideoAmp is thrilled to be working with Joanna and the whole Hypha team.